**VITAL PHARMACEUTICALS, INC.**,

      **Plaintiff**,

v.

**MONSTER ENERGY COMPANY**, *et al.*,

      **Defendants**.

_____/

## ORDER

**THIS MATTER** comes before the Court upon the Plaintiff's Renewed Expedited Motion for Preliminary Injunction (the "Motion") [ECF No. 43], the Defendants' Opposition to the Plaintiff's Motion for Preliminary Injunction (the "Opposition" or "Opp.") [ECF No. 63], and the Plaintiff's Reply Memorandum in Support (the "Reply") [ECF No. 79]. This Order resolves only the Motion and should not be taken as a judgment on the merits of VPX's claims. The Court has carefully reviewed the Motion, the parties' briefs, the record, and the applicable law. For the reasons that follow, the Motion is **DENIED**.

## THE HISTORY

This case arises from a dispute between the Plaintiff, Vital Pharmaceuticals, Inc. ("VPX"), and the Defendants, Monster Energy Company and Reign Beverage Company, LLC ("Monster"), over Monster's alleged infringement of VPX's trade dress for its BANG product. VPX and Monster are competing manufacturers of energy drinks. *See* Complaint ¶ 13; Opp. at 3. In its Complaint for Damages and Injunctive Relief (the "Complaint") [ECF No. 1], VPX brings claims against Monster for trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a) (Count I); trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Count II); unfair competition

under the Lanham Act, 15 U.S.C. § 1125 (Count III); Florida common law trade dress infringement and unfair competition (Count IV); Florida common law trademark infringement (Count V); and a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204 (Count VI). Complaint at 26–32.

VPX now seeks a preliminary injunction as to all but Count II.[1] *See* Motion at 6, 21. Specifically, VPX asks this Court to enjoin Monster from: 1) using VPX's BANG trade dress or "any trade dress that is confusingly similar to or a colorable imitation of" its BANG trade dress; 2) "doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the source of the products offered or distributed by" Monster, "or likely to confuse members of the public or prospective customers into believing that there is some connection between" VPX and Monster; 3) "otherwise competing unfairly with [VPX] in any manner"; and 4) "assisting, aiding, or abetting any other person or business entity" from doing so. [ECF No. 43-9]. In addition to their briefs, the parties have submitted numerous exhibits and multiple declarations. The Court also held a hearing on July 25, 2019, at which the parties presented their oral arguments. [ECF No. 96].

## THE FACTS

VPX launched its BANG energy drink in October 2012. Complaint ¶ 24. VPX avers that, "[u]nlike most energy drinks, BANG contains zero sugar, no calories, no carbohydrates, and no artificial colors." Motion at 3. BANG—which contains certain "performance ingredients," such as branched chain amino acids ("BCAAs") and CoQ10, *id.* at 3, 14—comes in over 20 flavors. *Id.* at

---

[1] As VPX recognizes, its state-law claims turn on the same "likelihood of confusion" analysis that animates its Lanham Act claims. Motion at 21. As such, for the reasons detailed in this Order, VPX has failed to meet its burden to show that it is entitled to a preliminary injunction on its state-law claims.

4. According to VPX, it has been continuously using its BANG trade dress since "as early as October 2015." *Id.* at 3. Importantly, VPX defines its BANG trade dress as containing the following "purely aesthetic, non-functional features" set against a 16-oz. black aluminum can:

> (a) a contrasting, flavor-dependent, bold, brightly-colored design for the rest of the can on a black background; (b) a large, stylized "b" logo [] in the same bold, bright color(s) as the rest of the color(s) on the can, appearing horizontally, covering the top portion of the primary panel of the can; (c) the performance ingredients "BCAA AMINOS," "SUPER CREATINE®" and "ULTRA COQ10" in all upper case letters spanning the rim adjacent to the top of the can; (d) the product name "BANG" in a stylized font in the same bold, bright color(s) as the rest of the color(s) on the can, appearing horizontally, covering the bottom portion of the primary panel of the can; (e) the tagline, "POTENT BRAIN AND BODY FUEL," in contrasting white/silver immediately below the product name "BANG," appearing horizontally, covering the bottom portion of the can; (f) the inventive flavor designation in all capital letters in the same bold, bright color(s) as the rest of the color(s) on the can, appearing horizontally, below the tag line in the bottom portion of the can, and (g) the "0 CALORIES PER CAN" designation, outlined in a white box, on the bottom corner of the front of the can[.]

Complaint ¶ 20; Motion at 3–4.

Below is a demonstrative VPX submitted of its black-can BANG energy drinks:





[ECF No. 43-2] at 4.

Here is the full line of BANG energy drinks:



[ECF No. 63-3] ¶ 41.

Monster launched its MONSTER energy drink, sold in a black 16-oz. aluminum can, in 2002. Opp. at 3. In January of 2019, Monster announced a new line of energy drinks, REIGN, which launched nationwide in March of this year. *Id.* at 3–4. REIGN, like BANG, contains no sugar, no calories, no carbohydrates, and includes performance ingredients, such as BCAAs and CoQ10—though apparently in higher amounts. Motion at 14; [ECF No. 63-3] at 79.

Below is a demonstrative of VPX's BANG alongside Monster's REIGN:



[ECF No. 79] at 3.

Monster's MONSTER alongside Monster's REIGN:



[ECF No. 63-3] ¶ 19.

Several other companies likewise sell their energy drinks in a black 16-oz. aluminum can.

*See* [ECF No. 63-3] ¶ 43:



In the Complaint, VPX alleges that JHO Intellectual Property Holdings, LLC, owns the REIGN trademark, and that the mark has been in continuous use since February 1, 2015. Complaint at ¶¶ 39, 41. Monster counters that VPX did not launch a product with the REIGN trademark until April of 2019—after Monster launched REIGN. *See* Opp. at 17 n.6; [ECF No. 63-5] ¶¶ 3–8, Exs. 1-6. VPX's REIGN is shown below:



Complaint ¶ 41.

## THE LAW

A preliminary injunction is an "extraordinary and drastic remedy[.]" *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).[2] To secure a preliminary injunction, a party must show: "(1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) the injury outweighs whatever damage an injunction may cause the opposing party; and (4) an injunction is not adverse to the public interest." *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1217 (11th Cir. 2009). Notably, the movant bears the "burden of persuasion" to "clearly establish[]" all four of these elements. *Siegel v. LePore*, 234

---

[2] Unless otherwise noted, emphasis has been added and internal citations and quotation marks have been omitted.

F.3d 1163, 1176 (11th Cir. 2000). Because all four elements are required to obtain a preliminary injunction, "failure to meet even one" is fatal. *Wreal*, 840 F.3d at 1248.

**ANALYSIS**

VPX has failed to meet *any* of the elements of a preliminary injunction. The Court addresses each in turn.

### A.  Substantial Likelihood of Success on the Merits

To bring a successful trade dress infringement claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must prove that: "1) its trade dress is inherently distinctive or has acquired secondary meaning, 2) its trade dress is primarily non-functional, and 3) the defendant's trade dress is confusingly similar." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986). "Trade dress is a complex composite of features and the law of unfair competition in respect to trade dress requires that all of the features be considered together, not separately." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012). "The features may include size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.*

### i.  Distinctive Trade Dress

There are two ways in which a movant may show that its trade dress is distinctive. First, "[s]ome trade dress, 'because its intrinsic nature serves to identify a particular source of a product, is deemed inherently distinctive.'" *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 578 (1992)). Second, "trade dress, though not inherently distinctive, can become distinctive if it acquires 'secondary meaning, which occurs when, in the minds of the public, the primary significance of trade dress is to identify the source of the product rather than the product itself.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000)).

Like trademarks, trade dress may be classified as generic, descriptive, suggestive, arbitrary, or fanciful—with a finding of inherent distinctiveness becoming more likely as one moves towards the suggestive or arbitrary end of the spectrum. *See AmBrit*, 812 F.2d at 1537; *see also Carillon Importers Ltd. v. Frank Pesce Grp., Inc.*, 913 F. Supp. 1559, 1563 (S.D. Fla. 1996). To determine whether a trade dress is inherently distinctive, courts must consider "whether it is a common basic shape or design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." *Miller's Ale House*, 702 F.3d at 1323 (quoting *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983)).

Simply put, a jury could easily find that VPX's trade dress, as defined, is not inherently distinctive. In fact, the most distinctive feature of the BANG cans—the contrasting "U" shape on the bottom of the can—is not even included in VPX's definition (perhaps because this feature does not appear on Monster's REIGN). *See* [ECF No. 43-1] at 12. The remaining features amount to a "mere refinement" to a "commonly-adopted and well-known form of ornamentation" for energy drinks. The black[3] 16-oz. can with a stylized, bold, brightly colored logo, a horizontal product name in a stylized font, capitalized descriptive wording below the product name, and capitalized ingredients spanning the upper rim of the can—*i.e.* the "overall impression"—appears to have been employed to "dress" energy drinks since at least 2002. *See* Opp. at 1; [ECF No. 63-3] at Ex. 10. Indeed, many companies employ these (or very similar) design elements. *See* [ECF No. 63-3]

---

[3] There is evidence that VPX's BANG is also sold in cans that do not have a black background, *see* [ECF No. 43-2] at Exs. 3–5, 7. Despite this evidence, the Court has given VPX the benefit of the doubt by treating its black cans as a class or series of their own for purposes of evaluating inherent distinctiveness in this expedited proceeding.

¶¶ 43–44. As such, at this early stage of the proceedings, this Court cannot say that "the design, shape or combination of elements [here] is so unique, unusual or unexpected in this market that [this Court] can assume without proof that it will automatically be perceived by customers as an indicator of origin[.]" *Miller's Ale House*, 702 F.3d at 1324 (finding restaurant's trade dress was not inherently distinctive because "[t]he particular name affixed on the wall and to menu items, the specific color of the polo shirts, the type of wood on the walls, the placement of the 'high-top' tables, and the openness of the kitchen, 'even if they in combination could be deemed unique,' . . . are all 'mere refinements' of this 'commonly-adopted and well-known form of ornamentation'"); *Tempur-Pedic N. Am., LLC v. Mattress Firm, Inc.*, 18-CV-2147, 2019 WL 2255022, at *4–5 (M.D. Fla. Jan. 11, 2019) (finding "the 'overall look and feel' of the Tempur-Pedic Trade Dress [to be] merely a refinement of commonly-adopted and well-known practices of mattress retailers to display their products" where "the record show[ed] that different mattress companies, including the parties, use[d] similar elements individually and in composition to display and sell their mattresses").

VPX relies heavily on three district court opinions: *Carillon*, 913 F. Supp. 1559; *Uptime Energy, Inc. v. Up Energy Drinks LLC*, 17-CV-04396-JFW, 2017 WL 10440012 (C.D. Cal. Nov. 16, 2017); and *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 08-CV-10983, 2008 WL 1735371 (E.D. Mich. Apr. 14, 2008). But each of these cases involved the "unique" or "unusual" combination the Eleventh Circuit has described as inherently distinctive. In *Carillon*, for instance, the court found the use of a "conventionally shaped, clear glass wine bottle" *for vodka* to be "[u]nlike the intricately shaped bottles of . . . other vodkas in evidence," and this shape, along with the product's labeling and color scheme, was, the court concluded, "a fanciful addition to the vodka market." *Carillon*, 913 F. Supp. at 1564. Similarly, in *Uptime*, the court determined that a "tall,

slender re-sealable aluminum bottle" was "particularly unique when compared to other energy drinks on the market." *Uptime*, 2017 WL 10440012, at *10. Here, by contrast, there is nothing particularly unique about the use of a 16-oz. aluminum can with bright, bold colors on a black background. To the contrary, as the Court has explained, these elements appear to be quite common in the energy drink industry. *See* [ECF No. 63-3] ¶¶ 43–44 (comparing various 16-oz. black aluminum can energy drinks). Finally, in *Innovation Ventures*, the court found the "5 Hour Energy" drink packaging inherently distinctive because "the color scheme, fonts, and *most significantly the graphical depiction of the landscape and figure*," taken together, constituted a protectable product image. *Innovation Ventures*, 2008 WL 1735371, at *6. In other words, "5 Hour Energy" created a unique mosaic; it did not, as here, simply add its logo to a common theme. *Accord Hard Rock Cafe Int'l USA, Inc. v. RockStar Hotels, Inc.*, 17-CV-62013, 2018 WL 7825183, at *18 (S.D. Fla. June 13, 2018) (explaining that, despite the presence of the plaintiff's logo, "[i]t is the trade dress itself . . . that must be an inherent indicator of origin, meaning consumers must identify [the company] from these design elements").

VPX also says that its trade dress has acquired secondary meaning. Motion at 8–10. But, again, secondary meaning "occurs when, in the minds of the public, the primary significance of trade dress is to identify the source of the product rather than the product itself.'" *Miller's Ale House*, 702 F.3d at 1322 (quoting *Wal-Mart Stores*, 529 U.S. at 211). In analyzing a secondary meaning claim, "consumer surveys are recognized as the most direct and persuasive evidence of secondary meaning." *Id.* Other factors courts may consider include: 1) the length and manner of use; 2) the nature and extent of advertising and promotion; 3) the efforts made by the plaintiff to promote a conscious connection with the public's mind between the trade dress and the plaintiff's product; and 4) the extent to which the public actually identifies the trade dress with the plaintiff's

product. *See Vital Pharm., Inc. v. Am. Body Bldg. Products, LLC*, 511 F. Supp. 2d 1303, 1311 (S.D. Fla. 2007). VPX has not submitted even a single consumer survey to establish that, "in the minds of the public, the primary significance of [its BANG] trade dress is to identify the source of the product rather than the product itself." *Miller's Ale House*, 702 F.3d at 1322.[4]

In lieu of survey results, VPX relies principally on evidence of its advertising efforts, on a collection of social media posts from its customers, and on stories in the news. Motion at 9–10. But an examination of VPX's promotional submissions reveals that VPX does not consistently feature its trade dress—at least not in the way it has defined that trade dress here. As an example, several featured cans use a colored background, instead of black. *See, e.g.*, [ECF No. 43-2] at 91 (featuring cans with red/pink and blue backgrounds), 116 (VPX Jeep featuring cans with red backgrounds); [ECF No. 43-5] at 38 (retail display featuring cans with white and yellow backgrounds); [ECF No. 63-2] ¶ 13 (VPX Jeep featuring can with pink background), ¶ 56 (VPX vending machine featuring cans with pink, blue, white, and yellow backgrounds). This variability necessarily leaves a very different overall impression than the trade dress VPX has described. And this lack of consistency in presentation weighs heavily against a finding of secondary meaning. *See Hard Rock*, 2018 WL 7825183, at *18 ("The mere presence of advertising does not create secondary meaning 'when it is not directed at highlighting the trade dress.'"). Moreover, "[m]erely featuring" the trade dress in advertising "is no more probative of secondary meaning than are strong sales[.]" *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 44 (1st Cir. 2001) ("[T]o provide protection based on extensive advertising would extend trade dress

---

[4] VPX certainly could have afforded the survey. In fact, in this case, it paid an expert $500 an hour to conduct a likelihood of confusion study. *See* [ECF No. 43-8] at 2.

protection to the label (or to the combination claim) without any showing that the consumer associated the dress with the product's source.").

Similarly, the social media posts from VPX's customers—often just a picture of the product—simply show that these consumers liked the product, that they noted its flavor, and that it provided an energy boost, etc. What they fail to show, however, is any consistent reliance either upon the actual features of the trade dress or on VPX as the source of that dress. *See* [ECF No. 43-2] at 39–88. In other words, a jury could easily find that the social media commentary does not support VPX's claim to secondary meaning.

Finally, VPX points the Court to its press coverage. Motion at 9. These articles may show that VPX's BANG product is recognized as a success—that is not in dispute; but these articles do not discuss, highlight, or otherwise note any of the features of VPX's claimed trade dress[5]—let alone any connection in consumers' minds between the BANG trade dress and VPX. *See, e.g.*, Complaint ¶¶ 53–59; [ECF Nos. 1-3, 1-4, 1-5].

On this record, in short, VPX has not shown a substantial likelihood of its proving either that its trade dress is inherently distinctive or that it has otherwise acquired secondary meaning. In other words, VPX has failed to establish that it is likely to succeed on the merits—and, therefore, a preliminary injunction is unwarranted.

### ii. **Functionality**

Even if VPX could show a substantial likelihood of success as to BANG's distinctiveness, its request for a preliminary injunction would still be denied because it has failed to satisfy the

---

[5] An article by David Marino-Nachison of Barron's does, it is true, describe VPX's "Rainbow Unicorn" BANG drink as "distinctive" and "a top seller." But this can is "clad in sky blue and pink"—not the 16-oz. black aluminum can at issue here. *See* [ECF No. 43-2] at 8, 133; Motion at 3.

second prong of a trade dress claim—functionality. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1202–03 (11th Cir. 2004). Functional features, by definition, are those "likely to be shared by different producers of the same product and therefore are unlikely to identify a particular producer." *Id.* at 1203.

The Eleventh Circuit has set out two tests for evaluating functionality. *First*, the "traditional test" finds a product feature functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id. Second*, the "competitive necessity test," most often applied in cases of aesthetic functionality, finds a product feature functional where its "exclusive use [] would put competitors at a significant non-reputation-related disadvantage." *Id.* If the design is functional under the traditional test, "there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* "The line between functionality and non-functionality is not brightly drawn." *Id.*

VPX argues that its trade dress is non-functional because its design "consists purely of aesthetic elements." Motion at 11. Monster counters that, because VPX uses its colors to identify a drink's flavor, the trade dress is necessarily functional. Opp. at 13–14. Indeed, the Eleventh Circuit has held that flavor-identifying color is an "aesthetic function[]" that "easily satisf[ies] the competitive necessity test." *Dippin' Dots*, 369 F.3d at 1204 n.7. While VPX is right that its flavor-dependent colors are only one feature of its trade dress, Reply at 2, an overall examination of the trade dress suggests a purposefully functional conveyance of flavor. *See, e.g.*, [ECF No. 43-2] at Ex. 1 (pink for cotton candy). As VPX seems to concede, it is "claiming trade dress in the *entire* contrasting, *flavor-dependent* . . . design." Motion at 11 n.7.

VPX points to *CytoSport, Inc. v. Vital Pharm., Inc.*, where the Eastern District of California, applying the Ninth Circuit's functionality standard, concluded that the trade dress of a protein drink was non-functional, despite its use of a "colored swirl" to indicate flavor. 617 F. Supp. 2d 1051, 1078–79 (E.D. Cal. 2009). But, unlike in *CytoSport*, where the color indicating flavor was only a small portion of the overall impression, *see id.*, the BANG trade dress employs flavor-corresponding color throughout the *whole* can (excluding the black background, of course). Because the overall impression of BANG's trade dress conveys the flavor of the drink, a jury could find that the trade dress is, in fact, functional. *See Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1329 (Fed. Cir. 1999) (finding functionality where company "used color coding to indicate diopter strength, not to indicate source"); *see also Carillon*, F. Supp. 1563 (noting "industry custom" to package "lime-flavored soda in a green twelve-ounce can"); *Sharn, Inc. v. Wolfe Tory Med., Inc.*, 09-CV-706-T-33AEP, 2009 WL 3416503, at *7 (M.D. Fla. Oct. 19, 2009) ("[F]eatures which are likely to be shared by different producers of the same product are likely functional and unlikely to identify a particular producer."). For this reason, too, then, a preliminary injunction is unwarranted.

### iii. Likelihood of Confusion

Finally, VPX has failed to "clearly establish" any likelihood of confusion. "The touchstone test for a violation of § 43(a) is the likelihood of confusion resulting from the defendant's adoption of a trade dress similar to the plaintiff's." *AmBrit*, 812 F.2d at 1538. In determining whether a likelihood of confusion exists, courts must consider: (1) the strength of the plaintiff's trade dress; (2) the similarity of the products' designs; (3) the similarity of the products themselves; (4) the similarity of the parties' trade channels and customers; (5) the similarity of the advertising media used by the parties; (6) the defendant's intent; and (7) the existence and extent of actual confusion in the consuming public. *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279,

1289 (11th Cir. 2018). An eighth factor, "the degree of care purchasers are likely to exercise," may also be considered. *Bauer Lamp Co., Inc. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir. 1991). "The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists." *AmBrit*, 812 F.2d at 1538. Instead, "a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision." *Id.* "The appropriate weight to be given to each of these factors varies with the circumstances of the case." *Id.*

### 1. Strength of the Trade Dress

The first confusion factor examines the strength of the trade dress. VPX says that its trade dress is strong because "the unique combination of the design elements comprising the BANG Trade Dress sets BANG apart from existing energy drinks." Motion at 13. This is essentially the same argument VPX offered for the proposition that its trade dress was inherently distinctive. But, as discussed above, VPX has not included in its definition of BANG's trade dress the most distinctive—that is, the strongest—feature of its dress. And the other features of that dress—as the Court has explained, *supra* Section III.A.i.—is a "mere refinement" to a "commonly-adopted and well-known form of ornamentation" for energy drinks. Put another way, a jury is not likely to find that VPX's trade dress is particularly strong.

### 2. Similarity of Design

"The second factor in the likelihood-of-confusion analysis requires the factfinder to compare the plaintiff's [trade dress] with the defendant's [trade dress] and measure their similarity." *Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242, 1260 (11th Cir. 2016). "The greater the similarity, the greater the likelihood of confusion." *Id.* In comparing similarity, courts must "consider the overall impression created by the [trade dresses],

and [] not simply compare isolated features." *Id.* Importantly, "[i]f a trademark operates in a crowded field of similar marks on similar goods or services, slight differences in names may be meaningful because consumers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Id.*

VPX contends—and the evidence suggests—that VPX's BANG and Monster's REIGN often appear in close proximity to each other in the marketplace. Motion at 13; Reply at 3; *see, e.g.*, [ECF No. 43-6] at 5–9. Of course, while this proximity could accentuate the two drinks' similarities, it might also amplify their overall differences. So, for example, VPX's "b" logo, stylized with a cross-hair, is difficult to confuse with REIGN's insignia of a large spartan mask— even in a fast-paced, crowded supermarket. *See* [ECF No. 43-1] at 12. And the prominence of these distinct logos weighs strongly against confusion. *See Nora Beverages, Inc. v. Perrier Grp. of America, Inc.*, 269 F.3d 114, 122 (2d Cir. 2001) ("Labels can be integral, if not dispositive, factors in determining overall similarity of trade dress."); *Vital Pharm.*, 511 F. Supp. 2d at 1316 (finding, in a case of competing nutritional supplement beverages, that "the presence of two distinct labels negates any likelihood of confusion"). Moreover, the product names, while similarly placed, do not use either the same font or similar capitalization. *See* [ECF No. 43-1] at 12. Finally, the tops and bottoms of the cans—which contribute to the overall image—are markedly different. In this respect, again, BANG's trade dress includes a contrasting "U" shape on the bottom of the can, which rounds off the background portion of the can and gives it a distinctly bullet-like affect. This "U"-shaped design, of course, appears nowhere on the REIGN can and thus weighs strongly against a finding of potential confusion. *Id.* Likewise, the writing on the top rim of the BANG can—on which the drink's "performance ingredients" are listed—is set to a colored background, whereas the rim of the REIGN can juxtaposes similar writing against a black background. *Id.* These

16

elements—the different logos, the contrasting product names and dissimilar stylization, and the divergent designs for the top and bottom portions of the cans—combine to convey very different overall impressions. And so, while there are, to be sure, similarities between the two cans, a jury could easily conclude that those similarities are outweighed by the many clear differences between them. This factor, in short, militates against a finding of likely confusion.

### 3. Similarity of the Product

Monster admits that both products are similar, *see* Opp. at 15—and, as such, this factor tilts in VPX's favor.

### 4. Similarity of Retail Outlets and Purchasers

The fourth factor examines the similarity of both the products' retail outlets and their typical purchasers. In this case, both products are sold through many of the same retail outlets—often in the same cooler or on the same retail shelves. *See, e.g.*, [ECF No. 43-1] at 28; [ECF No. 43-6] at 5–9. Additionally, both products target fitness-oriented consumers who are interested in "performance ingredients," like BCAAs and CoQ10. Motion at 14; Reply at 3; [ECF No. 43-1] ¶¶ 66–69. This factor thus likewise weighs in VPX's favor.

### 5. Similarity of Advertising Media Used

The fifth factor requires courts to "compare the parties' advertisements and the audiences they reach." *Florida Int'l Univ.*, 830 F.3d at 1262. "The greater the similarity, the greater the likelihood of confusion." *Id.* "[I]dentity of advertising methods" is not required; rather, "the standard is whether there is likely to be significant enough overlap in the audience of the advertisements that a possibility of confusion could result." *Id.*

VPX contends that both companies market their products through their respective "website[s], retailer's [sic] websites, and social media outlets." Motion at 16. But, as Monster

correctly points out, this evidence "falls far short of suggesting that the parties' advertising methods are similar." Opp. at 15–16.

In evaluating this fifth factor, the key question is whether there is "significant enough overlap in the audience of the advertisements that a possibility of confusion could result." *Florida Int'l Univ.*, 830 F.3d at 1262. And, as the Eleventh Circuit has explained, a party's use of its own website "would dispel rather than cause confusion . . . because the websites are separate and distinct, suggesting two completely unrelated business entities." *Tana v. Dantanna's*, 611 F.3d 767, 778 (11th Cir. 2010); *accord Hard Rock*, 2018 WL 7825183, at *14 ("[M]ere common use of the internet and social media as promotional platforms fails to demonstrate a likelihood of consumer confusion.").

Monster does not dispute that it recently hired one of VPX's former "brand ambassador[s]," *see* Opp. at 15—though the record does not reveal how much overlap there is between this ambassador's current target audience and the audience she targeted while she was with VPX. *See* [ECF No. 43-1] ¶ 72. Nor does Monster disagree that the parties attend some of the same trade shows, *see* Opp. at 15-16, such as the "SE Petro Food Expo" and the "National Association of Convenience Stores Show," *see* [ECF No. 43-1] ¶ 71. But, again, the record does not suggest that *consumers*—as opposed to retailers and wholesalers—actually attend most of these shows. And, given that Monster employs many other avenues for advertising its REIGN product, *see* Opp. at 15–16; [ECF No. 63-3] ¶ 27, the Court cannot, at this stage, conclude that a jury is likely to find a significant overlap between the products' audiences. This factor, then, weighs against a finding of likelihood of confusion.

### 6.  The Defendant's Intent

"If it can be shown that a defendant adopted a plaintiff's [trade dress] with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." *Florida Int'l Univ.*, 830 F.3d at 1263. In VPX's view, this Court should, for three reasons, infer that Monster intentionally copied VPX's trade dress: 1) Monster was "well aware of BANG (and VPX's intellectual property rights therein) prior to adopting" REIGN's trade dress; 2) "an intent to copy can be inferred from similarity between products"; and 3) Monster has taken pains to ensure that REIGN appears next to BANG in the marketplace. *See* Motion at 16–17. These arguments are unpersuasive.

*First*, VPX offers no support for its assertion that Monster's awareness of VPX's product shows an intent to copy VPX's trade dress. *Second*, while an intent to copy may be inferred from the products' similarity, there are, as discussed, salient differences between the products' trade dresses. And, since Monster's ENERGY and its REIGN products are likewise similar, VPX has failed to show that Monster's intention—if it was copying anything—was to copy BANG, rather than ENERGY. *See* Opp. at 2. *Third*, a jury could easily find that Monster's alleged efforts to have REIGN placed next to BANG on retail shelves reveal only its intent to compete with, not to infringe upon, VPX's product. *See* Opp. at 15 (REIGN competes directly with BANG). Notably, this factor turns, not on whether Monster copied aspects of BANG's trade dress, but on whether Monster "copie[d] a design *intending to cause confusion*[.]" *Yellowfin*, 898 F.3d at 1293. VPX has not shown that a jury is likely to find this—rather than some other, more innocuous—intent. As such, this factor weighs against VPX.

### 7. Actual Confusion

"Evidence of confusion by actual or potential customers is, of course, the best evidence of a likelihood of confusion." *Florida Int'l Univ.*, 830 F.3d at 1264. When assessing evidence of actual confusion, a court "must consider who was confused and how they were confused[.]" *Id.* "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight," while "confusion of actual customers of a business is worthy of substantial weight." *Id.* To amount to infringement, "a junior user's trade dress" must do more than "merely call[] to mind that of the senior user." *Yellowfin*, 898 F.3d at 1295.

VPX has submitted many examples of what, it says, are instances of actual confusion. But, upon careful examination, this evidence falls short of "clearly establishing" actual confusion at this early stage of the proceedings.

*First*, much of VPX's evidence shows only that consumers routinely note similarities between the products—notations that highlight just how much consumers understand the products' salient differences. *See, e.g.*, [ECF No. 43-3] at 42 ("I'll be honest I saw [Monster's REIGN] cans today and *thought* they were new ones for bang."), 70 ("Reign has no originality knock off bang"), 73 ("Just a pathetic BANG knock off!"), 80 ("I mistook it for bang until i got closer."), 84 ("Seriously I almost grabbed one and got pissed when I saw it wasn't a bang. It's another crap 'fake energy' drink."). Whatever else they are, these consumers are *not* confused. Similarly, although some consumers group BANG and REIGN together, there is no indication that these consumers are confused about the *source* of either product. *See, e.g.*, [ECF No. 81] ¶ 11 ("Bro I shit you not I have had I think five bangs/reigns today"), ¶ 12 ("Millennials drink Bang/Reign energy drinks to sit at a desk for a few hours"), ¶ 17 ("reign and bang are basically the exact same"), ¶ 25 ("Try BANG and REIGN Lots of Caffeine and no Sugar."). After all, given that the

products are direct competitors and that they contain the same amount of caffeine, similar "performance ingredients," and no sugar, it is not surprising that consumers often group them together—much as one would group Coke and Pepsi, Ferraris and Lamborghinis, or CVS and Walgreen's. But that is not tantamount to saying that consumers are confused as to who owns the products—or that they are unable to distinguish between them.

*Second*, a fair number of VPX's examples read as responses from loyal VPX fans to VPX's announcement of its lawsuit against Monster. *See, e.g.*, [ECF No. 43-3] at 49 ("I bought 2 in a quick rush thinking it was a bang[]. The audacity monster has to trick ppl." Response from VPX's CEO: "Unreal - Coke and Monster Colluded to defraud and confuse you and countless other consumers and they were successful."), 60 ("I'm sorry bang [] I cheated. I saw it at the grocery store, not knowing it was monster, and I tried it. Don't worry, it tasted like shit."), 67 ("@bangenergy is WAY BETTER!!! STOP THE SCAM AND MISLEADING PEOPLE @monsterenergy sucksssssss aassss"), 68 ("Drink the original, Drink Bang"), 71 ("Literally pathetic you guys copied bang. Because they were smashing monster. Won't buy this trash out of straight principal [sic] That you couldn't beat so you copied them. #bums"). Indeed, VPX concedes that it "has created a 'cult' following of loyal BANG energy drink consumers." [ECF No. 43-1] ¶ 38. Given this environment, the Court would need more information to evaluate other posts, such as, "I bought a bang from Vons the other day and I'm sitting here drinking it and I just realized this isn't even a bang. . . it's a 'reign' hahaha wtf," [ECF No. 81] ¶ 3, and "Legit, I bought reign and didn't know reign wasn't bang until like a week after drinking it[,]" *id.* ¶ 4. Either way, at this early stage of the litigation, the Court cannot say that a jury would find these examples to be *reliable* evidence of confusion.

VPX's remaining examples of confusion are complicated by the fact that it released its own "REIGN PRE-WORKOUT ENERGY DRINK." Given the similarities between VPX's BANG and its own REIGN, the consumers in question are just as likely to have been confused between the two companies' REIGN products as they are to have been confounded by the similarities between Monster's REIGN and VPX's BANG. *See, e.g.*, [ECF No. 43-3] at 37 (Message from packaging sales representative to VPX's CEO: "Your products are awesome, specifically Bang and Reign[.]"—with no indication that this representative is not referring to VPX's own REIGN product.), 38 ("Alert!!! Guys this is not a Bang product!!! . . . *they actually have a product call* [sic] *reign but this is not from them!!!* Today I was in the supermarket and they literally got me[.]"), 40 (VPX message: "Hello, Reign total body fuel is not associated with us what ever [sic]. Looks very similar, huh?" Consumer response: "*since you guys have a product I try with the same* name I totally thought that was bang"), 43 (Message to VPX's CEO, Jack Owoc: "I ran across a new product (Reign) . . . . Is this one of your brands or is is [sic] a private label / co- packing project?"— with no indication that the author is not referring to VPX's own REIGN product.), 45 ("I'm going to [] sue them for tricking me into thinking Reign was the bang Reign."), 50 ("I bought a Reign drink at the gas station today thinking it was your guys product."), 53 ("Is this the Reign made by the same company as Bang?").

Additionally, VPX has submitted photos of two retail displays with VPX's BANG and Monster's REIGN mixed together. *See* [ECF No. 43-4] at 11–12. VPX adds that it has "heard from retailers that they were confused into believing that the products are the same or somehow affiliated because they look so similar." Motion at 19. But, putting aside this self-serving hearsay, VPX has submitted *no* declarations to support this proposition. *Id.* at 19 n.10. On the other hand, in photos Monster submitted of one of these displays, the products are not intermingled. *See, e.g.*,

[ECF No. 63-10] at 8. And, Monster says, it found no evidence that the second display ever even existed. *See* [ECF No. 63-11] ¶ 5; [ECF No. 63-12] ¶ 5. In either event, since VPX has not submitted a declaration from *any store employees* to support its contention that the products were, as it alleges, intermingled—let alone that any consumers actually ever saw the intermingled displays—the Court cannot say that these displays caused actual confusion.

Finally, the parties rely on dueling studies of consumer confusion. But VPX's study is almost comically flawed, and the Court finds it wholly unreliable. Among other things, the study does not contain a control group—a basic hallmark of any legitimate scientific study—and its design, which compared only black REIGN cans with black BANG cans, grossly distorts actual market conditions (which, VPX concedes, often include multi-colored cans from a variety of sources). *See* [ECF No. 43-8]. Because VPX's study is so woefully deficient, the Court need not even look to Monster's competing analysis. This factor, then, militates strongly against a finding of actual confusion.

### 8. Degree of Care Purchasers are Likely to Exercise

The eighth and final factor examines the degree of care consumers are likely to exercise before purchasing the product. VPX argues that energy-drink consumers are more likely to be confused because they are doing nothing more than purchasing a relatively inexpensive, "single-serving" beverage in a supermarket. Motion at 14. And there is some support for this position. *See, e.g.*, *AmBrit*, 812 F.2d at 1544 (finding higher likelihood of confusion for ice cream novelties); *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1180–81 (C.D. Cal. 2010) (higher likelihood of confusion for bottled water); *CytoSport*, 617 F. Supp. 2d at 1076–77 (higher likelihood of confusion for protein drink).

But, as VPX has emphasized in other contexts, BANG and REIGN both target "fitness-focused" consumers who are interested in "zero sugar," "no calories," and "performance ingredients." Motion at 2–3, 14. The Court is not persuaded that these health-conscious, "fitness-focused" consumers, would exercise so little care in purchasing their desired energy drink. *See Vital Pharm.*, 511 F. Supp. 2d at 1316 ("[S]erious fitness enthusiasts . . . are discerning purchasers."). This factor, in sum, likewise weighs against confusion.

*     *     *     *     *     *

VPX has failed to "clearly establish" any of the elements of its trade dress claim. Accordingly, VPX has not shown that it is likely to succeed on the merits—and, therefore, a preliminary injunction is unwarranted.

### B. Irreparable Injury/Balance of Interests/Public Interest

Since the "failure to meet even one" of the elements required for a preliminary injunction is dispositive, the Court need not address the remaining elements. *Wreal*, 840 F.3d at 1248. Either way, VPX's arguments on these other elements are all premised upon its view that it is likely to succeed on the merits—specifically, that it has established a likelihood of confusion. *See* Motion at 22–25. But, because VPX has failed to "clearly establish" a substantial likelihood of success on the merits, it cannot meet its burden with respect to the remaining elements either.

### IV. Conclusion

A preliminary injunction is an "extraordinary and drastic remedy[.]" *Wreal*, 840 F.3d at 1247. VPX has not met its "burden of persuasion" to "clearly establish" any—let alone all—of the elements of a preliminary injunction. Accordingly, the Court hereby

**ORDERS AND ADJUDGES** that the Plaintiff's Renewed Expedited Motion for Preliminary Injunction [ECF No. 43] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 16th day of October 2019.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record