**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 19-60809-CIV-ALTMAN/HUNT

VITAL PHARMACEUTICALS, INC.,
d/b/a VPX Sports, a Florida Corporation,

    Plaintiff/Counterclaim-Defendant,

v.

MONSTER ENERGY COMPANY,
a Delaware corporation, and
REIGN BEVERAGE COMPANY, LLC,
a Delaware limited liability company,

    Defendants/Counterclaimants.
_____

MONSTER ENERGY COMPANY,
a Delaware corporation, and
REIGN BEVERAGE COMPANY, LLC,
a Delaware limited liability company,

    Crossclaimants,

v.

JHO INTELLECTUAL PROPERTY
HOLDINGS, LLC, a Florida limited liability
company,

    Crossclaim-Defendant.
_____/

**REPORT AND RECOMMENDATION ON MONSTER ENERGY COMPANY AND
REIGN BEVERAGE COMPANY'S EXPEDITED MOTION FOR PRELIMINARY
INJUNCTION AGAINST VPX'S INFRINGEMENT OF THEIR REIGN TRADEMARK
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    THIS CAUSE is before this Court on Monster Energy Company and Reign Beverage Company's Expedited Motion for Preliminary Injunction Against VPX's Infringement of their Reign Trademark, ECF No. 141.[1] The Honorable Roy K. Altman referred this Motion to the

undersigned for a Report and Recommendation. ECF No. 146; *see also* 28 U.S.C. § 636; S.D. Fla. L.R., Mag. R. 1. The undersigned conducted an evidentiary hearing on this Motion on November 13, 2019. Upon thorough and careful review of the record, oral argument of counsel, and applicable law, the undersigned respectfully RECOMMENDS that Monster Energy Company and Reign Beverage Company's Expedited Motion for Preliminary Injunction Against VPX's Infringement of their Reign Trademark, ECF No. 141, be GRANTED, for the reasons set forth below.

### I. FINDINGS OF FACT

**A.  Monster And Reign Were The First To Use The REIGN Trademark On Energy Drinks**

1. Counterclaimant Monster Energy Company ("Monster") is the developer and distributor of Monster Energy® drinks. ECF 141-1 ¶¶ 4-6.

2. In February 2018, Monster decided to develop a new line of energy drinks under a new name. *Id.* ¶ 7. After nearly a year of research and effort, Monster chose to market these new energy drinks under the name REIGN. *Id.*

3. To facilitate the launch and distribution of REIGN energy drinks, Monster formed a new subsidiary, Defendant and Counterclaimant Reign Beverage Company, LLC ("Reign"). *Id.* ¶ 8.

4. On January 17, 2019, Monster and Reign publicly announced the launch of their REIGN energy drinks. ECF 141-1 ¶ 9; Ex. 1. The announcement was widely covered by the press, which published pictures of REIGN energy drink cans. *Id.* ¶¶ 10- 11; Exs. 3- 6.

5. Monster and Reign began commercial sales of REIGN energy drinks to distributors in nine states in February 2019, with the products appearing in stores shortly

---

[1] The parties submitted proposed findings of fact and conclusions of law. No conclusion should be drawn from the fact that the undersigned has not used certain proposed language.

thereafter. *Id.* ¶ 12. This was followed by sales in additional states through March, and culminated in the nationwide launch of REIGN in all remaining states on March 25, 2019. *Id.*

6.  Pictured below is the current lineup of REIGN energy drinks offered by Monster and Reign.



*Id.* ¶ 14.

7.  These REIGN energy drinks are now sold in more than 159,000 stores nationwide. *Id.* ¶ 16. 83% of sales of REIGN energy drinks are through convenience stores, which are the primary sales channel for all energy drinks. *Id.*

8.  As of the filing of the present motion on November 4, 2019, Monster had spent $42,000,000 in marketing, advertising, and promoting its REIGN drinks. *Id.* Monster and Reign's gross sales of REIGN beverages to distributors have exceeded $165 million, which equates to about $366 million in retail sales value. *Id.*

B.  **VPX Bought A "Reign" Trademark Registration For Dietary And Nutritional Supplements With Knowledge Of Monster And Reign's First Use Of The REIGN Trademark On Energy Drinks**

9.  Dash, LLC ("Dash") is the original applicant and owner of the valid, registered trademark for the word mark REIGN, U.S. Trademark Reg. No. 5,107,809 ("REIGN Registration"). ECF No. 152-2 at Ex. 1.

10.  The REIGN Registration is for the use of the word "REIGN" for the following goods: "dietary and nutritional supplements; dietary and nutritional supplements used for weight loss; dietary supplement drink mixes; herbal supplements; [and] nutraceuticals for

use as a dietary supplement[.]" ECF No. 152-2 at Ex. 1.

11.     On November 12, 2018, Marc Kesten, VPX's in-house counsel, contacted counsel for non-party Dash, LLC about acquiring U.S. Trademark Registration No. 5,107,809. ECF 168-1, Ex. 25. This registration is for the trademark "Reign" for use in connection with "Dietary and nutritional supplements; Dietary and nutritional supplements used for weight loss; Dietary supplement drink mixes; Herbal supplements; Nutraceuticals for use as a dietary supplement." ECF 1, Ex. A. The registration listed Dash as the registrant and that its date of first use of the "Reign" trademark was February 1, 2015. *Id*.

12.     Dash had been using its "Reign" trademark on canisters of powdered nutritional supplements. ECF 141-3, Ex. 11. A picture of one of these canisters taken from Dash's website is shown below.



*Id.* Dash's website indicates that these canisters sold for $59.99 each. *Id.* Dash sold its "Reign" powder primarily through sports nutrition stores, gyms, and fitness centers, but

not through convenience stores. Second Supp. Re Decl., ECF No. 168-1 at 42:1-1. On November 14, 2018, two days after Mr. Kesten first contacted Dash's counsel, Mr. Kesten offered $7,500 for the "Reign" registration. ECF 168-1, Ex. 26.

13. On March 11, 2019, Dash and VPX's affiliate, JHO Intellectual Property Holdings, LLC ("JHO"), executed a "Trademark Purchase And Assignment Agreement." ECF 141-3, Ex. 10. Consistent with the title of the agreement, JHO expressed its interest in the recitals of the agreement in acquiring only Dash's "entire right, title and interest in and to the Mark." *Id.* at 1. The recitals include no language expressing an interest in any other aspect or asset of Dash's business. Similarly, Dash expressed an interest in selling only its trademark and not any other aspect or asset of its business. *Id*.

14. Dash sold and assigned the REIGN Registration to JHO Intellectual Property Holdings, LLC ("JHO") to be licensed for use by Vital Pharmaceuticals, Inc. ("VPX"). *Id.*

15. The substantive provisions of the agreement likewise transfer from Dash to JHO only the "Reign" trademark. *Id.* ¶ 1. The agreement does not purport to transfer any other assets or aspects of Dash's business, except that the agreement does generally recite the transfer of "any goodwill" associated with the "Reign" trademark. *Id.*

16. The agreement did not require Dash to transfer to JHO or VPX the formula or manufacturing process for Dash's "Reign" powdered nutritional supplements, any labels or logos for Dash's "Reign" product, any customer lists for the product, any equipment used to make the product, any technical knowledge about the product, or any other tangible or intangible assets other than the "Reign" trademark registration itself. There is no evidence that any such transfer occurred.

17. Dash's CEO Shellito testified in his deposition that Dash did not transfer anything to VPX other than the "Reign" trademark. ECF No. 168-1 at 177:17-178:13. He testified that Dash transferred no physical assets, formulas, customer lists, or information regarding how to make any type of product. *Id*. Shellito stated that he had no discussions with VPX about selling anything to VPX other than "Just 'Reign,' the five-letter word." *Id.* at 165:20-166:2. Shellito further testified that, after the transfer, "I didn't care what they were doing with" the "Reign" trademark. *Id.* at 163:7-8.

18. There is no evidence that any Dash management personnel or employees assisted JHO or VPX in any way in formulating, manufacturing, or marketing any "Reign" products.

19. On April 1, 2019, Dash announced that it was discontinuing its "Reign" powder and substituting in its place a powdered nutritional supplement called "Slay." ECF 141-3, Exs. 12-13. Also on April 1, an industry publication described "Slay" as having a "similar formula to Reign." ECF 168-1, Ex. 32. Shellito confirmed that Dash was suggesting to its customers that "Slay" is the replacement for "Reign," ECF No. 168-1 at 216:8- 217:13, and that he wanted customers to transition from "Reign" to "Slay." *Id.* at 219:12- 220:22, 222:2-5.

20. No evidence suggests that Dash has ever directed consumers of its "Reign" powdered supplements to VPX to fulfill their needs.

C. **VPX Launches Its Competing "Reign" Energy Drinks**

21. On March 28, 2019, VPX's Owoc announced on Instagram that VPX too would be launching a "Reign" energy drink in competition with Monster and Reign's REIGN energy drinks. ECF 141-3 ¶ 11.

22. VPX began selling its "Reign" energy drinks on its website, www.bang-energy.com, in late April 2019, about a month after it announced the drinks on Instagram. ECF 63-5 ¶¶ 3-8 & Exs. 1-6 thereto. These sales were all made on VPX's website. ECF 163-1 ¶ 25. VPX earned $1,900 in revenue on these few sales representing 158 cases. ECF 163-1 ¶ 24. A picture of this product in its 8-ounce plastic container is shown below.

ECF 141-3 ¶ 10.



23. VPX's "Reign" energy drinks and Dash's "Reign" nutritional supplements have substantial differences. First, VPX's product is a ready-to-drink beverage, while Dash's product was a powder. Second, the ingredients of the two products differ significantly.

25. In October 2019, VPX announced to its distributors that it would be introducing a new line of "Reign" energy drinks. ECF 141-1 ¶ 17 & Ex. 7 thereto. The new line of drinks would be carbonated, unlike the 8-ounce "Reign" energy drink, which was uncarbonated. Additionally, the new line of "Reign" energy drinks would be packed in 16-ounce aluminum cans, the same format as Monster and Reign's REIGN energy drinks. VPX plans to sell its new line of drinks at least through convenience stores, including ampm, 7-11, and Huck's. ECF 141-2 ¶¶ 2-4; ECF 141-5. ¶ 2; ECF 145-4. ¶¶2-3. The picture VPX used to announce its new line of drinks is reproduced below. The sample 16-ounce aluminum can produced by VPX at the hearing is almost identical to those pictured below.



ECF 141-1, Ex. 7 at 2.

26. The ingredients of this new line of "Reign" energy drinks again differ substantially from the ingredients of Dash's "Reign" powdered nutritional supplements.

**D.     The Proceedings in this Court**

27.     On November 4, 2019, Monster and Reign filed this motion for preliminary injunction, seeking to enjoin the launch of VPX's new line of 16-ounce "Reign" energy drinks, and to enjoin all use of the "Reign" trademark in connection with ready-to-drink beverages by VPX. ECF 141. Monster and Reign submitted evidence that VPX was planning to launch its "Reign" energy drinks in February 2020. ECF 141-2 ¶ 4; ECF 141-4 ¶ 3.[2]

28.     The following day, VPX posted a video on Instagram stating that its new "Reign" energy drinks would be available in stores in 10 days, that is, by November 15, 2019. ECF 145-1, Ex. D. In response, on November 7, 2019, Monster and Reign filed a request to treat their motion as an emergency motion, requesting a ruling by November 15. ECF 145.

29.     On November 12, 2019, VPX filed its initial opposition papers. ECF 152.

30.     On November 13, 2019, this Court conducted a hearing on Monster and Reign's motion. At that hearing, VPX explained that the launch of the new line of drinks is imminent, stating: "And in terms of launching we are prepared. We already have orders, pre-orders lined up and we are ready to go." ECF 162 at 12:23-25.[3]

31.     At the hearing, the undersigned requested that the parties attempt to negotiate a temporary compromise that would allow the Court more time to address the merits of Monster and Reign's motion while maintaining the status quo. As a result of those discussions, the parties agreed to the entry of a stipulated order preventing VPX from using the trademark "Reign" or any confusingly similar trademark in connection with any ready-to-drink beverage, except that VPX may continue to offer for sale on the

---

[2] On January 21, 2020, Monster and Reign filed a Motion for an Order to Show Cause Why Plaintiff Should Not Be Held in Contempt, ECF No. 216, with Instagram, Facebook and Bang website posts showing that on January 20, 2020, VPX began marketing, promoting, and offering for sale a ready-to-drink 16-ounce beverage under the name "Reign."

[3] The parties requested an opportunity to provide supplemental briefing and proposed findings of fact and conclusions of law. The Court granted these requests and carefully reviewed same.

internet its 8-ounce Reign Pre-Workout Energy Drink. ECF 154. That order remains in effect until final disposition of Monster and Reign's preliminary injunction motion.

## II. CONCLUSIONS OF LAW

This Court may grant a preliminary injunction upon a showing that (1) the movant has a substantial likelihood of success on the merits of the underlying case; (2) the movant will suffer irreparable harm in the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued; and (4) the injunction would not disserve the public interest. *North American Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008).

### A. Monster And Reign Are Likely To Succeed On The Merits

#### 1. The Parties' Dispute Is Over Ownership Of The REIGN Trademark In Connection With Energy Drinks

To establish a claim for trademark infringement, one must show (1) ownership of the trademark, and (2) the likelihood of confusion of the parties' marks. *Turner Greenberg Assocs. v. C&C Imports*, 320 F. Supp. 2d 1317, 1330 (S.D. Fla. 2004) (citing *Alliance Metals, Inc. of Atlanta v. Hinely Indus.*, 222 F.3d 895, 906 (11th Cir. 2000)).

Here, the parties are in agreement as to the second element – likelihood of confusion. Both parties use the same trademark – REIGN – on the same goods – ready-to-drink beverages. And both parties have accused each other of trademark infringement, alleging that their simultaneous use of the REIGN trademark on energy drinks is likely to cause consumer confusion. Accordingly, the Court finds that consumer confusion is likely and focuses on the first element – ownership of the trademark. *See Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1191 (6th Cir. 1988) (cases involving the same trademark on the same goods are "open and shut").

#### 2. Monster And Reign Are Likely To Prevail On Their Claim Of Ownership

"The first to use a mark on a product or service in a particular geographic market, the senior user, acquires rights in the mark in that market." *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023 (11th Cir. 1989). *See also* J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:4 (5th ed. 2019). Monster and Reign were the first

9

to use the REIGN trademark on ready-to-drink beverages generally, and energy drinks specifically, and thus acquired rights to the REIGN trademark in connection with those goods.

VPX argues that it nevertheless acquired superior rights to the REIGN trademark in connection with ready-to-drink energy drinks when it purchased U.S. Trademark Registration No. 5,107,809 from Dash. According to VPX, as the assignee of Dash's rights, it may rely upon Dash's date of first use of February 1, 2015, and thus VPX pre-dates Monster and Reign's first use. Monster and Reign counter that VPX acquired no rights through the assignment from Dash. Monster and Reign describe the transaction between Dash and VPX as an "assignment in gross" of Dash's "Reign" trademark, and argue that an assignment in gross transfers no trademark rights.

"[T]he transfer of a trademark or trade name without the attendant good-will of the business which it represents is, in general, an invalid, 'in gross' transfer of rights." *Int'l Cosmetics Exchange v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002). *See also McCarthy* §§ 18:2-18:3. As the Second Circuit has explained:

> A trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes. "A trademark only gives the right to prohibit the use of it so far as to protect the owner's goodwill." *Prestonettes, Inc. v. Coty* (1924) 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731; a trademark cannot be sold or assigned apart from the goodwill it symbolizes. *Lanham Act* § 10, 15 U.S.C.S. § 1060. There are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable.

*Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984).

Monster and Reign have made a strong showing that the transaction between Dash and VPX was an assignment in gross of Dash's "Reign" trademark that did not transfer to VPX any of the goodwill associated with Dash's "Reign" nutritional supplements. The courts consider a variety of evidence in assessing whether goodwill was transferred, and all of this evidence strongly suggests that VPX did not acquire, and is not exploiting, Dash's goodwill.

### a. VPX's "Reign" Energy Drinks Are Substantially Different From Dash's "Reign" Nutritional Supplements

"Where a transferred trademark is to be used on a new and different product, any

10

goodwill which the mark itself might represent cannot legally be assigned. The trademark owner does not have the right to a particular word but to the use of the word as the symbol of particular goods." *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 289 (8th Cir. 1969). As the Second Circuit again explained:

> Use of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another. "[T]he consumers might buy a product thinking it to be of one quality or having certain characteristics and could find only too late to be another. To say that this would be remedied by the public soon losing faith in the product fails to give the consumer the protection it initially deserves."

*Marshak*, 746 F.2d at 929 (quoting *Pepsico*, 416 F.2d at 289); *accord Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999).

Even minor changes in the product by the assignee will result in an assignment in gross. *Pepsico*, 416 F.2d at 286, 288 (the purported assignment was an invalid assignment in gross because the defendant-assignee was not using the trademark "on a product having substantially the same characteristics" as the product of the assignor). *See also Archer Daniels Midland Co. v. Narula*, 2001 WL 804025 at *7 (N.D. Ill. 2001) (rejecting the plaintiff's argument that ready-to-drink beverages and powders used to make beverages are substantially similar); *Sugar Busters*, 177 F.3d at 266 (assignment in gross occurred when assignor used the mark on a retail diabetics supply store and assignee used the mark on a book for diabetics); *Atlas Beverage Co. v. Minneapolis Brewing Co.*, 113 F.2d 672, 677 (8th Cir. 1940) (assignment in gross occurred when assignor used the mark on whiskey and assignee used the mark on beer); *Boathouse Grp., Inc. v. TigerLogic Corp.*, 777 F. Supp. 2d 243, 251-52 (D. Mass. 2011) (assignment in gross occurred where the assignor and assignee used the trademark on two different types of software); *Indep. Baking Powder Co. v. Boorman*, 175 F. 448, 455 (C.C.D.N.J. 1910) (assignment in gross occurred when assignor used the mark on alum baking powder and assignee used the mark on phosphate baking powder).

The differences between Dash's "Reign" nutritional supplement powder and VPX's "Reign" energy drinks are quite substantial. As discussed above, Dash's product is a powder, while VPX's product is a beverage. In addition, as also discussed above, the two

11

products share almost no ingredients in common. This factor weighs heavily in favor of finding an invalid assignment in gross.

### b. VPX Received No Assets From Dash

Another factor considered by the courts is whether the assignee purchased any assets associated with the trademark, such as (1) any physical assets used by the assignor in making its trademarked goods, (2) any formulas used to make the trademarked goods, or (3) any customer lists for the trademarked goods. *See Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (CCPA 1978); *Mister Donut of America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969); *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 290 (8th Cir. 1969); *Archer Daniels Midland Co. v. Narula*, 2001 WL 804025 at *7 & n.7 (N.D. Ill. July 12, 2001); *Liquid Glass Enters. v. Liquid Glass Industries of Canada*, 1989 WL 222653 at *5 (E.D. Mich. April 28, 1989); *Greenlon, Inc. of Cincinnati v. Greenlawn, Inc.*, 542 F. Supp. 890, 894 (S.D. Ohio 1982). While the transfer of assets is not always critical, *see Defiance Button Mach. Co. v. C&C Metal Products*, 759 F.2d 1053, 1059 (11th Cir. 1985), it is unlikely that the assignee is exploiting the goodwill of the assignor without the transfer of at least some tangible or intangible assets. This is because, absent the transfer of any such assets, the assignee has left behind everything that the consuming public associated with the assignor's trademark.

No evidence suggests that VPX received Dash's formula used to make Dash's "Reign" nutritional supplements, any technical knowledge relating to the manufacture of this product, any machinery used to make this product, or any customer list relating to this product. To the contrary, Dash's Shellito testified that no such transfers occurred. ECF No. 168-1 at 177:17-178:13. The assignment agreement itself similarly reflects that no such transfer occurred. ECF 141-3, Ex. 10 ¶ 1. Thus, this factor leans heavily in favor of finding an invalid assignment in gross.

### c. Dash Continues To Exploit Its Goodwill Under A New Trademark

The cases also look to whether the assignor has continued to make its original product, even if under a new trademark. *See California Packing Corp. v. Sun-Maid Raisin Growers*, 81 F.2d 674, 678 (9th Cir. 1936) ("A manufacturer cannot make a valid

assignment of a trade-mark and continue the manufacture or sale of the same products in connection with which the trade-mark was used."); *Archer Daniels Midland*, 2001 WL 804025 at *7 (no goodwill transferred where assignor "continues to sell the same products" under a new trademark); *Independent Baking Powder Co. v. Boorman*, 175 F. 448, 451 (C.C.D.N.J. 1910) (assignor discontinued use of the trademark "Solar," "but kept their business and continued to manufacture identically the same powder and sell it under the same symbols under which it had previously been sold, save that they did not use the name 'Solar.'"); *Eiseman v. Schiffer*, 157 F. 473, 475 (C.C.S.D.N.Y. 1907) (assignor "continued to conduct the business in which it has used the mark precisely as it had before, with the single exception that it affixed the mark 'Electra' instead of 'Radium' to the goods it sold.").

When an assignor continues to make its original product under a new trademark, this is a strong indication that the assignor has retained and is continuing to exploit its goodwill by merely transferring that goodwill to its own new trademark, rather than transferring goodwill to the assignee. Where this factor is combined with the assignor's failure to transfer any tangible assets, the inference that no goodwill was transferred is especially strong. *McCarthy* § 18:23.

Here, Dash continues to make a similar powdered supplement under a new name, "Slay." In fact, it appears that Dash has done everything it can to ensure that consumers perceive "Slay" – and not VPX's "Reign" energy drinks – as the successor to Dash's "Reign" powder. As mentioned above, Dash announced on the internet that it was discontinuing Reign, but introducing a new product, "Slay," that has a "similar formula to Reign." ECF 168-1, Ex. 32. *See also* ECF 141-3, Exs. 12-13.

Notably, Dash did not direct its customers to VPX to purchase the "Reign" product they had come to enjoy. Dash did the opposite, telling customers it was still making "Reign" but under a different name, "Slay." This is further evidence that Dash, not VPX, is exploiting the goodwill associated with Dash's "Reign" nutritional supplements. *See Liquid Glass*, 1989 WL 222653 at *5 (assignor informed its customers that its products were available under a new trademark, evidencing an assignment in gross). Accordingly, this factor also weighs strongly in favor of finding an invalid assignment in gross.

      d.    **<u>There Is No Continuity Of Management Between Dash And VPX</u>**

Another factor considered by the courts is "whether there is a continuity of management." *Marshak*, 746 F.2d at 930. If the assignor's management team joins the assignee, this can help ensure that the assignee is able to exploit the assignor's goodwill through use and implementation of the assignor's formulas and quality control procedures. Here, there is no evidence that any of Dash's management team, or any employee with any relevant knowledge, joined VPX. To the contrary, Dash's Shellito confirmed in his deposition that he provided no consulting services to VPX. ECF No. 168-1 at 178:18-179:5.

      e.    **<u>Survey Evidence Further Indicates There Was No Transfer Of Goodwill</u>**

In addition to all of these factors, Monster and Reign have submitted a survey undertaken by their survey expert, Hal Poret. Mr. Poret showed 260 consumers VPX's 8-ounce "Reign" energy drink, and asked them whether they had seen or heard of any other product from the same brand. ECF 141-6 at 25-26. Only eight consumers responded that they had seen or heard of another "Reign" product, *id.* at 26, and none of them identified any kind of powder as that product. *Id.* at 27. Thus, no surveyed consumers viewed VPX's "Reign" energy drinks as coming from the same brand or source as Dash's "Reign" powder.

This survey evidence, too, indicates that VPX is not exploiting or benefiting from Dash's goodwill in the "Reign" trademark. The survey shows that consumers do not perceive the VPX and Dash "Reign" products as coming from the same source. This shows a clear break in continuity between any goodwill associated with the Dash product and any goodwill associated with the VPX product.

      f.    **<u>The Recital Of "Goodwill" In The Assignment Is Entitled To No Weight Given The Substance Of The Transaction</u>**

The Dash/VPX assignment agreement recites that Dash conveys to VPX "any goodwill" associated with the "Reign" trademark. ECF 141-3, Ex. 10 ¶ 1. The courts, however, recognize that a mere recitation of such language is ineffective to actually

14

transfer goodwill. *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 676 (7th Cir. 1982); *Glow Indus. v. Lopez*, 273 F. Supp. 2d 1095, 1108 (C.D. Cal. 2003); *Greenlon*, 542 F. Supp. at 892; *McCarthy* § 18:24. Instead, the courts look to the reality of the transaction, addressing the factors discussed above, including the manner in which the assignee uses the mark, to determine whether the goodwill in fact was transferred. *InterState Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 349 (D.N.J. 2004); *Glow*, 273 F. Supp. 2d at 1108; *Archer Daniels*, 2001 WL 804025 at *6; *Liquid Glass*, 1989 WL 222653 at *5. Despite this recitation of words in the assignment agreement, the undersigned finds that Dash and VPX did nothing to actually transfer any goodwill from Dash to VPX; indeed Dash actively retained all of the actual goodwill associated with its "Reign" supplement. Accordingly, for all of the reasons explained above, the Dash / VPX transaction was an assignment in gross.

### 3. The Wording Of Dash's Trademark Registration Does Not Overcome The Assignment In Gross Rule

VPX argues that the trademark registration it purchased from Dash is broadly worded and encompasses all "nutritional supplements," regardless of form, composition, or format. VPX further argues that its "Reign" energy drinks may be classified as nutritional supplements. Based upon this, VPX concludes that the trademark registration gives it superior rights to market "Reign" energy drinks. This Court disagrees.

"It is elementary that a registrant has rights under the statute only with respect to goods on which the trademark has been used." *Jean Patou, Inc. v. Theon, Inc.*, 9 F.3d 971, 975 (Fed. Cir. 1993). This is so even if the registration is phrased broadly enough to encompass goods that the owner has never sold under its registered trademark. For example, in *Schmidt v. Versacomp, Inc.*, 2011 WL 13172509 (S.D. Fla. Feb. 17, 2011), the plaintiff and defendant both sold boat lifts under the TNT trademark. After infringement litigation began, the plaintiff purchased a 1966 registration for a TNT trademark from Gray Manufacturing. *Id.* at *3. The registration was for "vehicle lifts," but Gray had used the TNT trademark only on lifts for cars and trucks. *Id.* The court held that the plaintiff's acquisition of Gray's TNT trademark was an assignment in gross because the plaintiff's boat lifts differed substantially from Gray's car and truck lifts. *Id.* at *5. Directly relevant here, the court expressly considered and rejected the plaintiff's argument that it was entitled to priority for all "vehicle lifts" because that was the phrase used in the registration. *Id.* The

15

Court held that the plaintiff "ignores the critical rift caused by Gray Manufacturing's failure to properly assign its goodwill." *Id.*

Thus, contrary to VPX's argument, VPX did not acquire from Dash the right to use the "Reign" trademark on any and all products that can be characterized in some sense as "nutritional supplements." The most VPX could acquire would have been Dash's right to use the "Reign" trademark on the specific goods on which Dash actually used the mark, powdered nutritional supplements. *Id.* The broad wording of the registration is of no help to VPX. VPX's failure to acquire Dash's goodwill is controlling.

Moreover, VPX's attempt to characterize its "Reign" energy drinks as dietary supplements and not beverages does not in fact make them supplements. The FDA has made clear that "[e]ven when the label of a product characterizes it as a dietary supplement the product may not in fact be a dietary supplement." ECF 168-1, Ex. 30 at 2. To determine the propriety of a characterization on a label, the FDA considers packaging and marketing, among other things. *Id.* at 3. VPX itself states that it is "A Super Potent High-Performance **Energy Drink**," ECF 168-1, Ex. 29 at 3, and VPX's CEO repeatedly refers to the product as an "energy drink" on Instagram. ECF 63-2 ¶¶ 8, 10. All of this evidence strongly suggests that VPX's "Reign" is a beverage, not a dietary supplement.

**B.     Monster And Reign Will Suffer Irreparable Harm If An Injunction Does Not Issue**

"Although there is probably no presumption of irreparable harm in a Lanham Act case, trademark infringement often implicates injuries of that caliber." *Overhead Door Corp. v. Burger*, No. 12-cv-101, 2013 WL 3057796 at *8 (M.D. Ga. June 17, 2013) (citing *Tally-Ho*, 889 F.2d at 1029). "Irreparable injury includes loss of control of reputation, loss of trade, and loss of goodwill. Irreparable injury can also be based upon the possibility of injury." *Id. Accord Edge Sys. v. Aguila*, No. 14-24517, 2015 WL 12868177, at *13 (S.D. Fla. Jan. 29, 2015).

Loss of control over a trademark owner's reputation is often a critical factor in finding irreparable harm.

> The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by

16

> the acts of another. A plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff. It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm.

*Sylvan Learning Inc. v. Learning Sols., Inc.*, 795 F. Supp. 2d 1284, 1300 (S.D. Ala. 2011). *Accord Spy Optic Inc. v. Melbourne Wholesale*, No. 16-cv-1541, 2018 WL 672275, at *4 (M.D. Fla. Jan. 31, 2018); *Hospitality Int'l, Inc. v. Sitaram, Inc.*, No. 12-cv-1145, 2013 WL 6798927, at *7 (M.D. Fla. Dec. 23, 2013); *Mixed Fighting Aliance Promotions v. de la Noval*, No. 11-21107, 2011 WL 13223714, at *11 (S.D. Fla. April 14, 2011). Accordingly, the courts do not hesitate to find irreparable harm when the defendant threatens "to wrongfully trade upon Plaintiff's reputation and exclusive rights in its trademarks." *Niko Petroleum Retailers of Fla., LLC v. Miami VIP Tour LLCs*, No. 14-21770, 2014 WL 12862297, at *9 (S.D. Fla. May 29, 2014). *See also Louis Vuitton Malletier v. YangQuan Lu*, No. 11-24068, 2012 WL 13014684 at *5 (S.D. Fla. Jan. 19, 2012).

Here, the irreparable harm to Monster and Reign is clear. VPX is planning to launch a new line of "Reign" energy drinks in direct competition with the original REIGN energy drinks sold by Monster and Reign since February 2019. Monster and Reign have no control over the quality, nature, ingredients or levels thereof, the interactions between the ingredients, efficacy, taste, marketing or safety of VPX's "Reign" drinks.

Monster and Reign represent that they do not know the efficacy or safety of VPX's "Reign" drink. Yet, because VPX is using an identical trademark on identical goods, consumers necessarily will associate VPX's drinks with Monster and Reign. *Wynn Oil*, 839 F.2d at 1191.

This loss of control may threaten Monster and Reign's reputation, threatening to cause Monster and Reign irreparable harm through loss of potentially dissatisfied customers. ECF 141-1 ¶¶ 20-22. These consumers may also post their disappointment with "Reign" online, causing additional consumers to potentially avoid Monster and Reign's energy drinks. *Id.* Similarly, if any consumers are injured or have an adverse reaction to VPX's "Reign" drinks, substantial negative publicity would result and such publicity would potentially be associated with Monster and Reign. *Id.* ¶ 20. In addition to the potential lost initial and repeat sales due to confusion and negative association, this threatens to cause irreparable damage to the MONSTER and REIGN brands by turning consumers away from the brands permanently and eroding market share that Monster

17

has built in its original MONSTER drinks, and which has been created for the REIGN drinks since their launch. *Id.* ¶ 22. The amount of such lost sales and lost market share will be difficult to quantify and thus cannot be adequately compensated through monetary relief. *See C.B. Fleet Co. v. Unico Holdings*, 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007) ("loss of market share is more than sufficient to establish irreparable harm"); *Celgene Corp. v. Distinct Pharma*, No. 17-cv-5303, 2019 WL 1220320, at *6 (D.N.J. March 13, 2019); *Quantum Fitness Corp. v. Quantum LifeStyle Ctrs.*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999); *P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F. Supp. 662, 667 (S.D.N.Y. 1985) (each recognizing the difficulty of calculating damages in trademark infringement cases).

VPX argues that Monster waived any right to object to its use of the Reign product name by failing to take action when the original 8-ounce drink was put on the market. The undersigned finds that Monster and Reign were not required to seek preliminary relief when VPX first launched its 8-ounce "Reign" drink. VPX concedes sales of this product were "disappointing," were made on the internet only, and totaled only $1,900 in revenues. ECF No. 163-1 ¶¶ 24, 26. Accordingly, Monster and Reign were not required to expend their resources, VPX's resources, and the Court's resources combatting this minimal potential infringement. Legal action is required "only when defendant's infringing acts significantly impact on plaintiff's good will and business reputation. A small level of sales of unauthorized goods will often not be sufficient to require prompt action." *McCarthy* § 31:19. *See also id.* § 31:20 (discussing the doctrine of "progressive encroachment").

**C.** **The Balance Of Hardships Weighs In Favor Of A Preliminary Injunction**

An injunction would do no more than require VPX to comply with the law, and a defendant cannot be heard to complain that an injunction would cause it harm by requiring compliance with the law. As the courts have previously explained, "the infringing defendant had no right to use the mark, and therefore could suffer no legitimate hardship by being forced to stop that which it had no right to do." *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010). *Accord TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1333 (S.D. Fla. 2015).

Moreover, VPX has not yet launched its product. Thus, VPX will not suffer the typical harm of a trademark defendant – abandonment of a product that is already on the

store shelves. At most, the preliminary injunction, if wrongly issued, will delay VPX's launch by a few months. Any investment VPX has made in its new "Reign" product line can be put to use by VPX after trial if the injunction is set aside.

VPX originally planned to launch its new product line in February 2020. ECF 141-2 ¶ 4; ECF 141-4 ¶ 3. It appears that VPX moved its planned launch date up to November 2019 only after receiving Monster and Reign's preliminary injunction motion. Thus, the Court need not consider any hardship to VPX before February 2020 in equitably assessing the balance of hardships.

### D. A Preliminary Injunction Would Serve The Public Interest

The public interest is served by preventing consumer confusion. Accordingly, because Monster and Reign have made a strong showing of a likelihood of consumer confusion, this factor also favors the grant of a preliminary injunction. *See Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 197-98 (3d Cir. 1990); *Augusta Nat'l, Inc. v. Executive Golf Mgmt.*, 996 F. Supp. 492, 499 (D.S.C. 1998).

### E. The Court Will Require A Bond Of $2,000,000

VPX initially requested a bond of $203 million, including $100 million to cover alleged lost sales and an additional $100 million to cover alleged reputational harm. This Court concludes that this request is unsupported by objective record evidence. VPX has sold only $1,900 of its 8-ounce "Reign" drink, and none of its 16-ounce "Reign" drink. VPX simply fails to substantiate how it can fairly estimate that it would lose $100 million in sales if enjoined until trial in May 2020. ECF No. 197. Likewise, VPX has failed to substantiate how it is likely to suffer $100 million in reputational harm merely from being required to maintain the status quo.

VPX has spent approximately $2 million creating, developing, producing, and marketing its REIGN product. ECF No. 163-1 at ¶27. During the November 13, 2019 hearing on this Motion, counsel for VPX represented that "we are between one million and two million of a bond." ECF 162 at 104. Accordingly, this Court recommends that the bond be set at $2,000,000.

### RECOMMENDATION

Based on the foregoing, the undersigned RECOMMENDS that Monster Energy Company and Reign Beverage Company's Expedited Motion for Preliminary Injunction

Against VPX's Infringement of their Reign Trademark, ECF No. 141 be GRANTED.

VPX is hereby enjoined from marketing, advertising or selling any 16oz Reign ready-to-drink product as of this date to allow the District Court to rule on any objections of the parties and issue a final decision. Monster shall post a bond of $2,000,000 upon a final decision by the District Court. A separate order will issue upon the District Court's review.

Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(b). Upon proper motion, the parties may seek a shortened objection period.  The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3–1 (2018); *see Thomas v. Arn*, 474 U.S. 140 (1985).

DONE AND SUBMITTED at Fort Lauderdale, Florida this 24th day of January 2020.

_____
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE
PATRICK M. HUNT

Copies furnished to:
Honorable Roy K. Altman
All Counsel of Record