UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-60809-CIV-ALTMAN/Hunt

VITAL PHARMACEUTICALS, INC.,
d/b/a VPX Sports, a Florida Corporation,

    *Plaintiff/Counterclaim-Defendant*,

v.

MONSTER ENERGY COMPANY,
a Delaware corporation, and
REIGN BEVERAGE COMPANY, LLC,
a Delaware limited liability company,

    *Defendants/Counterclaimants*.

_____

MONSTER ENERGY COMPANY,
a Delaware corporation, and
REIGN BEVERAGE COMPANY, LLC,
a Delaware limited liability company,

    *Crossclaimants*,

v.

JHO INTELLECTUAL PROPERTY
HOLDINGS, LLC, a Florida limited
liability company,

    *Crossclaim-Defendant*.
_____/

## **ORDER**

Monster Energy Company and Reign Beverage Company LLC (collectively, "Monster") compete with Vital Pharmaceuticals, Inc. ("VPX") in the sale of energy drinks. Monster sells an energy drink called "Reign." So does VPX. Through its Motion for a Preliminary Injunction,

Monster alleges trademark infringement and seeks to enjoin VPX from selling energy drinks under the "Reign" name. [ECF No. 141] (the "Motion").

This Court referred the Motion to the Magistrate Judge who, with the benefit of briefing and oral argument, promptly issued a Report and Recommendation, in which he suggested that this Court grant Monster's Motion. [ECF No. 230] (the "R&R"). VPX objected. [ECF No. 238] (the "Objections"). And Monster responded. [ECF No. 255] (the "Response"). For the reasons set out below, the Court now **ADOPTS** the R&R and **GRANTS** Monster's Motion for a Preliminary Injunction.

## THE FACTS[1]

Monster Energy Company is the developer and distributor of Monster Energy® drinks. *See* [ECF No. 141-1] ¶¶ 4–6. In February 2018, Monster Energy Company developed a new line of energy drinks to appeal to fitness-conscious consumers. *Id.* ¶ 7. After nearly a year of research, it chose to market these new drinks under the name "Reign." *Id.* To facilitate the launch and distribution of this new line, Monster Energy Company formed a subsidiary, Reign Beverage Company LLC. *Id.* ¶ 8. By February 2019, Monster began commercial sales of the Reign energy drink to distributors in nine states. *Id.* ¶ 12. The product appeared in stores shortly thereafter. *Id.* On March 25, 2019, Monster launched its Reign energy drink nationwide. *Id.* The drink is now sold in more than 159,000 stores, with gross sales exceeding $165 million. *Id.* ¶ 16. More than 80% of those sales come through convenience stores. *Id.* The Reign lineup is pictured below:

---

[1] After a careful examination of the whole record, the Court adopts the R&R's findings of fact in full.



*Id.* ¶ 14.

Dash, LLC ("Dash"), not a party to this action, is the original applicant for and owner of the valid, registered trademark for the mark REIGN.[2] *See* [ECF No. 152-2] at Ex. 1 (the "REIGN Registration"). Dash began using the REIGN mark in 2015, well before the parties here created their Reign energy drinks. *Id.* The REIGN Registration applies to the use of the word "Reign" and governs the following goods: "Dietary and nutritional supplements; Dietary and nutritional supplements used for weight loss; Dietary supplement drink mixes; Herbal supplements; [and] Nutraceuticals for use as a dietary supplement . . . ." *Id.*

Under its REIGN mark, Dash manufactured and sold a powdered, fruit-flavored, pre-workout supplement. *See* [ECF No. 141-3] at Ex. 11. The powdered supplement was caffeinated and geared towards fitness-focused consumers. *See* Objections at 4. Dash primarily sold its Reign powder through nutrition stores, gyms, and fitness centers. *See* [ECF No. 170] at 42:3–4. Dash sold the powdered supplement in forty-serving containers for $59.99 each. *See* [ECF No. 141-3] at Ex. 11. Dash's product is pictured below:

---

[2] U.S. Trademark Reg. No. 5,107,809.



*Id.*

On November 12, 2018, VPX's in-house counsel contacted Dash about acquiring the REIGN Registration. *See* [ECF No. 168-1] at Ex. 25. Months later, on March 11, 2019—just as Monster began its nationwide Reign rollout—VPX entered into a Trademark Purchase and Assignment Agreement (the "Agreement") with Dash to purchase the REIGN trademark. *See* [ECF No. 158] at Ex. 10.[3] The Agreement contemplated that VPX would purchase from Dash the rights to the REIGN mark—and nothing else. *Id.* VPX did not acquire any product formula, equipment, technical knowledge, or other assets from Dash. *Id.* As Dash's CEO would later put it, Dash had no discussions with VPX about selling *anything* other than "Just 'Reign,' the five-letter word." [ECF No. 170] at 165:20–166:7. For this reason, Dash's CEO admitted that, after the transfer, he "didn't care what they were doing with" the trademark. *Id.* at 163:7–8.

Following the sale, Dash announced that it was discontinuing its Reign powder and that, in its place, it was substituting a powdered nutritional supplement called "Slay." [ECF No. 141-3] at Exs. 12–13. Dash described Slay as having a "similar formula to Reign." [ECF No. 168-1] at

---

[3] VPX purchased the REIGN trademark through its affiliate, JHO Intellectual Property Holdings, LLC, which then licensed the mark to VPX. *See* R&R ¶ 14.

Ex. 32. Dash's CEO confirmed, in fact, that the company was telling its customers that Slay was Reign's replacement, *see* [ECF No. 170] at 216:8–217:13, and that he wanted customers to transition from Reign to Slay, *id.* at 222:2–5. There is no evidence that Dash ever directed any consumer of its Reign powdered supplement to VPX. *See* R&R ¶ 20.

For VPX's part, once it purchased the REIGN trademark, it began marketing a new energy drink under its newly-acquired mark. Specifically, on March 28, 2019, three days after Monster's nationwide launch, VPX announced on Instagram that it, too, would be launching a Reign energy drink. *See* [ECF No. 141-3] ¶ 11. VPX began selling its competing Reign energy drink in eight-ounce containers on its website in April 2019. [ECF No. 63-5] ¶¶ 3–8. In October 2019, VPX informed its distributors that it would be introducing a new line of Reign energy drinks. [ECF No. 141-1] ¶ 17. These new drinks would be packaged in sixteen-ounce aluminum cans, the same medium Monster was using, and would be sold in convenience stores, the same venue through which Monster makes the bulk of its sales. *See id.*; R&R ¶ 25. These VPX Reign cans look like this:



[ECF No. 141-1] ¶ 17.

VPX's new line of energy drinks marked a significant deviation from the product Dash had sold under the REIGN mark. To be sure, VPX's new energy drink shares some similarities with Dash's powder: they are both caffeinated, fruit-flavored, pre-workout products that are marketed to fitness-focused consumers. [ECF No. 168-1] at Exs. 28–29. But, in other salient respects, VPX

5

designed a completely different product: VPX's Reign, for instance, (1) is a ready-to-drink carbonated beverage, *not* a powdered supplement; and (2) contains *no* ingredients in common with Dash's Reign (other than caffeine). *Id.* So, while the two products' similarities may lead consumers to believe that they are one and the same, in fact, the products are completely different. And, as explained below, that is precisely the problem.

## STANDARD OF REVIEW

Objections to a magistrate's report and recommendation are governed by 28 U.S.C. § 636(b). The Court reviews *de novo* those parts of a report and recommendation to which a party has objected. *See* 28 U.S.C. § 636(b); *Macort v. Prem, Inc.*, 208 F. App'x 781, 783–84 (11th Cir. 2006). The Court reviews the remaining portions for clear error. *Id.* at 784 (holding that the court "must only satisfy itself that there is no clear error on the face of the record" when there is no objection). "A party filing objections must specifically identify those findings objected to and the specific basis for such objections." *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 2005 WL 8155948, at *1 (S.D. Fla. Sept. 21, 2005).

## THE LAW

To secure a preliminary injunction, a movant must show: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." *Commodores Entm't Corp. v. McClary*, 648 F. App'x 771, 774 (11th Cir. 2016). The movant must "clearly establish[] the burden of persuasion" for each of these four elements. *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (internal quotation marks omitted).

## ANALYSIS

### A. No Clear Error

The Magistrate Judge found that Monster had carried its burden as to each element of the preliminary injunction test and recommended that the Court enter the preliminary injunction. *See* R&R at 19–20. In its Objections, VPX challenges only *one* prong of the Magistrate Judge's analysis. Specifically, VPX argues that the Magistrate Judge erred in finding that Monster had "clearly" established "a substantial likelihood of success" on its trademark infringement claim. *See* Objections at 2.

To prevail on its trademark infringement claim, Monster must show "(1) ownership of the trademark, and (2) the likelihood of confusion of the parties' marks." R&R at 9.[4] The Magistrate Judge determined that Monster is substantially likely to prevail on both elements of this test.[5] VPX objects only to the first element: ownership. *See* Objections at 2. In VPX's view, because it purchased the REIGN trademark, it—not Monster—owns that mark. *Id.* And so, VPX says, Monster is infringing on *its* trademark. *See* [ECF No. 152] at 2.

This leaves the Court with two tasks: *First*, the Court must examine the portions of the R&R to which no party has objected for "clear error on the face of the record." *Macort*, 208 F. App'x at 784. The Court has done so and can find no error—much less *clear* error—in the

---

[4] *See generally Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1130–31 (11th Cir. 2018) (to establish trademark infringement, "a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two" (quoting *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010))).

[5] There is no dispute over the likelihood of confusion. After all, the parties are looking to use the same mark, on the same product, in the same stores. Indeed, each party argues that *it* owns the trademark, and that the other's use is confusingly similar. *See* R&R at 9.

Magistrate Judge's well-reasoned Report. *See* R&R at 9, 16–19. *Second*, the Court must examine *de novo* the part of the R&R to which VPX has objected—i.e., the Report's analysis on the question of ownership. *Macort*, 208 F. App'x at 783–84. The Court now turns to this second task.

### B. Monster Used the REIGN Trademark First

"Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1080–81 (11th Cir. 2016) (quoting *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015)). It is undisputed in this case that Monster used the REIGN mark *before* VPX. Monster had introduced, distributed, and launched its Reign energy drink nationwide before VPX even announced on Instagram its future intention to introduce a competing Reign energy drink. Because VPX did not use the mark first, it cannot establish ownership rights on that basis.[6]

Trying to parry this result, VPX contends that, by purchasing the REIGN trademark from Dash, it inherited Dash's first use. Because Dash used the mark in 2015—well before Monster began to sell Reign energy drinks—VPX claims that its use of the REIGN mark has priority over Monster's. Unfortunately for VPX, and as the Magistrate Judge correctly found, VPX's purchase was—by a substantial likelihood—an invalid "assignment in gross," which exchanged *no* rights in the REIGN trademark.

---

[6] While registration of a trademark creates a presumption of ownership, the law is clear that first use controls—even over a registered mark. *See* 15 U.S.C. § 1057(c); *see also Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 558 (E.D.N.Y. 2017) (recognizing that first use is "sufficient to overcome the presumption of validity created by the plaintiff's registration of the trademark").

### C. Assignment in Gross

We start with the principle that priority is assignable. In other words, a party who purchases a trademark inherits the seller's date of first use—and, with it, the seller's priority. *See Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1310 (11th Cir. 1999); *see also* 3 McCarthy on Trademarks and Unfair Competition § 18:15 (5th ed. 2020) (hereinafter, McCarthy on Trademarks) ("All courts follow the rule that . . . after a valid assignment, the assignee acquires all of the legal advantages of the mark that the assignor enjoyed, including priority of use.").

But to transfer a trademark—and its priority—successfully, the purchase and sale of the mark must be *valid*. *See Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002). The sale of a trademark apart from its goodwill, however, is an "assignment in gross" and is *invalid*. *See* 15 U.S.C. § 1060(a)(1) ("A registered mark . . . shall be assignable with the good will of the business in which the mark is used . . . ."). As the Eleventh Circuit has explained: "[I]t is well-settled law that the transfer of a trademark or trade name without the attendant good-will of the business which it represents is, in general, an invalid, 'in gross' transfer of rights." *Int'l Cosmetics*, 303 F.3d at 1246.

This "anti-assignment-in-gross" rule is deeply rooted in trademark law. *See, e.g.*, *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) (noting the "fundamental error of supposing that a trade-mark right is a right in gross"). The rule's basic purpose is to prevent the consumer deception that is likely to occur when a party purchases a trademark and then uses that mark for a *different* product. *See Heron Dev. Corp. v. Vacation Tours, Inc.*, 2018 WL 2943217, at *4 (S.D. Fla. June 12, 2018). When the purchaser of a trademark makes meaningful changes to the product, sale under the same tradename may "result in a fraud on the purchasing public, who may reasonably assume that the mark signifies the same nature and quality of goods sold." *Id.* (quoting

9

McCarthy on Trademarks § 18:3).[7] "The consumer might buy a product thinking it to be of one quality or having certain characteristics and could find it only too late to be another." *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 289 (8th Cir. 1969). "As a matter of theory, the prohibition on transfers in gross should be a firm one." Stephen L. Carter, *The Trouble with Trademark*, 99 Yale L.J. 759, 786 (1990).[8]

Whether a trademark has been transferred along with its (intangible) goodwill is not always—or even ever—pellucid. As a result, courts have designed a variety of tests to determine whether a transfer constitutes an assignment in gross. Each of these tests serves the same purpose: disincentivizing the consumer deception that may otherwise result when a trademark is sold and used for a different good. *See PepsiCo*, 416 F.2d at 288 ("Inherent in the rules involving the assignment of a trademark is the recognition of protection against consumer deception."). As it turns out, these tests weigh strongly in favor of the Magistrate Judge's finding that VPX's "purchase" of the REIGN trademark was, in fact, an invalid assignment in gross.

### 1. VPX and Dash's Reign Products Are Not Substantially Similar

To determine whether a trademark was assigned with the goodwill the mark has come to represent, courts look (primarily) to whether the assignee is using the mark for a "substantially similar" product. *Marshak v. Green*, 746 F.2d 927, 930 (2d Cir. 1984); *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 266 (5th Cir. 1999) ("[T]he transfer of goodwill requires only that the

---

[7] *See generally* Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1709 (1999) ("It is hard to see how the goals of preventing consumer confusion and encouraging investments in product quality would be furthered by allowing a company to sell the rights to a mark to another who will not make the same products. If anything, assignments in gross are vehicles for adding to consumer confusion, not reducing it.").
[8] The doctrine is not only firmly established in case law and theory—it is also mandated by Congress, which rejected an early version of the Lanham Act that would have permitted trademarks to be assigned *without* their goodwill. *See* McCarthy on Trademarks § 18:10 (detailing the legislative history).

[goods] be sufficiently similar . . . ." (quoting *Visa, U.S.A., Inc. v. Birmingham Tr. Nat. Bank*, 696 F.2d 1371, 1376 (Fed. Cir. 1982))); *BBC Grp. NV LLC v. Island Life Rest. Grp. LLC*, 413 F. Supp. 3d 1032, 1041 (W.D. Wash. 2019); *see also Int'l Cosmetics*, 303 F.3d 1246 (finding that an "assignment was not in gross" when the assignee continued to use the mark on "the *very goods* which created [the mark's] reputation" (emphasis added)).

When the assignee uses the mark for a "substantially similar" product, "consumers [will] not be deceived or harmed," as they continue to rely on the brand they have come to trust. *See Marshak*, 746 F.2d at 930; *see also Heron Dev. Corp. v. Vacation Tours, Inc.*, 2018 WL 2943217, at *5 (S.D. Fla. June 12, 2018) (no assignment in gross when the assignee sold "the very same travel products and services," and so the assignment "present[ed] no risk of deceiving the public"). In protecting consumers, courts have recognized that "[e]ven minor differences can be enough to threaten customer deception." *Clark & Freeman Corp. v. Heartland Co.*, 811 F. Supp. 137 (S.D.N.Y. 1993) (finding an assignment in gross when assignee transitioned from selling women's shoes to men's shoes).

Here, far from selling a "substantially similar" product, VPX entirely abandoned the product Dash had sold. So, for instance, while Dash's Reign was a powdered nutritional supplement sold in forty-serving containers, VPX's Reign is a single-serving, ready-to-drink, carbonated beverage. The ingredients of the products are also completely different. Of the roughly twenty ingredients in VPX's energy drink, only one—caffeine—also appeared in Dash's powder. Given these differences, consumers of VPX's Reign are left with *no* guarantee that they are purchasing goods of the same "quality previously associated with the mark." *See Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1109 (C.D. Cal. 2003). In this sense, VPX has left behind *any* goodwill Dash had earned for its mark.

Not surprisingly, federal courts across the country have found that comparable changes signal an assignment in gross. So, for example, in *Archer Daniels Midland Co. v. Narula*—a case that is directly on point here—the evidence "actually seem[ed] to indicate that [the products] may not be similar" at all because one was "a ready-made beverage" while the other was a "powder[] used to make beverages." 2001 WL 804025, at *7 (N.D. Ill. July 12, 2001). This is exactly what happened here. The Eighth Circuit has likewise found that a cola-flavored drink differed substantially from a pepper-flavored drink and concluded that, because the assignee "changed the type of beverage altogether," its continued use of the mark may "deceive the public." *See PepsiCo*, 416 F.2d at 288. Here, VPX did not simply change the flavors of Dash's product—it changed products completely, shifting from a powdered nutritional supplement to a carbonated beverage, thereby *exacerbating* the potential harm to unsuspecting consumers.[9]

Against all this, VPX advances three arguments—all unavailing. *First*, VPX, noting that "the products need not be identical," claims that its energy drink is sufficiently similar to Dash's powder because both are (i) fruit-flavored, (ii) pre-workout, (iii) dietary supplements that (iv) contain caffeine. *See* Objections at 4. VPX is right (to a degree): some courts have found assignments valid *despite* minor changes in the product. *See, e.g.*, *Brady v. Grendene USA, Inc.*, 2015 WL 3539702, at *8 (S.D. Cal. June 3, 2015) (different materials for footwear); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899 (E.D.N.Y. 1988) (different cigarette paper); *Hy–Cross Hatchery, Inc. v. Osborne*, 303 F.2d 947 (C.C.P.A. 1962) (different breeds of chicken). But

---

[9] *See also Sugar Busters*, 177 F.3d at 266–67 (book for diabetics and store for diabetics are not substantially similar); *Marshak*, 746 F.2d at 928–29 (two music groups are not substantially similar); *BBC Grp.*, 413 F. Supp. 3d at 1041–42 (Korean restaurant and Mediterranean restaurant are not substantially similar); *interState Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 349–50 (D.N.J. 2004) (payment software and banking software are not substantially similar); *Clark & Freeman*, 811 F. Supp. at 137 (women's shoes and men's shoes are not substantially similar).

these cases simply reflect the reality that not *every* product change will be meaningful enough to matter to (or confuse) consumers.[10] Here, however, the revamp VPX implemented—including a *complete* change in ingredients—may very well matter to consumers. By the same token, the superficial similarities between VPX's beverage and Dash's powder—similarities VPX leans on for its position—are also part of the problem: by including some similar features in what is otherwise a different product, VPX's strategy threatens to confuse consumers.

*Second*, VPX argues that the "substantially similar" test is, in fact, *not* about whether the products are substantially similar, but rather whether they are designed to appeal to distinct or similar groups. *See* Objections at 4. But, as Monster correctly points out, the cases VPX cites for this proposition say only that, for two products to be deemed similar, they must appeal to similar groups. *See, e.g.*, *BBC Grp.*, 413 F. Supp. 3d at 1041–42 ("'Substantially similar' products must have more in common besides belonging to the same general category of products—they must also appeal to similar customer groups."). But these cases never suggest that appealing to similar consumer groups is *sufficient* to show substantial similarity. *See, e.g.*, *Sugar Busters*, 177 F.3d at 266 (holding that products appealing to diabetics are not substantially similar); *PepsiCo*, 416 F.2d at 288 (holding that products appealing to soda drinkers are not substantially similar). Indeed, because VPX's energy drink and Dash's powder may cater to similar customers, it is even *more* likely that VPX's decision to sell its *different* product—under the same name—will prove misleading.

---

[10] In *Brady*, for example, a change in shoes from leather sandals to plastic flip-flops would have been sufficiently obvious to consumers. 2015 WL 3539702, at *8. In *Bambu*, consumers would be unlikely to notice a slightly thinner cigarette paper. 683 F. Supp. at 908. And, in *Hy-Cross*, the continued use of the trademark on different breeds of chicken would not be confusing because the type of chicken was indicated in the product's full name. 303 F.2d at 1167.

13

*Third*, VPX accuses the Magistrate Judge of "completely ignor[ing] the fact that Monster presented *no evidence* to support its argument that the products are dissimilar and *no evidence* to refute VPX's argument that the products are, in fact, similar." Objections at 3 (emphasis in original). As we have seen, however, this contention is simply false. Among other things, Monster adduced evidence—mostly product labels—that the two products are composed of entirely different ingredients. *See, e.g.*, [ECF No. 168-1] at Exs. 28–29. Monster also established that, while VPX's Reign is a carbonated ready-to-drink beverage, Dash's was a powdered nutritional supplement. *See* [ECF No. 141-3] at Ex. 11. This last objection, in sum, has no merit.

### 2. VPX Acquired No Assets from Dash

Beyond looking to whether the products are substantially similar, courts also consider whether the assignee purchased any assets associated with the trademark. *See, e.g.*, *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969) (finding an assignment in gross when assignee did not acquire any "customer lists, merchandise, equipment, recipes, decals or other goods"); *PepsiCo*, 416 F.2d at 290 (assignment in gross where assignee "did not acquire any of the assets" and "did not acquire any formula or process"). As VPX notes, it is certainly not *necessary* to transfer tangible assets. *See Int'l Cosmetics*, 303 F.3d at 1246. At the same time, the assignee's receipt of no "tangible assets" "tends to show that good will was not transferred," *Archer Daniels*, 2001 WL 804025, at *7 (citation omitted). After all, when the assignee purchases *nothing* but the trademark, the absence of any tangible acquisition may well undermine the public's legitimate expectation that the mark will "go on in real continuity with the past." *White v. Toscano, Inc.*, 2005 WL 8160219, at *5 (M.D. Fla. Oct. 11, 2005).

Apart from the trademark, VPX acquired no assets from Dash. In fact, the Agreement between VPX and Dash specifically contemplated that VPX would purchase the REIGN mark

14

from Dash—and nothing else. The Agreement, for instance, never suggests that VPX intended to purchase any product formula, any piece of equipment, or any other asset from Dash. Indeed, as Dash's CEO would reveal in his deposition, Dash had *no* discussions with VPX about selling *anything* other than "Just 'Reign,' the five-letter word." [ECF No. 168-1] at 165:20–166:2. This fact, too, strongly indicates that VPX's purchase was nothing more than an assignment in gross.

### 3. Dash Continues To Capitalize on its Goodwill Under a New Trademark

When a trademark assignor continues to sell its original product, it likely has not transferred the goodwill associated with its prior mark. *See Cal. Packing Corp. v. Sun-Maid Raisin Growers of Cal.*, 81 F.2d 674, 678 (9th Cir. 1936) ("A manufacturer cannot make a valid assignment of a trade-mark and continue the manufacture or sale of the same products in connection with which the trade-mark was used . . . ."); *Archer Daniels*, 2001 WL 804025, at *7 (holding that a trademark assignment was invalid, in part, because the assignor "continue[d] to sell the same products"); McCarthy on Trademarks § 18:23 (noting that, where the assignor "continues to sell the same products under a different mark, this would tend to prove that the assignee received no good will at all").

As the Magistrate Judge noted, Dash continues to make a similar powdered supplement under a new name: "Slay." But, rather than direct its customers to VPX, Dash announced that it was discontinuing Reign and substituting Slay in its place. If there were any doubt about Dash's intentions, its CEO later *confirmed* that Slay was Reign's replacement. [ECF No. 170] at 216:8–217:13. Indeed, the company's express goal was to transition customers from Reign to Slay. *Id.* at 222:2–5. These facts, taken together, likewise suggest that the assignment was in gross. *See Liquid Glass Enters., Inc. v. Liquid Glass Indus. of Canada, Ltd.*, 1989 WL 222653, at *5 (E.D. Mich.

15

Apr. 28, 1989) (finding that an assignor informing its customers that its product was available under a new tradename evidenced an assignment in gross).

### 4. There Is No Continuity of Management Between Dash and VPX

Finally, courts look to whether there is a "continuity of management" between the assignor and the assignee such that "the assignee will continue to provide the same quality service." *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 293 F. Supp. 3d 1334, 1366 (M.D. Fla. 2017) (quoting *J. Atkins Holdings Ltd. v. English Discounts, Inc.*, 729 F. Supp. 945, 950 (S.D.N.Y. 1990)). Here, there is no evidence that any Dash employee joined VPX—or vice versa. And, indeed, Dash's CEO specifically testified that, after the assignment, he provided absolutely *no* consulting services to VPX. [ECF No. 170] at 178:18–179:5. This factor, then, also suggests that the assignment was in gross.

### 5. VPX's Remaining Objections

VPX lodges two final objections—both of which, again, are unpersuasive.

*First*, VPX argues that the Magistrate Judge erred by giving "considerable weight" to the Expert Report of Hal Perot, which is subject to a *Daubert* challenge and which Monster submitted as further proof of an assignment in gross. There is no reason, however, to think that the Magistrate Judge placed "considerable weight" on this report. The twenty-page R&R dedicated only two paragraphs to it and, in any event, made clear that the report did nothing more than provide *additional* support for the R&R's conclusions. *See* R&R at 14 (considering the Perot Report "[i]n addition to all of the[] factors" described already). Either way, despite not relying on the Perot Report at all, this Court—as noted—has found ample grounds to affirm and adopt the R&R.

*Second*, VPX contends that Monster must prove a substantial likelihood of success on the merits by "clear and convincing evidence." *See* Objections at 7 (citing *Siegel v. Lepore*, 234 F.3d

1163, 1176 (11th Cir. 2000)). But VPX cites *no* authority—much less binding authority—for this higher standard, and the Court has found none. The one case VPX does cite, *Siegel*, simply held that the movant must "clearly" establish its burden of persuasion with respect to each element of a preliminary injunction. *See Siegel*, 234 F.3d at 1176. And, as the Court has explained, for all the reasons set out in this Order and in the R&R, Monster has "clearly" met this burden.[11]

## CONCLUSION

Having carefully reviewed *de novo* those portions of the R&R to which VPX has objected—and the remaining portions for clear error, *see* 28 U.S.C. § 636(b)—the Court hereby

**ORDERS AND ADJUDGES** that VPX's Objections [ECF No. 238] are **OVERRULED**, the R&R [ECF No. 230] is **ADOPTED**, and the Motion [ECF No. 141] is **GRANTED**.

The preliminary injunction is hereby **ENTERED**. VPX, its officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of the foregoing, are hereby enjoined and restrained from using the REIGN mark in connection with the sale, distribution, marketing, or promotion of any ready-to-drink beverage, including marketing and promotion on social media. This injunction shall take effect immediately.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 30th day of April 2020.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

---

[11] Furthermore, a party objecting to a report and recommendation must cite "statutory, rule, or case authority, in support of [its] position." *See* S.D. FLA. L.R. 4(a). VPX cited no relevant authority for its position—and its objection thus fails on that basis alone.