UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-60809-CIV-ALTMAN/Hunt

VITAL PHARMACEUTICALS, INC.,
d/b/a VPX Sports, a Florida Corporation,

     *Plaintiff/Counterclaim-Defendant*,

**v.**

MONSTER ENERGY COMPANY,
a Delaware corporation, and
REIGN BEVERAGE COMPANY, LLC,
a Delaware limited liability company,

     *Defendants/Counterclaimants*.

_____

MONSTER ENERGY COMPANY,
a Delaware corporation, and
REIGN BEVERAGE COMPANY, LLC,
a Delaware limited liability company,

     *Crossclaimants*,
**v.**

JHO INTELLECTUAL PROPERTY
HOLDINGS, LLC, a Florida limited
liability company,

     *Crossclaim-Defendant*.

_____/

## ORDER[1]

Before the Hon. Roy K. Altman:

Monster Energy Company and Reign Beverage Company LLC (collectively, "Monster")

compete with Vital Pharmaceuticals, Inc. ("VPX") in the energy drink market. Through this action,

---

[1] With the Court's permission, the parties have submitted some of their filings under seal. Those filings shall remain under seal until further order of the Court. But, recognizing that "proceedings in the United States District Court are public and Court filings are matters of public record," *see* S.D. Fla. L.R. 5.4(a), this Order has been filed publicly.

VPX challenges Monster's sale of an energy drink called "Reign." VPX does this in two ways: *First*, VPX contends that Monster's Reign infringes on the trade dress for its own Bang energy drink. *Second*, VPX argues that Monster's Reign impinges on its registered REIGN trademark. In response, Monster counterclaims that, in fact, it is VPX that has infringed on *its* REIGN mark. After a long, hard-fought litigation, Monster moved for summary judgment on both the trade dress and trademark claims. This Order follows.

### THE FACTS

In 2002, Monster launched its Monster Energy drink. *See* Statement of Material Facts [ECF No. 243] ("SOMF") ¶ 27. Since its inception, the original Monster Energy drink has been sold in 16-ounce black cans with Monster's M-Claw icon appearing in the can's center in a contrasting green color:



*Id.* Monster has established itself as the best-selling energy drink in the United States by unit volume and dollar value. *Id.* ¶ 28.

VPX is also a leading seller of energy drinks. *See* VPX's Opposition to Summary Judgment [ECF No. 314-1] (the "Opposition") at 2. Since 2012, VPX has distributed and sold its Bang®

energy drink nationwide. *Id.* at 2–3. A Bang can—which has retained the same basic design since October 2015—is pictured below:



*Id.* at 3.

Monster paints Bang's trade dress as a mere refinement of its original Monster Energy drink. *See* Motion for Summary Judgment [ECF No. 242] (the "Motion") at 24–27. Both cans, for example, feature bright colors on a black can, the product's name set out horizontally beneath a stylized logo, and certain ingredients listed in capital letters along the rim of the can. *Id.* Indeed, pointing to the following picture, Monster says that these features have been widely used, not just on its original Monster Energy drink, but in the energy drink industry generally:



*See id.* at 27.

VPX, on the other hand, contends that Bang has a "unique appearance" that "distinguishes it from all other energy drinks." Opposition at 3. In support of this proposition, Bang points (in part) to comments made by Monster's own employees who have suggested that there *is* something distinctive about Bang's packaging. *Id.* at 4. One employee, for instance, noted: "Attached is a line up shot of Bang. They've used powerful color combinations to really pop off shelf. It's definitely working and managed to capture a new consumer base." *See* Opposition Ex. E. The same employee went on to say that, "[a]s you see with Bang, it's bright and fun but still black, not too hard." *Id.*

In putting into words what makes Bang "pop" off the shelf, VPX has defined its Bang trade dress as containing the following features set against a 16-ounce black aluminum can:

> (a) a contrasting, flavor-dependent, bold, brightly-colored design for the rest of the can on a black background; (b) a large, stylized 'b' logo in the same bold, bright color(s) as the rest of the color(s) on the can, appearing horizontally, covering the top portion of the primary panel of the can; (c) the performance ingredients BCAA AMINOS, SUPER CREATINE, and ULTRA COQ10 in all upper case letters spanning the rim adjacent to the top of the can; (d) the product name 'BANG' in a stylized font in the same bold, bright color(s) as the rest of the color(s) on the can, appearing horizontally, covering the bottom portion of the primary panel of the can; (e) the tagline, 'POTENT BRAIN AND BODY FUEL,' in contrasting white/silver immediately below the product name 'BANG,' appearing horizontally covering the bottom portion of the can; (f) the inventive flavor designation in all capital letters in the same bold, bright color(s) as the rest of the color(s) on the can, appearing

horizontally, below the tag line in the bottom portion of the can; and (g) the '0 CALORIES PER CAN' designation, outlined in a white box, on the bottom corner of the front of the can.

*See* SOMF ¶ 35 (emphasis omitted).[2]

Bang has experienced substantial growth in recent years. Data indicates, for example, that Bang has captured nearly 10% of the energy drink market—with most of that success coming since 2017. *See* Opposition at 16. Indeed, during the 52-week period ending April 21, 2019, retail sales of Bang in convenience stores, drug stores, grocery stores, and big box stores totaled more than $556 million—or 213 million cans—representing an 855% increase from the previous year. *Id.* VPX attributes this growth, in large part, to the millions of dollars it has spent on advertising, some portion of which prominently features the Bang trade dress. *Id.* For instance:



Opposition Ex. CC. And this:



---

[2] VPX suspiciously omits from its trade dress definition one of the most distinctive aspects of its can: the U-shape that, towards the bottom of the can, mimics the form of a bullet and thereby accentuates the "bang" theme.

[ECF No. 281-3] at 7.

In February 2018, in the midst of Bang's rapid growth, Monster decided to develop a new line of energy drinks. *See* SOMF ¶ 1. Following months of research and effort, Monster chose to market these new energy drinks under the name "Reign." *Id.* In January 2019, Monster publicly announced the launch of its Reign energy drinks. *Id.* ¶ 2. The announcement was covered by the press, which published pictures of the Reign can. *Id.* One month later, in February 2019, Monster began commercial sales of Reign. *Id.* at 3. And, by March 25, 2019, Monster launched the drink nationwide. *Id.* The current Reign lineup is pictured below:



*See* Motion at 6.

In VPX's view, Reign is the product of Monster's intentional plot to copy and infringe on Bang's trade dress. *See* Opposition at 2 (alleging that Monster "recognized the distinctive nature of BANG®'s product packaging and deliberately sought out to copy and infringe on BANG®'s trade dress"). Monster, by contrast, unequivocally denies that it copied the Bang trade dress. *See* Reply in Further Support of Summary Judgment [ECF No. 284-1] (the "Reply") at 16. From Monster's perspective, VPX's claims are wholly "unsubstantiated" and suggest only that VPX is "conflat[ing] competition for copying." *Id*.

But VPX has submitted some evidence that Monster's "[o]bjective" in developing Reign was to "compete with Bang," *see* Opposition Ex. A, and which indicates that Monster used Bang's

trade dress for inspiration, *see* Opposition Ex. E. In fact, while Monster was developing Reign's trade dress, it apparently created electronic lineups in which potential Reign designs were placed alongside Bang cans. *See* Opposition Ex. P. Through its internal presentations, Monster also instructed its staff that Reign "MUST be touching Bang" in any account that sells Bang. *See* Opposition Ex. L. And, as it released its new product, Monster referred to Reign as a "BANG killer," Opposition Ex. A, and used slogans such as "FUCK BANG" and "#FBang," Opposition Exs. F, W.

In either event, while VPX excoriates Monster for allegedly copying the Bang trade dress, on March 11, 2019—after Monster began its nationwide Reign rollout—VPX entered into an agreement to purchase the REIGN trademark registration. *See* SOMF ¶ 4.[3] The "Trademark Purchase and Assignment Agreement" purported to transfer the REIGN trademark from Dash, LLC ("Dash") to VPX. *See* [ECF No. 158], Ex. 10 (the "Assignment Agreement" or, simply, the "Agreement"). This REIGN registration, however, is for "Dietary and nutritional supplements; Dietary and nutritional supplements used for weight loss; Dietary supplement drink mixes; Herbal supplements; [and] Nutraceuticals for use as a dietary supplement . . . ." SOMF ¶ 4.

Dash—not a party to this case—is the original owner of the registered REIGN trademark. *Id.* Dash began using the REIGN mark in 2015, well before either party here sought to develop a Reign energy drink. *Id.* Under its REIGN mark, Dash manufactured and sold a powdered, fruit-flavored, pre-workout dietary supplement, *see* Opposition at 5, which Dash sold in 40-serving tubs for $59.99 each, SOMF ¶¶ 5–6. Dash's powder looked like this:

---

[3] VPX purchased the REIGN mark through its affiliate, JHO Intellectual Property Holdings LLC. The REIGN mark bears U.S. Trademark Registration No. 5,107,809.



Motion at 7.

The Agreement between VPX and Dash contemplated that VPX would purchase from Dash the rights to the REIGN mark—and nothing else. *See generally* Assignment Agreement. Although the Agreement suggested that Dash would assign both its rights in the mark *and* "any goodwill associated therewith," the Agreement transferred *no* formula, label, logo, customer list, equipment, technical knowledge, or any other tangible or intangible asset. *Id.* Nor did Dash agree to provide any consulting services in connection with the transfer. SOMF ¶ 12. Indeed, as Dash's CEO would later put it, Dash had no discussions with VPX about selling *anything* other than "Just 'Reign,' the five-letter word." *Id.* ¶ 11. For this reason, Dash's CEO admitted that, after the transfer, he "didn't care what they were doing with" the trademark. *Id.*

Following the sale, Dash announced that it was discontinuing its Reign powder and that, in its place, it was substituting[4] a powdered nutritional supplement called "Slay." *Id.* ¶ 13. Dash's

---

[4] VPX objects to Monster's use of the word "substituting"—which VPX characterizes as an improper opinion, not a fact. *See* VPX's Response to Statement of Material Facts [ECF No. 259] ¶ 13. But VPX's objection ignores Dash's own advertisements, which made clear that it was

announcement explained that "reign is discontinued" and that "slay is here to save the day in place of" its predecessor. *Id.* Dash's CEO confirmed, in fact, that the company was telling its customers that Slay was Reign's replacement, and that he wanted customers to transition from Reign to Slay. *Id*. ¶ 14. At least some customers got the message. For example, when hearing of Slay, one user of Dash's Reign powder commented, "Ahhhh just ran out of my Reign[,] how timely!" *Id.* ¶ 15. Notably, there is no evidence that Dash ever directed any consumer of its Reign powdered supplement to VPX. *Id.* ¶ 16. To the contrary, Dash intended to retain those consumers for itself by directing them to its new Slay product. *Id.*

For VPX's part, once it purchased the REIGN trademark, it departed from Dash's dietary powder and began marketing a new energy drink under its newly-acquired mark. *Id.* ¶¶ 18–19. Specifically, on March 28, 2019, *three days* after Monster's nationwide launch—and on the very *same day* that VPX filed this lawsuit—VPX announced on Instagram that it, too, would be launching a Reign energy drink. [ECF No. 141-3] ¶ 11. VPX's CEO boasted on social media: "MAJOR LAWSUIT FILED!!!!! BANG ENERGY REIGNS ON MONSTER'S CHARADE! . . . You heard right my friends. I, Jack Owoc, am the sole and exclusive owner [of] the USPTO Registered REIGN® Trademark!!" *Id.* VPX began selling its competing Reign energy drink in eight-ounce containers on its website in April 2019. SOMF ¶ 19. Months later, in October 2019, VPX informed its distributors that it would be introducing a new line of Reign energy drinks. *Id.* ¶ 23. Unlike the first iteration, the new beverages would be carbonated. *Id.* These new drinks would also be packaged in sixteen-ounce aluminum cans, the same medium Monster was using, and

---

deploying Slay "in place of" Reign. SOMF ¶ 13. VPX's objection, in other words, raises no *genuine* dispute of fact.

would be sold in convenience stores, the same venue through which Monster makes the bulk of its sales. *Id.* ¶¶ 23–24. These VPX Reign cans look like this:



*See* Motion at 10.

VPX's new line of energy drinks marked a significant deviation from the product Dash had sold under the REIGN mark. To be sure, VPX's new energy drink shares some similarities with Dash's powder: they are both caffeinated, fruit-flavored, pre-workout products that are marketed to fitness-focused consumers. Opposition at 5. But, in other salient respects, VPX designed a completely different product: VPX's Reign, for instance, (1) is a ready-to-drink carbonated beverage, *not* a powdered dietary supplement; and (2) contains *no* ingredients in common with Dash's Reign (other than caffeine). *See* SOMF ¶¶ 21–22, 25. So, while the two products' similarities may lead consumers to believe that they are one and the same, in fact, the products are entirely different.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the

case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fᴇᴅ. R. Cɪᴠ. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at

323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).[5]

## ANALYSIS

Monster has moved for summary judgment on (1) VPX's trade dress claim (that Reign infringes on the Bang trade dress); (2) VPX's trademark claim (that Reign impinges on VPX's registered REIGN mark); and (3) on its own counterclaim (that VPX's Reign infringes on Monster's REIGN mark). Ultimately, because a reasonable factfinder could conclude that VPX owns enforceable trade dress rights for its Bang can, VPX's trade dress claim must go to trial. On the other hand, because no reasonable factfinder could conclude that VPX, in fact, owns a valid REIGN mark—and since there is no dispute that the two REIGN products are confusingly similar—Monster is entitled to summary judgment on the trademark claims.

### A.  Trade Dress

Section 43(a) of the Lanham Act creates a federal cause of action for trade dress infringement. *See* 15 U.S.C. § 1125. "'Trade Dress' involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)). As

---

[5] In a separate order, the Court ruled that this case will be tried before the Court, not a jury. [ECF No. 321]. VPX has filed a motion to reconsider that decision. [ECF No. 331]. The parties do not address how (if at all) the summary judgment standard might differ for a bench trial as compared with a jury trial. In any case, even assuming some divergence in the applicable standard, this Court's judgment would be the same. *See generally Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (discussing generally the standard for summary judgment "in cases slated for a bench trial").

here, the "classic trade dress infringement action involve[s] the packaging or labeling of goods." *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996).

To prevail on a claim of trade dress infringement, a plaintiff must prove that "(1) the defendant's product is confusingly similar to its product; (2) the similar features of the two products are primarily non-functional; and (3) the plaintiff's product is distinctive." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012). Challenging only the third element, Monster contends that VPX owns no protectable trade dress because Bang's packaging is not distinctive.

There are two ways in which a product's trade dress may be distinctive. *First*, "[s]ome trade dress, 'because its intrinsic nature serves to identify a particular source of a product, is deemed inherently distinctive.'" *Miller's Ale House*, 702 F.3d at 1322 (cleaned up) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). *Second*, "[o]ther trade dress, though not inherently distinctive, can become distinctive if it acquires 'secondary meaning, which occurs when, in the minds of the public, the primary significance of [the] trade dress is to identify the source of the product rather than the product itself.'" *Id.* (cleaned up) (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000)). In either case, "[t]he legal inquiry and tests involved in ruling on a trade dress claim are not conducive to resolution at the summary judgment stage, where the Court cannot make factual determinations." *Vital Pharm., Inc. v. Am. Body Bldg. Prod., LLC*, 2006 WL 3755204, at *3 (S.D. Fla. Dec. 19, 2006).

This distinctiveness requirement has long been an essential component of trade dress law. Distinctiveness, after all, is just another way of assessing the informational value a particular trade dress conveys. Viewed in this light, a product's trade dress is protectable *only if* the dress is "used to identify the producer." *Dippin' Dots*, 369 F.3d at 1202 (quoting *Publ'ns Int'l, Ltd. v. Landoll,*

13

*Inc.*, 164 F.3d 337, 338 (7th Cir. 1998)). Requiring this association between trade dress and producer makes sense. As the Supreme Court has explained, the "[p]rotection of trade dress . . . serves the [Lanham] Act's purpose to 'secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.'" *Two Pesos*, 505 U.S. at 774. But protecting a trade dress furthers neither of these aims—securing goodwill or protecting consumers—when consumers do not associate the trade dress with a specific producer. This is because, "[e]ven if a competitor appropriated the identical trade dress, the plaintiff would not be injured [if] the plaintiff's trade dress does not serve to distinguish its goods from those of its competitor's." *AmBrit*, 812 F.2d at 1536. And, because there remain triable issues of fact as to both Bang's inherent distinctiveness and its secondary meaning, summary judgment is (doubly) foreclosed here.

### 1. Inherent Distinctiveness

In assessing inherent distinctiveness, courts must examine the trade dress and consider "whether [it] is a common basic shape or design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." *Miller's Ale House*, 702 F.3d at 1323 (quoting *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983)); *see also Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977).[6] The ultimate question in determining whether a product's trade dress is distinctive is not whether "each element or part" of the dress is distinctive, but rather

---

[6] "In reality, all three questions are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin." 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:13 (5th ed.) (hereinafter, MCCARTHY ON TRADEMARKS).

whether the combination of elements, taken "as a whole," conveys a unique impression. *See Remcraft Lighting Prod., Inc. v. Maxim Lighting, Inc.*, 706 F. Supp. 855, 858 (S.D. Fla. 1989); *see also AmBrit*, 812 F.2d at 1537 n.25 (noting that "§ 43(a) protects not the individual elements of a producer's trade dress, but rather their combination and the unique impression conveyed by that combination").

In this case, a reasonable factfinder could conclude that Bang's "unique" or "unusual" trade dress serves to identify its source. For example, unlike many of the cans before this Court, the Bang can has a bold, brightly colored rim that spans the top of the can. The Bang trade dress also features the phrase "POTENT BRAIN AND BODY FUEL" below the product name—a phrasing and location that are apparently unique to the Bang can. The can bears a '0 CALORIES PER CAN' designation, outlined in a white box, on the bottom corner of the front of the can, which is largely absent from the other cans the parties have submitted. Moreover, while several of its competitors' cans feature a graphic against the black background, Bang's background is completely black. And even Monster acknowledges that only Bang features the (arguably-distinctive) "b" logo. The picture below illustrates some of these Bang-specific peculiarities:



*See* Motion at 5. Although many of these elements appear *individually* on other energy drink cans, a reasonable factfinder could conclude that Bang's combination of these elements conveys a "unique" overall impression.

Indeed, while Monster now maintains that *no* reasonable person could *ever* find Bang's can unique, its *own employee* suggested otherwise. *See* Opposition Ex. E. While helping to design Monster's Reign dress, that employee, drawing on the Bang dress for inspiration, noted: "They've used powerful color combinations to really ***pop off shelf***. It's definitely working and managed to capture a new consumer base." *Id.* (emphasis added). It is difficult to see how the Bang cans could "pop off the shelf," so to speak, if the packaging were only a "mere refinement" of other drinks on the market.

This conclusion is consistent with the Eleventh Circuit's decision in a similar case. *See AmBrit*, 812 F.2d at 1537–37. In *AmBrit*, the Eleventh Circuit affirmed—albeit on clear error review—the district court's conclusion that the Klondike bar's packaging was inherently distinctive. *Id*. The Klondike wrapper had a square size, bright silver and royal blue coloring, a pebbled texture, and images of polar bears and sunbursts. *Id.* at 1536–37. The court rejected Klondike's competitor's argument that the Klondike packaging was a "mere refinement" of other industry packaging because "third parties have used these same elements in connection with their packaging of ice cream products and frozen desserts." *Id.* at 1537. As the court explained:

> Isolated or piecemeal third party uses of various elements of the Klondike trade dress do not detract from the distinctiveness of the overall impression conveyed by the combination of those elements on the Klondike wrapper. Indeed, third party use of one or more suggestive or arbitrary elements of a plaintiff's trade dress renders that trade dress indistinct only if the third party use is so extensive and so similar to the plaintiff's that it impairs the ability of consumers to use the trade dress of the products to identify their source.

*Id.* Applying this standard, this Court cannot say that, to *any* rational factfinder, Bang's dress is so similar to other cans that consumers could not use Bang's dress to identify the cans' source.

Notably, in similar situations, courts have declined to find that a trade dress is not inherently distinctive—at least at summary judgment. *See, e.g.*, *Remcraft Lighting Products*, 706 F. Supp. at 857–58. In *Remcraft*, which involved the design of a lamp, the Court denied summary judgment on the question of inherent distinctiveness. In the Court's view, even if there were "many similar designs in the market," the "real issue is . . . whether the [product] is sufficiently distinct that it can be differentiated from other products." *Id.* at 858. And this issue was a "question of fact" the Court refused to answer at summary judgment. *Id.* The *Remcraft* Court's reasoning is apposite here: Although there may be similar energy drinks in the market, a reasonable factfinder could conclude that Bang is different *enough* to maintain its distinctiveness.

Indeed, given the fact-intensive nature of this inquiry, courts routinely decline to decide the question of inherent distinctiveness at summary judgment. *See, e.g.*, *Paramount Farms Int'l LLC v. Keenan Farms Inc.*, 2012 WL 5974169, at *6 (C.D. Cal. Nov. 28, 2012) (concluding—based on the plaintiff's pistachio-packaging's colors, its font, and its vertical printing of the word "pistachios"—that "there is, at a minimum, a triable issue whether the [trade dress] is inherently distinctive"); *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 897–98 (S.D. Tex. 2011) (holding—because "no other motor oil contains the exact combination of features of the [plaintiff's motor oil] bottle"—that a "jury in this case could reasonably find" that the bottle is "either a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods or not" (internal quotation marks omitted)); *X-IT Prod., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 620 (E.D. Va. 2001) (finding—based on the plaintiff's ladder-packaging's dimensions and picture—that a "reasonable jury could conclude on the facts submitted that [the] packaging trade dress is inherently distinctive").

Against all this, Monster contends that "the elements of VPX's alleged trade dress, individually and in combination, are very 'common,' are not 'unique or unusual,' and are at most 'a mere refinement of a commonly-adopted and well-known form of ornamentation.'" *See* Motion at 31. In support, Monster advances three arguments—all unconvincing.

*First*, Monster attacks each *individual* component of Bang's trade dress *in isolation* and argues that Bang deserves no protection here because each component is already (and widely) used elsewhere in the industry. *See* Motion at 24–26. But, as *AmBrit* and *Remcraft* make plain, the test is *not* whether each feature of the Bang trade dress is *individually* distinctive—but rather whether all the features, *taken together*, convey a unique or distinctive impression. *See Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238, 1248 (10th Cir. 2016) ("While each of these elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness." (quoting *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (2d Cir. 1993))); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. 2010) ("The existence of non-distinctive elements does not eliminate the possibility of inherent distinctiveness in the trade dress as a whole." (cleaned up)). Monster's first argument thus proves too little.

*Second*, Monster suggests that some of the Bang trade dress' components are "irrelevant" to the distinctiveness inquiry because Reign does not incorporate them. *See* Motion at 24–26, 29. But Monster's decision not to incorporate some of Bang's features speaks only to the likelihood that a consumer might be confused by the similarities between the two products—a different element of VPX's trade dress claim, which (incidentally) Monster has chosen *not* to challenge here. By contrast, on the element Monster has attacked—whether Bang's trade dress is inherently

distinctive—the Court must look to the entire panoply of Bang's features, both those Reign may have incorporated and those it has chosen to discard. It is, for this reason, difficult to understand how *Monster's* subsequent decision to incorporate only some of Bang's features could affect the distinctiveness—if it exists—of the Bang can. To use one obvious example: Imagine a trade dress suit by Coca-Cola against a company that had copied only the red hue of the Coke can. It would be absurd for that company to argue, at summary judgment or elsewhere, that Coca-Cola's trade dress is not inherently distinctive because the competing company had chosen to incorporate only one feature—the color—of that dress. Just so here.

*Third*, Monster urges the Court to look at the below picture and, from it, to conclude that "[n]o rational trier of fact" could find *anything* "distinctive about the claimed features of VPX's alleged trade dress."



Motion at 27. But the Bang trade dress is not, as Monster says, *identical* to the other cans. Indeed, one of Monster's own employees suggested that there was something unique to Bang's packaging. Opposition Ex. E. And, perhaps more fundamentally, Monster's request is simply not appropriate for summary judgment. As several courts have recognized, the concept of inherent distinctiveness is an "intuitive" one that is "heavily fact-dependent." *Ashley Furniture Indus., Inc. v. SanGiacomo*

*N.A. Ltd.*, 187 F.3d 363, 377 (4th Cir. 1999). As a result, "the question of inherent distinctiveness almost always involves heavily disputed facts . . . not ordinarily amenable to summary judgment." *Id.*; *see also Stop Staring! Designs v. Tatyana, LLC*, 2010 WL 11459355, at *3 (C.D. Cal. Nov. 12, 2010) ("Inherent distinctiveness is fact-intensive and rarely suitable for summary judgment."). This is precisely the case here.

## 2.  Secondary Meaning

Secondary meaning "occurs when, in the minds of the public, the primary significance of [the] trade dress is to identify the source of the product rather than the product itself.'" *Miller's Ale House*, 702 F.3d at 1322 (cleaned up) (quoting *Wal-Mart*, 529 U.S. at 211). Because secondary meaning asks an empirical question, "survey evidence 'is the most direct and persuasive evidence' to establish secondary meaning." *Vital Pharm.*, 511 F. Supp. 2d at 1311 (quoting *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999)); *see also Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, 2011 WL 4005454, at *6 (S.D. Fla. Sept. 8, 2011) ("Establishing secondary meaning is best accomplished by surveys or other quantitative evidence."). Whether a product has acquired secondary meaning is a "question[] of fact." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1084 (11th Cir. 2016).

In the absence of a consumer survey, courts in this Circuit consider four factors to determine whether a trade dress has acquired secondary meaning. *See Olem Shoe Corp. v. Washington Shoe Co.*, 2011 WL 6202282, at *20 (S.D. Fla. Dec. 1, 2011), *aff'd*, 591 F. App'x 873 (11th Cir. 2015). The four factors are:

> (1) The length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the trade dress and the plaintiff's business; and (4) the extent to which the public actually identifies the trade dress with the plaintiff's products.

*Id.* (cleaned up) (citing *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1525 (11th Cir. 1991)); *Habersham Plantation Corp.*, 2011 WL 4005454, at *7 (applying the four factors); *see generally Remcraft*, 706 F. Supp. at 858 ("Proof of secondary meaning can be provided by either direct or circumstantial evidence."). Some courts have also recognized that "proof of intentional copying [may be] probative evidence on the secondary meaning issue." *Brooks Shoe Mfg.*, 716 F.2d at 860.

While VPX has not adduced much evidence of secondary meaning, it has provided, in the Court's view, enough to survive summary judgment.

### a.  Length and Manner

*First*, as to the length and manner of use, most courts agree that "exclusive" and "substantial" use is "circumstantial evidence that secondary meaning has attached to the Plaintiff's trade dress." *See Remcraft*, 706 F. Supp. at 858; *see also Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789–90 (8th Cir. 1995) ("[L]ength and exclusivity of continuous use is a factor bearing on secondary meaning . . . ."). Here, the parties agree that the Bang trade dress has remained virtually identical since it was redesigned in October 2015. SOMF ¶ 33. By the time Monster released its Reign energy drink in the spring of 2019, therefore, VPX had been distributing its Bang cans— and, by VPX's account, accumulating brand recognition—for over three years. *Id.* at 29. VPX, to be sure, has been using the Bang trade dress for a relatively short amount of time—and so, its use is not a particularly strong indication of secondary meaning. Nevertheless, courts have found that similar amounts of "continuous use" do have "some bearing on the issue of secondary meaning." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 296 (7th Cir. 1998) (5 years); *see also FN Herstal SA*, 838 F.3d at 1084 (nearly 2 years); *Sparrow Barns & Events, LLC v. Ruth Farm Inc.*, 2019 WL 1560442, at *6 (E.D. Tex. Apr. 10, 2019) (nearly 5 years); *Landscape Forms, Inc. v.*

*Columbia Cascade Co.*, 117 F. Supp. 2d 360, 366 (S.D.N.Y. 2000) (5 years); *cf.* 15 U.S.C. § 1052 ("The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made."). The Eleventh Circuit has noted that "[t]here is no fixed rule as to the length of time a symbol must be in use before it can achieve secondary meaning," *FN Herstal SA*, 838 F.3d at 1084 (quoting McCarthy on Trademarks § 15:54), and has cited approvingly to a Second Circuit decision that affirmed a finding of secondary meaning after only eleven months of use, *id.* (citing *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 544 (2d Cir. 1956)).

Pointing to the length-and-manner factor's "exclusivity requirement," Monster contends that "[t]he use of so many similar trade dresses by third parties . . . strongly militates against any finding of secondary meaning." Motion at 34. But, as the Court has already detailed, the extent to which Bang offers a unique overall impression is a matter of genuine dispute: VPX says the Bang can's features are collectively unique; Monster says they are not. Either way, Monster's objection only highlights the importance of resolving this fact-intensive dispute at trial. *See, e.g.*, *Cal. Scents v. Surco Prod., Inc.*, 28 F. App'x 659, 663 (9th Cir. 2002) (denying summary judgment on the issue of secondary meaning, in part, because the plaintiff "raised a genuine issue of material fact as to the exclusivity of its use of [the product's] trade dress").

### b.  Advertising and Sales

*Second*, a reasonable factfinder could weigh the next two factors—VPX's advertising campaign and its effort to create a conscious connection in the public's mind between the Bang trade dress and the Bang brand—in VPX's favor. In assessing these factors, the Eleventh Circuit

has recognized that "sales and advertising may be considered by the finder of fact in making the secondary meaning inquiry." *AmBrit*, 812 F.2d at 1540. Sales and advertising *do not*, in all cases, establish secondary meaning. Instead, there must be some link between the trade dress and its sales or its advertising:

> For advertising to serve as evidence to prove secondary meaning in a trade dress case, the advertising must draw attention to the alleged trade dress. Similarly, to use the volume of sales to serve as evidence to prove secondary meaning in a trade dress, there must be some proof that the sales were generated by the alleged trade dress rather than by factors other than source identification.

*See* MCCARTHY ON TRADEMARKS § 8:8.50; *see also Hard Rock Cafe Int'l USA, Inc. v. RockStar Hotels, Inc.*, 2018 WL 7825183, at *18 (S.D. Fla. June 13, 2018) (explaining that evidence of advertising "emphasizing" or "highlighting" the trade dress can support secondary meaning); *Investacorp*, 722 F. Supp. at 724 (noting that "[m]ore is needed to establish the necessary consumer association than the mere proof of sales and growth").

VPX's internal records show that, in 2018 and 2019 alone, it spent over $1.7 million on advertising and marketing for Bang. *See* Opposition Ex. FF. Crucially, many of those advertisements *prominently* featured—that is, "dr[e]w attention to," "emphasize[d]," or "highlight[ed]"—the Bang trade dress. Here are just a few examples:



[ECF No. 281-3] at 7.

The evidence also suggests that VPX had a substantial platform to reach the consuming public. Indeed, according to VPX, its social media network spans hundreds of thousands of

followers and reaches over 230 million people worldwide. *See* [ECF No. 38-1] ¶ 37. Given this reach, VPX had a significant opportunity to influence the minds of consumers and to acquire secondary meaning. A reasonable factfinder, in sum, could conclude that VPX's advertising efforts support its claim that Bang's trade dress has achieved secondary meaning. *See, e.g.*, *Jenny Yoo Collection, Inc. v. Essense of Australia, Inc.*, 2019 WL 2717167, at *9 (D. Kan. June 28, 2019) (finding that advertising to "84,800 Instagram followers and 17,046 Facebook followers"—fewer, by an order of magnitude, than the hundreds of thousands of followers Bang has accumulated here—"support[s] an inference that [the plaintiff's] trade dress has achieved secondary meaning"); *GamerModz, LLC v. Golubev*, 2011 WL 4755026, at *3 (M.D. Fla. Aug. 3, 2011) (concluding that advertising expenditures of only $100,000, which resulted in approximately 200,000 visits to the plaintiff's website, supported secondary meaning); *Carillon Importers Ltd. v. Frank Pesce Grp., Inc.*, 913 F. Supp. 1559, 1565 (S.D. Fla. 1996) (finding that a vodka bottle's "trade dress is strong and therefore merits protection," in part, because of $55 million in sales over 5 years and "multi-million dollar[s]" in advertising).

As for sales, VPX points out that, during the 52-week period ending April 21, 2019, it sold more than 213 million cans of Bang—with gross sales totaling $556 million. Opposition at 16. For context, the Eleventh Circuit found no clear error in the district court's holding that the Klondike bar's wrapper had acquired secondary meaning partly due to evidence of "extensive sales—36 million bars in the 1980 fiscal year" (or just 17% of the number of Bang cans sold in a similar one-year period). *See AmBrit*, 812 F.2d at 1540 n.40. To Monster's point, VPX does little to link these sales to its trade dress. The sales, for example, may be driven entirely by factors other than Bang's trade dress—most obviously, perhaps, by the drink itself. But, construing the evidence—as the Court must—in the light most favorable to VPX, there is *at least* some evidence linking Bang's

sales to its trade dress, including a Monster employee who (arguably) attributed Bang's success to its dress. *See* Opposition Ex. E ("Attached is a line up shot of Bang. They've used powerful color combinations to really pop off shelf. It's definitely working and managed to capture a new consumer base."). A reasonable factfinder could thus conclude that Bang's enormous sales are suggestive of secondary meaning.

Monster largely takes issue with VPX's advertising—and, in particular, complains that the advertisements do not explicitly tell consumers to "look for" the Bang dress. Opposition at 27–28. Relying on the First Circuit's decision in *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25 (1st Cir. 2001), Monster argues: "To be probative of secondary meaning, the advertising must direct the consumer to those features claimed as trade dress. Merely 'featuring' the relevant aspect of the product in advertising is no more probative of secondary meaning than are strong sales . . . ." Motion at 27–28 (quoting *Yankee Candle*, 259 F.3d at 44). But the First Circuit's conclusion— that featuring the trade dress is insufficient to support a finding of secondary meaning *unless* the advertisement "directs" consumers to the dress—appears to be at odds with what we know about human cognitive behavior. If, for example, something as subtle as playing French music in a store makes customers more likely to buy French wine, it is difficult to believe that advertisers would need to spell out *so explicitly* what consumers need to "look for" in a product before those consumers draw the desired connection between the product's trade dress and its producer. *See* A. C. North, *et al.*, *The Influence of In-Store Music on Wine Selections*, 84(2) J. APPLIED PSYCHOL. 271 (1999); *see generally* DANIEL KAHNEMAN, THINKING, FAST AND SLOW 13 (2011) (explaining the "complexity and richness of the automatic and often unconscious processes that underlie" our thinking).

The First Circuit's decision is also at odds with the view adopted by other courts—perhaps most notably the Ninth Circuit. That circuit has repeatedly said that "image advertising"—advertising that "'feature[s] in some way the trade dress itself'"—supports an inference of secondary meaning, *even if* the advertisement does not explicitly "urge[] the customer to 'look for' the . . . claimed elements" of [the] trade dress." *Sunburst Prod., Inc. v. Derrick Law Co.*, 922 F.2d 845, 845 (9th Cir. 1991); *see also Paramount Farms Int'l LLC*, 2012 WL 5974169, at *7 ("Significantly, all of these commercials contain elements to educate viewers about the Claimed Trade Dress. At the close of each commercial, Plaintiff's pistachio package emerges from a pistachio shell."); *Givenchy S.A. v. BCBG Max Azria Grp., Inc.*, 2012 WL 3072327, at *5 (C.D. Cal. Apr. 25, 2012) ("These advertisements portray . . . the handbags, with the design features prominently visible . . . and the word 'Givenchy.' Thus, these advertisements appear to endeavor to reinforce the connection consumers draw between the design features of the handbags and its source—Givenchy.").

Fortunately, the Eleventh Circuit has weighed in on this question. In considering whether a company's "V" design on its shoes had acquired secondary meaning, the court concluded that it did not because the seller "did not engage in substantial 'image advertising,' featuring the 'V' design and other aesthetic aspects of the shoes." *Brooks Shoe Mfg.*, 716 F.2d at 860. The ineluctable inference, of course, was that the advertising *would have* tilted in favor of secondary meaning if—as VPX has done here—the plaintiff had prominently featured the design in its ads. Ultimately, then, Monster asks for too much. While an advertisement that explicitly directs consumers to a product's trade dress may *help* to foster secondary meaning, it is not *necessary* to do so.

26

### c.   Intentional Copying

*Third*, a reasonable factfinder could conclude that VPX's evidence of intentional copying militates in favor of secondary meaning. The Eleventh Circuit has held that "proof of intentional copying is probative evidence on the secondary meaning issue." *Brooks Shoe Mfg.*, 716 F.2d at 860. At the same time, the court has cautioned that "close copying does not *necessarily* indicate that the defendant has attempted to capitalize on the secondary meaning of plaintiff's trademark or trade dress." *Id.* There may be perfectly legitimate reasons to copy or imitate features of another company's product. Competitors "may, for example, choose to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844–45 (9th Cir. 1987). As a result, the Eleventh Circuit has looked to whether the alleged copying indicates that a company adopted its trade dress "to take advantage of the popularity of [its competitor's dress] on the market." *FN Herstal SA*, 838 F.3d at 1086.

VPX has adduced circumstantial evidence of intentional copying. As an initial matter, of course, a reasonable factfinder could notice a substantial resemblance between the Bang and Reign cans, as shown below:



Opposition at 4. Beyond this resemblance, Monster's internal documents indicate that its "[o]bjective" in designing the Reign can was to "compete with Bang"—a statement that would seem to ascribe to Monster both the motive and the opportunity to copy the Bang dress. *See* Opposition Ex. A. And, indeed, some Monster documents even suggest that it relied on the Bang can for inspiration. One e-mail, for instance, said: "As you see with Bang, it's bright and fun but still black, not too hard." *See* Opposition Ex. E. Another shows more than ten prototypes of the Reign can placed alongside images of Bang's cans. *See* Opposition Ex. P. As Monster drove its new energy drink to the market, it urged its employees to "[p]rioritize displays at launch and position Reign adjacent to Bang wherever they exist." Opposition Ex. U; *see also* Opposition Ex. L (instructing staff that Reign "MUST be touching Bang" in any account that sells Bang). And, as it released its new product, Monster referred to Reign as a "BANG killer," Opposition Ex. A, and used slogans such as "FUCK BANG" and "#FBang," Opposition Exs. F, W.

There are admittedly different ways to view this evidence. Monster, for its part, insists that it was only *competing* with Bang—not *copying* it. Motion at 11. VPX's position, on the other hand, is that Monster copied certain critical features of the Bang dress and then instructed its employees to place Reign right next to Bang "wherever they exist" in an unabashed attempt to capitalize off the secondary meaning Bang had already developed. Opposition at 15. Given these plausible alternative positions, the Court finds that—at least when the evidence is viewed in the light most favorable to VPX—a reasonable factfinder could weigh this factor in VPX's favor. *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1264 (9th Cir. 2001) ("No doubt, the statements at issue are subject to various interpretations. But the very fact that the court acknowledged that the evidence of copying was 'contested' and 'controverted' should have precluded summary judgment.").

***

To summarize, although VPX has pointed the Court to no direct evidence that consumers associate the Bang trade dress with the Bang brand, VPX has provided enough circumstantial evidence to create a genuine issue on the question of secondary meaning. As the Northern District of California explained in a similar case: Although the plaintiff "does not offer much evidence to establish secondary meaning of its marks and dress . . . , the evidence is sufficient to create a disputed issue of fact concerning secondary meaning." *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 251 F. Supp. 3d 1288, 1303 (N.D. Cal. 2017); *see also Cal. Scents*, 28 F. App'x at 662 (finding a genuine issue of fact on question of secondary meaning, even though the plaintiff "provided minimal evidence that some actual purchasers may associate its dress with the source"); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 312–13 (6th Cir. 2001) ("While consumer surveys certainly would have been helpful to [the plaintiff's] claim, their absence is not fatal, at least on summary judgment."); *Miller's Ale House*, 702 F.3d at 1319 (noting that "secondary meaning" is a "[f]act-intensive issue[]").[7]

## B. Trademark

While VPX's trade dress claim presents genuine issues of material fact, its trademark claim—that *it* owns the REIGN mark and that Monster is infringing on that mark—is simply not close. Indeed, on this second claim, every fact and (just about) every consideration weighs decisively against VPX.

---

[7] In *Sazerac*, after denying summary judgment, the court held a bench trial in which it ultimately found that the plaintiff had failed to establish secondary meaning. In so holding, the court noted that, "[i]n the final analysis, this case was not close." *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1016 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir. 2019). While this case may very well end up the same way, the Court is simply not authorized, at this juncture, to weigh the evidence as Monster requests.

To prevail on a trademark infringement claim, "a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1130–31 (11th Cir. 2018) (quoting *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010)).

Here, both parties agree that their simultaneous use of the REIGN mark on energy drinks is likely to confuse consumers. The gravamen of their dispute, then, is the question of ownership: VPX argues that its purchase of the REIGN mark establishes its ownership of that mark; Monster, by contrast, contends that its rights are superior to VPX's because it used the REIGN mark first and because VPX's purported purchase of the mark's registration was invalid.

### 1. Monster Used the REIGN Mark First

"Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *FN Herstal SA*, 838 F.3d at 1080–81 (quoting *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015)). In this case, it is undisputed that Monster used the REIGN mark in commerce *before* VPX.[8] Monster had

---

[8] Curiously, in its Response to Monster's Statement of Material Facts, VPX disputed Monster's "characterization that 'Monster [had] completed its nationwide launch of its REIGN energy drinks'" three days before VPX's March 28, 2019 Instagram announcement. VPX Resp. SOMF ¶ 18. The disputation is curious because VPX did not contest Monster's earlier statement that its introduction of Reign "culminated in the nationwide launch of REIGN in all remaining states on March 25, 2019." *Id.* ¶ 3 (failing to dispute the point). This incongruity is, for four reasons, not problematic. *First*, in its Complaint, VPX admits that Monster launched Reign "domestically" on March 25, 2019. *See* Compl. [ECF No. 1] ¶ 77. *Second*, VPX has *never* contended that it was the first to distribute Reign or that it obtained its rights through first use. Any arguments to that effect are therefore waived. *See, e.g.*, *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). *Third*, given these first two points, the Court reads VPX's failure to contest Monster's earlier averment—that Monster had launched Reign nationwide on March 25, 2019—

introduced, distributed, and launched its Reign energy drink nationwide before VPX even announced on Instagram its intention to (someday) introduce a competing Reign energy drink. In fact, VPX introduced its competing Reign on the *same day* that it filed this lawsuit—through which it sought to halt Monster's already-ongoing distribution of Reign—and boasted: "MAJOR LAWSUIT FILED!!!!! BANG ENERGY REIGNS ON MONSTER'S CHARADE!" [ECF No. 141-3] ¶ 11. And, in its Complaint—which, again, VPX filed before it ever offered Reign for sale—VPX recognized that Monster's Reign was already "available for purchase throughout the United States." *See* Compl. [ECF No. 1] ¶ 78. In short, Monster launched Reign nationwide on March 25, 2019; VPX announced that it would produce a competing Reign drink on March 28, 2019; and VPX did not begin selling its competing drink until late April 2019. Because VPX did not use the mark first, it cannot establish ownership rights on that basis. While registration of a trademark creates a presumption of ownership, the law is clear that first use controls—even over a registered mark. *See* 15 U.S.C. § 1057(c); *see also Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 558 (E.D.N.Y. 2017) (recognizing that first use is "sufficient to overcome the presumption of validity created by the plaintiff's registration of the trademark"). Monster thus has priority over the REIGN mark unless VPX can show that it acquired priority through its purchase of the REIGN registration from Dash.

---

as dispositive. Viewed this way, the two VPX statements are not inconsistent because Monster could have launched Reign on March 25, 2019—as VPX concedes in its Complaint—even if, as VPX's second disputation suggests, that nationwide launch was not "completed" on *that* day. *Fourth*—and in any event—even a cursory review of the record establishes that there is no genuine dispute on this issue. *See, e.g.*, [ECF No. 1-3-1-4] (media coverage of Reign in January 2019); [ECF No. 141-1] ¶ 12 (declaration stating that Reign launched nationwide on March 25, 2019); [ECF No. 141-3] ¶ 11 (Bang social media post referencing market presence of Monster's Reign). On this record, then, any reasonable factfinder would have to conclude that Monster distributed Reign nationwide *before* VPX entered the market with its own (competing) Reign drink.

To that end, VPX contends that, through the Assignment Agreement it signed with Dash, it inherited Dash's first use of the REIGN mark. Specifically, because Dash used the mark in 2015—well before Monster began selling Reign energy drinks—VPX claims that its use of the REIGN mark has priority over Monster's. Unfortunately for VPX, its purchase was an "assignment in gross," which exchanged *no* rights in the REIGN mark.

### 2.   VPX's Assignment in Gross Transferred No Rights in the REIGN Mark

To be fair, VPX is partly right: priority is assignable. In other words, a party who purchases a trademark inherits the seller's date of first use—and, with it, the seller's priority. *See Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1310 (11th Cir. 1999) (noting that "an assignee of a trademark steps into the shoes of the assignor"); *see also* MCCARTHY ON TRADEMARKS § 18:15 ("All courts follow the rule that . . . after a valid assignment, the assignee acquires all of the legal advantages of the mark that the assignor enjoyed, including priority of use.").

But to transfer a trademark—and its priority—successfully, the purchase and sale of the mark must be *valid*. *See Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002). The sale of a trademark *without* its goodwill, however, is an "assignment in gross" and is *invalid*. *See* 15 U.S.C. § 1060(a)(1) ("A registered mark . . . shall be assignable with the good will of the business in which the mark is used . . . ."). As the Eleventh Circuit has explained: "[I]t is well-settled law that the transfer of a trademark or trade name without the attendant good-will of the business which it represents is, in general, an invalid, 'in gross' transfer of rights." *Int'l Cosmetics*, 303 F.3d at 1246; *see also Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 189 n.9 (11th Cir. 2005) (holding that a transfer of a trademark without the associated goodwill was "an invalid transfer 'in gross'").

This "anti-assignment-in-gross" rule is deeply rooted in trademark law. *See, e.g.*, *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) (noting the "fundamental error of supposing that a trade-mark right is a right in gross"). The rule's basic purpose is to prevent the consumer deception that is likely to occur when a party purchases a trademark and then uses that mark for a *different* product. *See Heron Dev. Corp. v. Vacation Tours, Inc.*, 2017 WL 5957743, at *5 (S.D. Fla. Nov. 30, 2017). When the purchaser of a trademark makes meaningful changes to the product, sale under the same tradename may "result in a fraud on the purchasing public, who reasonably assume that the mark signifies the same nature and quality of goods" sold. *Id.* (quoting MCCARTHY ON TRADEMARKS § 18:3).[9] "The consumer might buy a product thinking it to be of one quality or having certain characteristics and could find it only too late to be another." *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 289 (8th Cir. 1969). "As a matter of theory, the prohibition on transfers in gross should be a firm one." Stephen L. Carter, *The Trouble with Trademark*, 99 Yale L.J. 759, 786 (1990).[10]

Whether a trademark has been transferred along with its (intangible) goodwill is not always—or even ever—pellucid. As a result, courts have designed a variety of tests to determine whether a transfer constitutes an assignment in gross. Each of these tests serves the same purpose: preventing the consumer deception that is otherwise likely to occur when a trademark for one good

---

[9] *See generally* Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1709 (1999) ("It is hard to see how the goals of preventing consumer confusion and encouraging investments in product quality would be furthered by allowing a company to sell the rights to a mark to another who will not make the same products. If anything, assignments in gross are vehicles for adding to consumer confusion, not reducing it.").

[10] The doctrine is not only firmly established in case law and theory—it is also (arguably) mandated by Congress, which rejected an early version of the Lanham Act that would have permitted trademarks to be assigned *without* their goodwill. *See* McCarthy on Trademarks § 18:10 (detailing the legislative history); *see also Ludden v. Metro Weekly*, 8 F. Supp. 2d 7, 16 (D.D.C. 1998) ("In this country, in the congressional debates surrounding passage of the Lanham Act, an attempt to prevent codification of the anti-assignment-in-gross rule failed.").

is sold and then used for a different good. *See PepsiCo*, 416 F.2d at 288 ("Inherent in the rules involving the assignment of a trademark is the recognition of protection against consumer deception."). As it turns out, these tests all confirm that VPX's "purchase" of the REIGN mark was, in fact, an invalid assignment in gross.

### a. VPX and Dash's Reign Products Are Not Substantially Similar

To determine whether a trademark was assigned with the goodwill the mark has come to represent, courts look (primarily) to whether the assignee is using the mark for a "substantially similar" product. *See, e.g.*, *Marshak v. Green*, 746 F.2d 927, 930 (2d Cir. 1984); *Sugar Busters*, 177 F.3d at 266 ("[T]he transfer of goodwill requires only that the [goods] be sufficiently similar . . . ." (quoting *Visa, U.S.A., Inc. v. Birmingham Tr. Nat. Bank*, 696 F.2d 1371, 1376 (Fed. Cir. 1982))); *BBC Grp. NV LLC v. Island Life Rest. Grp. LLC*, 413 F. Supp. 3d 1032, 1041 (W.D. Wash. 2019) (applying the "substantially similar" test); *see also Int'l Cosmetics*, 303 F.3d 1246 (finding that an "assignment was not in gross" when the assignee continued to use the mark on "the *very goods* which created [the mark's] reputation" (emphasis added)).

When the assignee uses the mark for a "substantially similar" product, "consumers [will] not be deceived or harmed" as they continue to rely on the brand they have come to trust. *See Marshak*, 746 F.2d at 930; *see also Heron Dev. Corp.*, 2017 WL 5957743, at *6 (no assignment in gross when the assignee sold "the very same travel products and services," and so the assignment "present[ed] no risk of deceiving the public"). In protecting consumers, "[e]ven minor differences can be enough to threaten customer deception." *Clark & Freeman Corp. v. Heartland Co.*, 811 F. Supp. 137 (S.D.N.Y. 1993) (finding an assignment in gross when assignee transitioned from selling women's shoes to men's shoes).

34

Here, no reasonable factfinder could conclude that the products Dash and VPX sold under the REIGN mark are "substantially similar." In fact, far from selling a substantially similar product, VPX entirely abandoned the product Dash had sold. It is undisputed, for instance, that Dash's Reign was a powdered nutritional supplement sold in forty-serving containers, while VPX's Reign is a single-serving, ready-to-drink, carbonated beverage. SOMF ¶¶ 21, 23. The ingredients of the products are also completely different. Of the roughly twenty ingredients in VPX's energy drink, only one—caffeine—also appeared in Dash's powder. *Id.* ¶ 25; *see also* [ECF No. 242-1], Ex. 4 at 318:6–20 (admission by VPX's CEO that what the products have in common is caffeine). Given these differences, consumers of VPX's Reign are left with *no* guarantee that they are purchasing goods of the same "nature and quality previously associated with the mark." *See Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1109 (C.D. Cal. 2003). In this sense, VPX has left behind *any* goodwill Dash had earned for its mark.

Not surprisingly, federal courts across the country have found that comparable changes between an old and a new product signal an assignment in gross. So, for example, the Eighth Circuit found that a cola-flavored drink differed substantially from a pepper-flavored drink and concluded that, because the assignee "changed the type of beverage altogether," its continued use of the mark may "deceive the public." *See PepsiCo*, 416 F.2d at 288. Here, VPX did not simply change the flavors of Dash's product; it changed products completely, shifting from a powdered nutritional supplement to a carbonated beverage—thereby exacerbating the potential harm to unsuspecting consumers. VPX attempts to distinguish *PepsiCo* by claiming that the Eighth Circuit's ruling was premised on the fact that the drinks did not target similar consumers. *See* Opposition at 20. But the Court finds no basis in that opinion for VPX's reading. The *PepsiCo* Court was clear: the two flavored drinks—just like the two products here—were "totally different

product[s]," and so, permitting them to be sold under the same name "would be to condone public deceit." 416 F.2d at 289–90.[11]

Similarly, in *Archer Daniels Midland Co. v. Narula*—a case that is directly on point here— the court found that the evidence before it "actually seem[ed] to indicate that [the products] may not be similar" at all because one was "a ready-made beverage" while the other was a "powder[] used to make beverages." 2001 WL 804025, at *7 (N.D. Ill. July 12, 2001). This is exactly what happened here. Although the *Archer Daniels* Court, as VPX points out, ultimately declined to enter summary judgment on this issue, its decision resulted only from a defect in the parties' briefing. While the evidence "seem[ed] to indicate" that the products were entirely different, the court was concerned that the "evidence does not tell us enough about [the new product] to permit us to fully compare it with [the predecessor's] products." *Id.* at *7. There was, for instance, no evidence in that case about the two products' *ingredients*. Here, by contrast, the parties have extensively briefed the many salient differences between Dash and VPX's Reign. Because, in sum, there is no similar lacuna in the evidentiary record, the Court sees no reason to withhold summary judgment in this case.

Other federal courts have reach similar conclusions. *See, e.g.*, *Sugar Busters*, 177 F.3d at 266–67 (book for diabetics and store for diabetics are not substantially similar); *Marshak*, 746 F.2d at 928–29 (two music groups are not substantially similar); *Atlas Beverage Co. v. Minneapolis Brewing Co.*, 113 F.2d 672, 677 (8th Cir. 1940) (whiskey and beer are not substantially similar); *BBC Grp.*, 413 F. Supp. 3d at 1041–42 (Korean restaurant and Mediterranean restaurant are not substantially similar); *interState Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 349–50 (D.N.J.

---

[11] Justice Blackmun—who, at that time, sat on the Eighth Circuit—concurred with the majority on all but one (unrelated) issue.

2004) (payment software and banking software are not substantially similar); *Clark & Freeman*, 811 F. Supp. at 137 (women's shoes and men's shoes are not substantially similar). While VPX attempts to distinguish these decisions by nitpicking them to obsolescence, *see* Opposition at 20–21, the Court is unconvinced. If VPX is right, *all* of these courts must have been wrong—and this is just not plausible.

Trying to parry this result, VPX offers three arguments—all unavailing.

*First*, noting that the products need not be "identical," VPX claims that its energy drink is sufficiently similar to Dash's powder because both are fruit-flavored, pre-workout, dietary supplements. *See* Response at 19. VPX is right (to a degree): some courts have found assignments valid *despite* minor changes in the product. *See, e.g.*, *Brady v. Grendene USA, Inc.*, 2015 WL 3539702, at *8 (S.D. Cal. June 3, 2015) (different materials for footwear); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899 (E.D.N.Y. 1988) (different cigarette paper); *Hy–Cross Hatchery, Inc. v. Osborne*, 303 F.2d 947 (C.C.P.A. 1962) (different breeds of chicken). But these cases simply reflect the reality that not *every* product change will confuse (or matter to) consumers.[12] Here, however, the revamp VPX implemented—including a *complete* change in ingredients—may very well matter to consumers. By the same token, the superficial similarities

---

[12] In *Brady*, for example, a change in shoes from leather sandals to plastic flip-flops would have been sufficiently obvious to consumers. 2015 WL 3539702, at *8. In *Bambu*, a slightly thinner cigarette paper would be unlikely to harm consumers. 683 F. Supp. at 908. And, in *Hy-Cross*, the continued use of the trademark on different breeds of chicken would not be confusing because the type of chicken was indicated in the product's full name. 303 F.2d at 1167. Although all of these decisions are readily distinguishable from this case, it is worth noting that at least one of them—*Hy-Cross*—has been the subject of intense criticism. In his concurrence in *PepsiCo*, for instance, then-Judge Blackmun suggested that *Hy-Cross* should be narrowly circumscribed to its facts—since it was a "peculiar case factually" in that it involved "live baby chicks." 416 F.2d at 290 (Blackmun, J., concurring). In Judge Blackmun's view, to the extent litigants sought to read *Hy-Cross* as establishing anything more than that, its ruling should be rejected as "aberrational to settled authority." *Id.*

between VPX's beverage and Dash's powder—similarities VPX leans on—are also part of the problem: by including some similar features in what is otherwise an entirely different product, VPX's strategy threatens to confuse consumers even more.[13]

*Second*, VPX argues that the "substantially similar" test is, in fact, *not* about whether the products are substantially similar, but rather whether they are designed to appeal to similar groups. *See* Response at 19. But, as Monster correctly points out, the cases VPX cites for this proposition say only that, for two products to be deemed similar, they must appeal to similar groups. *See, e.g.*, *BBC Grp.*, 413 F. Supp. 3d at 1041–42 ("'Substantially similar' products must have more in common besides belonging to the same general category of products—they must also appeal to similar customer groups."). What these cases never suggest is that appealing to similar consumer groups is *sufficient* to show substantial similarity. Nor could they. Such a rule, after all, would violate the well-rooted principle that appealing to similar groups, without more, is insufficient to establish substantial similarity *See, e.g.*, *Sugar Busters*, 177 F.3d at 266 (holding that products appealing to diabetics are not substantially similar); *PepsiCo*, 416 F.2d at 288 (holding that products appealing to soda drinkers are not substantially similar). Indeed, because VPX's energy drink and Dash's powder may cater to similar customers, it is even *more* likely that VPX's decision to sell its *different* product, under the same name, will prove misleading.

---

[13] In a similar argument, VPX claims that its Reign is substantially similar to Dash's Reign because (according to VPX) they both belong to the same USPTO category: "Dietary and nutritional supplements." *See* Opposition at 19. But, even if the products belong to the same *category*, VPX's position has absolutely no basis in the law. Courts, after all, have recognized that belonging to the same USPTO category *does not* somehow render those products substantially similar. *See, e.g.*, *Schmidt v. Versacomp, Inc.*, 2011 WL 13172509, at *5 (S.D. Fla. Feb. 17, 2011) (Jordan, J.) (finding that two products were not substantially similar even though both were vehicle lifts); *BBC Grp.*, 413 F. Supp. 3d at 1041–42 (explaining that "products must have more in common besides belonging to the same general category of products").

*Third*, in what turns out to be a perfect example of what makes VPX's assignment an assignment in gross, VPX cites Gatorade, a well-known sports drink—which, VPX says, "is often sold in ready-to-drink format, but is also sold in powdered form." Opposition at 20. And this powdered form, according to VPX, "is no less 'Gatorade' in the mind of consumers." *Id.* But this is *precisely* the issue. Imagine, for example, that before Gatorade created its powdered product, it sold the Gatorade trademark to VPX. Imagine, too, that VPX then abandoned Gatorade's ready-to-drink beverage and created its own powdered Gatorade—with an entirely new set of ingredients. As VPX puts it, this powdered form would be "no less 'Gatorade' in the mind of consumers." And that, of course, would be the problem: these consumers would be *deceived* into thinking that the source and nature of the product were the same when, in fact, they were not. Swap "Gatorade" for "Dash," and this is exactly what happened here.

The Seventh Circuit faced a similar issue in *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 362 (7th Cir. 1993). In that case, the trademark "Green River" had been used for a soft drink with one formula. *Id.* at 360. A new company sought to purchase the mark and later began using it to sell a soft drink with an entirely different formula. *Id.* As Judge Posner, writing for the court, explained, the "point is not that the product to which a trademark is affixed can never change." *Id.* at 362. Like Gatorade's expansion from a beverage to a powder, "[m]any trademarked products, ranging from Chevrolets to Coca-Cola, have changed enormously over the years." *Id.* "But in these cases the consumer always knew whose product it was that he was getting." *Id.* By contrast, where—as here—a *new* company creates a *new* product under the *same* old mark, the consumer "is the unwitting pawn . . . , being sold a different product, made by a different producer, from the product and producer that the trademark had been meant to identify." *Id.* This VPX cannot do.

There is, then, no genuine dispute on this first factor. Indeed, the underlying facts—that, for instance, VPX created a different product with different ingredients—are undisputed. There is, therefore, nothing for a factfinder to find. And, as the Court details below, the remaining factors only confirm that Dash's assignment was an invalid assignment in gross.

### b. VPX Acquired No Assets from Dash

Beyond looking to whether the products are substantially similar, courts also consider whether the assignee purchased any assets associated with the trademark. *See, e.g.*, *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969) (finding an assignment in gross when assignee did not acquire any "customer lists, merchandise, equipment, recipes, decals or other goods"); *PepsiCo*, 416 F.2d at 290 (finding an assignment in gross when assignee "did not acquire any of the assets" and "did not acquire any formula or process"). As VPX notes, to render an assignment valid, it is certainly not *necessary* to transfer any tangible assets. *See Int'l Cosmetics*, 303 F.3d at 1246. At the same time, the assignee's receipt of no "tangible assets" "tends to show that good will was not transferred." *Archer Daniels*, 2001 WL 804025, at *7 (citation omitted). After all, when the assignee purchases *nothing* but the trademark, the absence of any tangible acquisition may well undermine the public's legitimate expectation that the mark will "go on in real continuity with the past." *White v. Toscano, Inc.*, 2005 WL 8160219, at *5 (M.D. Fla. Oct. 11, 2005).

Apart from the trademark, VPX acquired no assets from Dash. In fact, the Agreement between VPX and Dash specifically contemplated that VPX would purchase the REIGN mark from Dash—and nothing else. *See* Assignment Agreement.[14] The Agreement, for instance, never

---

[14] While the Agreement does say that VPX would receive "any goodwill associated" with the REIGN mark, courts have universally recognized that "a trademark assignment does not transfer goodwill merely because it formally recites that the goodwill is transferred." *Schmidt*, 2011 WL

suggests that VPX intended to purchase any product formula, any piece of equipment, or any other asset from Dash. *Id.* Indeed, as Dash's CEO would reveal in his deposition, Dash had *no* discussions with VPX about selling *anything* other than "Just 'Reign,' the five-letter word." SOMF ¶ 11. This admission from Dash's CEO is undisputed. And, notably, VPX has identified no case, anywhere in the country, in which, after the assignor made a similar admission, the court found that the assignment was valid. This factor, then, also indicates that VPX's purchase was nothing more than an assignment in gross.

### c.  Dash Continues To Capitalize on its Goodwill Under a New Trademark

When a trademark assignor continues to sell its original product, it likely has not transferred the goodwill associated with its prior mark. *See Cal. Packing Corp. v. Sun-Maid Raisin Growers of Cal.*, 81 F.2d 674, 678 (9th Cir. 1936) ("A manufacturer cannot make a valid assignment of a trade-mark and continue the manufacture or sale of the same products in connection with which the trade-mark was used . . . ."); *Archer Daniels*, 2001 WL 804025, at *7 (explaining that an assignor "continu[ing] to sell the same products . . . tends to show that good will was not transferred"); MCCARTHY ON TRADEMARKS § 18:23 (noting that, where the assignor "continues to sell the same products under a different mark, this would tend to prove that the assignee received no good will at all").

___

13172509, at *5; *see also Glow Indus.*, 273 F. Supp. 2d at 1108 ("[A] mere recitation in the assignment agreement 'that the mark was assigned together with the good will of the business symbolized by the mark' is not sufficient to establish a valid transfer." (quoting *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982))). Such recitations are given little, if any, weight. Instead, courts focus on the *substance* of the transaction—viz., the factors discussed here, which demonstrate that Dash transferred no goodwill to VPX. *See, e.g.*, *Schmidt*, 2011 WL 13172509, at *5 (noting that, instead of harping on bare recitations about the transfer of goodwill, "[c]ourts focus, rather, on the nature of the assignee's use of the trademark").

Here, Dash has continued to make a similar powdered supplement under a new name: "Slay." SOMF ¶ 13. But, rather than direct its customers to VPX, Dash announced that it was discontinuing Reign and substituting Slay in its place. *Id.* If there were any doubt about Dash's intentions, its CEO later *confirmed* that Slay was Reign's replacement. *Id.* ¶ 14. Indeed, the company's express goal was to transition customers from Reign to Slay. *Id.* And there is at least some evidence showing that consumers understood Dash's message. For example, when learning about the introduction of Slay, one user of Dash's Reign powder commented, "Ahhhh just ran out of my Reign[,] how timely!" *Id.* ¶ 15. These facts, taken together, likewise support Monster's view that the assignment was in gross. *See Liquid Glass Enters., Inc. v. Liquid Glass Indus. of Canada, Ltd.*, 1989 WL 222653, at *5 (E.D. Mich. Apr. 28, 1989) (holding that an assignor's decision to inform its customers that its product was available under a new tradename evidenced an assignment in gross).

### d.  There Is No Continuity of Management Between Dash and VPX

Courts also look to whether there is a "continuity of management" between the assignor and the assignee such that "the assignee will continue to provide the same quality service." *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 293 F. Supp. 3d 1334, 1366 (M.D. Fla. 2017) (quoting *J. Atkins Holdings Ltd. v. English Discounts, Inc.*, 729 F. Supp. 945, 950 (S.D.N.Y. 1990)). Here, there is no evidence that any Dash employee joined VPX—or vice versa. And, indeed, Dash's CEO specifically testified that, after the assignment, he provided absolutely *no* consulting services to VPX. SOMF ¶ 12. This factor thus further confirms that the assignment was in gross.

***

In short, all of the factors that courts consider—substantial similarity, any asset transfers, the discontinuation of the predecessor product, and any continuation of management—weigh

strongly in Monster's favor. On these facts, then—from the salient differences between the products to Dash's uncontradicted admission that it transferred *nothing* but the REIGN name—no reasonable factfinder could conclude that VPX *owns* the REIGN mark. Instead, based on Monster's undisputed first use, any reasonable factfinder would have to conclude that Monster's first use of the REIGN mark deserves priority.

### 3.   The Parties Agree that their REIGN Marks Are Confusingly Similar

The second element of any trademark infringement claim is likelihood of confusion. *See Commodores Entm't Corp.*, 879 F.3d at 1130–31. To evaluate the likelihood of confusion, the Eleventh Circuit applies a seven-factor test:

> (1) the strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks; (5) similarity of advertising methods; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*See Webster v. Dean Guitars*, 955 F.3d 1270, 1278 (11th Cir. 2020).

There is no genuine dispute of material fact on this element. Indeed, the parties agree that their simultaneous use of the REIGN mark on the same product, in the same stores, and with the same consumers will likely result in confusion. As VPX put it in opposing Monster's preliminary injunction motion, "VPX and Monster agree . . . the parties' simultaneous uses is likely to cause confusion." [ECF No. 152] at 9.[15] And VPX never disputes this likelihood of confusion in its Opposition to Monster's Motion for Summary Judgment. It has therefore waived any such argument. *See, e.g.*, *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived."); *Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a

---

[15] This is unsurprising. Proving that the two Reign products were likely to confuse consumers is an element of VPX's own trademark claim.

summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). The Court thus concludes that the parties' simultaneous use of the REIGN mark is likely to confuse consumers.

### 4. Cancellation of the REIGN Mark

The parties agree that the Lanham Act permits a district court to direct the cancellation of a trademark registration either when that registration has been determined to be "invalid" or when the mark has been "abandoned." *See, e.g.*, *Playnation Play Sys. v. Velex Corp.*, 924 F.3d 1159, 1170 (11th Cir. 2019); *AmBrit*, 812 F.2d at 1550–51. Under 15 U.S.C. § 1119, "in any action involving a registered mark the court may . . . order the cancelation of registrations, in whole or in part." In *interState Net Bank v. NetB@nk, Inc.*, for instance, the court canceled a trademark registration after finding that the mark was assigned in gross and that the assignor had abandoned the mark. 348 F. Supp. 2d at 352; *see also Liquid Glass Enters.*, 1989 WL 222653, at *4 ("In determining whether the trademark . . . should be cancelled, the Court must examine the validity of the assignment.").

Here, for all the reasons set out above, the Court finds that Dash's assignment of the REIGN mark to VPX was invalid. The Court also finds that Dash abandoned the REIGN mark by "discontinu[ing]" its use of that mark with an "intent not to resume such use." 15 U.S.C. § 1127. Indeed, the Assignment Agreement plainly contemplated that Dash would cease its use of the mark after the assignment. *See* Agreement ¶ 5. VPX's sole argument on this issue appears to be that there are genuine issues of material fact with respect to whether the assignment was valid. Because the Court has rejected that contention, it now also directs that the REIGN registration be canceled.

\*\*\*

Accordingly, the Court hereby

**ORDERS AND ADJUDGES** that Monster's Motion for Summary Judgment [ECF No. 242] is **GRANTED in part** and **DENIED in part** as follows:

1. Summary Judgment is **DENIED** as to VPX's trade dress claim (Complaint Count I, Counterclaim Count I).

2. Summary Judgment is **GRANTED** as to VPX's trademark claim (Complaint Counts II, III, and V) and Monster's trademark claim (Counterclaim Counts II, III, IV, and V).

3. The REIGN trademark, Registration No. 5,107,809, is hereby **CANCELED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 6th day of July 2020.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record