**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 19-60809-CIV-ALTMAN/Hunt**

**VITAL PHARMACEUTICALS, INC.,**
**d/b/a VPX Sports, a Florida Corporation,**

      *Plaintiff/Counterclaim-Defendant,*

**v.**

**MONSTER ENERGY COMPANY,**
**a Delaware corporation, and**
**REIGN BEVERAGE COMPANY, LLC,**
**a Delaware limited liability company,**

      *Defendants/Counterclaimants.*
_____

**MONSTER ENERGY COMPANY,**
**a Delaware corporation, and**
**REIGN BEVERAGE COMPANY, LLC,**
**a Delaware limited liability company,**

      *Crossclaimants,*

**v.**

**JHO INTELLECTUAL PROPERTY**
**HOLDINGS, LLC, a Florida limited**
**liability company,**

      *Crossclaim-Defendant.*
_____/

## **ORDER**

Monster and VPX compete in the energy-drink market.[1] Through this lawsuit, VPX took its war with Monster—previously waged in the marketplace—into the courts, seeking to drive its rival's competing energy drink out of business. To that end, VPX brought a trade-dress claim, alleging that Monster's Reign energy drink infringes on its Bang energy drink. The two beverages are pictured below:





Following a round of heated motions practice, we denied Monster's motion for summary judgment on VPX's trade-dress claim, explaining that—at that stage—we could not resolve the many (factual) disputes that lurked just beneath the surface. And so, the bench trial came. Over nine long days, we heard directly from the parties' witnesses, examined hundreds of energy-drink cans, and entertained hours of argument from counsel. In the end, this case simply wasn't close.

---

[1] We refer to Monster Energy Company and Reign Beverage Company LLC, collectively, as "Monster," and to Vital Pharmaceuticals, Inc. as "VPX."

*For one thing*, VPX couldn't establish that its trade dress was entitled to protection. It couldn't show, for instance, that the Bang can—which closely resembles the iconic (and original) Monster Energy drink—is inherently unique or distinctive. Nor could it show that its trade dress carries any secondary meaning in the minds of consumers. Indeed, VPX opened the trial by revealing a shocking (and entirely new) theory: that Monster had stolen the *precise* colors Bang had used in its cans—down to the very last shade—in a craven effort to pass its product off as Bang's. By the end, though, VPX's copied-paint theory had been totally debunked—and its case was left in shambles.

*For another*, VPX failed to show that consumers are likely to confuse Reign with Bang. The two drinks, after all, incorporate significant differences—starting with their names and logos—which allow consumers to easily distinguish between them in a crowded marketplace of black energy drinks. On top of that—despite selling millions of Bang cans and conducting a (half-hearted) survey—VPX ended up presenting no evidence of *actual* confusion. And so, today—after a hard-fought case—we enter **FINAL JUDGMENT** for Monster.

FINDINGS OF FACT

### A. Monster Energy Drink

1. Monster is a global force in the energy-drink market. In 2002, Monster launched its iconic Monster Energy drink. *See* Tr. at 327:14–16.[2] Monster Energy is a "traditional" energy drink, containing 160 mg of caffeine and over 50 g of sugar. *Id.* at 351:18–25, 1123:2–3. The Monster Energy drink comes in a 16-ounce black can with Monster's M-Claw icon appearing at the can's center in a bright, contrasting green color. The can looks like this:

---

[2] The trial transcripts can be found at ECF Nos. 417–25. The transcripts for each day of trial are consecutively paginated, so we'll simply use "Tr." when citing to those transcripts.



*See* Ex. D-330.

2.  Over time, Monster expanded its Monster Energy drink line by introducing a wide variety of new flavors. *See* Tr. at 333:20–335:5. These new cans (shown below) sport a contrasting, flavor-dependent, brightly-colored M-Claw logo set against a black background:



*See* Ex. D-448.

3.  Monster Energy has become the best-selling energy drink in the United States by unit sales and dollar volume. *See* Tr. at 344:19–20. Monster sells over three billion cans of Monster Energy per year, totaling annual gross sales of over $3 billion, with an annual retail value of over $6 billion. *Id.* at 343:19–25, 344:1–9. Since the brand's inception, Monster has spent well over $7 billion in advertising. *Id.* at 345:5–11.

4

### B. VPX's Bang Energy Drink

4. VPX is also a leader in the energy-drink market. VPX released its Bang energy drink in 2008. *Id.* at 1028:18–1029:1. As Bang grew as a brand, its labeling evolved. In fact, VPX has used at least five different Bang labels over the years. *See* Ex. D-46 (picturing the Bang label over time).

5. When VPX first introduced Bang, the drink hardly resembled its modern form. VPX sold it as an uncarbonated beverage marketed in a plastic bottle with the blue and red packaging pictured below, *see* Tr. 1028:18–1029:18:



*See* Ex. D-46 at 1.

6. In 2012, VPX, for the first time, introduced a carbonated beverage in a can. *See* Tr. at 1029:20–1030:8. These cans featured different flavor-dependent colors. *See* Ex. D-46 at 5–9. This later version of Bang—which likewise looked nothing like the modern version—looked like this:



*Id.*

7. In 2015, moving towards something much closer to its current label, VPX transitioned to the following design, which incorporates—most notably—its "b" logo:



*See* Ex. D-46 at 13; *see also* Tr. at 1043:24–1045:11.

8. In 2017, VPX changed its Bang packaging again, this time adding—among other things—a colored band along the top of the can and a silver "U" shape at the bottom, *see* Tr. at 1140:10–

1141:1, the latter of which is now one of the most dominant and distinctive features of the label. Here's that can:



*See* Ex. D-46 at 18.

9. And, in 2019—about when it filed this case—VPX released the can it uses today. *See* Tr. at 1146:10–17. In this version, VPX changed "BCAA Aminos" across the top of the can to "EAA Aminos" and added a contrasting color line both beneath the top-colored band and around the "b" logo. *See* Ex. D-46 at 45. As with previous iterations of the label, the colors on the can represent different flavors. *See* Tr. at 1164:3–5. VPX has no registration for this trade dress. *See* Joint Pretrial Stipulation [ECF No. 342] at 8. Here are pictures of the final design:



*See* Ex. D-46 at 45.



*See* Exs. P-2783A (Blue Razz), P-2784A (Cotton Candy), P-2785A (Lemon Drop), P-2786A (Peach Mango), P-2787A (Purple Guava Pear), P-2788A (Sour Heads).

10. While it's clear that VPX asserts trade-dress rights in these black-background cans, VPX has been inconsistent about how it defines that trade dress. In its complaint, VPX defined its trade dress as including the following features on a 16-ounce black can:

> [**1**] a black background with a contrasting, flavor-dependent, bold, brightly-colored design for the rest of the can; [**2**] a large, stylized "b" logo in the same bold, bright color(s) as the rest of the color(s) on the can, covering the top portion of the primary panel of the can; [**3**] the performance ingredients "BCAA AMINOS," "SUPER

CREATINE®" and "ULTRA COQ10" in all capital letters going around the rim of
the top of the can; [4] the product name "bang" in a stylized font in the same bold,
bright color(s) as the rest of the color(s) on the can, covering the bottom portion of
the primary panel of the can; [5] the tagline, "POTENT BRAIN AND BODY
FUEL," in contrasting white/silver immediately below the product name "bang,"
covering the bottom portion of the can; and [6] the flavor-designation in all capital
letters in the same bold, bright color(s) as the rest of the color(s) on the can, appearing
below the tag line in the bottom portion of the can.

*See* Compl. [ECF No. 1] ¶ 20.

11. In this definition, VPX excluded certain prominent features that appear on the Bang (but *not* the

Reign) can, including the colored band along Bang's rim and its U-shaped carveout—a transparent

attempt by VPX to overemphasize the similarities between its product and Monster's.

12. By the time VPX moved for a preliminary injunction, it had already started altering its trade-dress

definition. *See* Motion for Preliminary Injunction [ECF No. 43] at 3–4. In that motion, VPX added

a seventh element: "the '0 CALORIES PER CAN' designation, outlined in a white box, on the

bottom corner of the front of the can." *Id.*[3] But, reversing course, VPX would go on to omit that

element *both* in its summary-judgment briefing and in the parties' joint pretrial stipulation. *See*

Opposition to Summary Judgment [ECF No. 260] at 3; Joint Pretrial Stipulation at 8.

13. During trial, VPX continued to muddle the issue. While Monster unwaveringly contended that

VPX was bound by its defined trade dress,[4] VPX created an elusive, moving target for its trade-

dress rights—at one point trying to bring the zero-calorie designation *back* into the case, *see* Tr. at

---

[3] The parties refer to this as "the 0-calorie bug."
[4] *See, e.g.*, Tr. at 41:10–12 ("[E]very issue in this case must be in accordance with the trade dress as the plaintiff chose to define it."); *id.* at 52:2 ("They can't redefine their trade dress . . . ."); *id.* at 421:3–4 (arguing that VPX "disclaimed not just bugs on the back [but also] the bugs on the front" because those elements did not appear in VPX's defined trade dress); *id.* at 1692:16–18 ("But most importantly, as this Court itself has noted, you must, you must precisely define, articulate the specific elements that comprise the distinct trade dress.").

420:13–20, before VPX's founder and CEO, Jack Owoc, then retreated, indicating that VPX (in fact) had no rights to that feature, *id.* at 1236:8–18, 1319:6–9.

14. VPX's confusing trade-dress games didn't end there. After the evidentiary portion of the trial had closed—but before the lawyers' summations—VPX filed a motion to amend the complaint it had filed nearly a *year-and-a-half* earlier. *See* Motion for Leave to File Conformed Complaint [ECF No. 401] ("Motion to Conform"). In that motion, it sought to amend its defined trade dress yet again. In this latest transformation, VPX's proposed amendment went far beyond adding the zero-calorie bug. Instead, VPX proposed a non-exhaustive list of elements, which (this time) included, for instance, the colored band and the U-shaped carveout and tracked certain historical changes in the can over time. Here's the latest version:

> BANG®'s trade dress consists of an overall look and feel of the 16-ounce black aluminum BANG® cans, the design of which is evidenced [in pictures and the physical cans], all of which include the distinctive combination of the following nonfunctional, non-exhaustive features on a 16-ounce black aluminum can: [**1**] a black background with a contrasting, SKU-dependent, bold, brightly-colored design for the rest of the can (with a non-material change in 2017 to add a U-shape at the very bottom of the primary display panel); [**2**] a large, stylized "b" logo in the same bold, bright color(s) as the rest of the color(s) on the can, covering the top portion of the primary panel of the can (with a non-material change in 2019 to include a thin, contrasting outline); [**3**] performance ingredients, for example, "BCAA AMINOS," "SUPER CREATINE®" and "ULTRA COQ10," in all capital letters going around the rim of the top of the can (with a non-material change in 2017 to include a matching colored rim, and nonmaterial changes in 2019 to add a thin contrasting strip at the bottom of that colored rim and to use "EAA AMINOS"); [**4**] the product name "bang" in a stylized font in the same bold, bright color(s) as the rest of the color(s) on the can, covering the bottom portion of the primary display panel of the can (with a non-material change in 2019 to include a thin, contrasting outline); [**5**] the tagline, "POTENT BRAIN AND BODY FUEL," in contrasting white/silver and all capital letters immediately below the product name "bang"; [**6**] the flavor-designation in all capital letters in the same bold, bright color(s) as the rest of the color(s) on the can, appearing below the tag line in the bottom portion of the can; [**7**] the "0 CALORIES PER CAN" bug, outlined in a white box, on the bottom corner of the front of the can; [**8**] on the left panel of the can, a stylized logo matching item [2] and [4] above but smaller, followed immediately by a tagline in contrasting white/silver in all capital letters; and [**9**] under item [8] above,

a unique mix of text and callouts, including without limitation, "Not Intended for Individuals under the AGE OF 18" and four horizontal zero bugs relating to nutritional facts and/or ingredients.

*See id.* at 3–4.

15. For all the focus on Bang's black cans, VPX has mainly withdrawn from that design since 2017. That is, although VPX still sells the original black-background cans, *all* of Bang's new flavors since 2017 have featured colorful (non-black) backgrounds. *See* Tr. at 1248:20–1249:6. In line with this shifting strategy, a majority of the cans in Bang's lineup today don't have the black background VPX now seeks to enforce:



*See* Ex. D-603.

16. In carving out space in the crowded energy-drink field, VPX positioned Bang as a "better-for-you" energy drink with zero calories, zero sugars, zero carbs, zero artificial flavors, zero artificial coloring, a higher level of caffeine, and certain performance ingredients—a combination it viewed as "revolutionary." *See, e.g.*, Tr. at 1079:1–4, 1236:1–7. While Monster had previously offered products with no calories or carbs, what VPX was doing was different: Bang's caffeine level (300 mg) almost doubled Monster Energy's; Bang's formula contained unique performance ingredients, and VPX marketed its energy drink as a healthier; "fitness-oriented" alternative to the major energy-drink players. *Id.* at 351:5–352:9.

17. And the evidence supports Bang's position that it did, in fact, revolutionize the emerging "performance" energy-drink subcategory. *Id.* at 91:10–18, 1281:23–25. Indeed, over its relatively short lifespan, Bang sales have exploded: from $70 million in 2016 to $320 million in 2017 to $1.28 billion in 2019 to a projected $2.1 billion in 2020. *Id.* at 1082:7–12. Bang not only brought new consumers to the energy-drink arena, *id.* at 946:17–24 (noting that Bang "draw[s] in more of a female fan base than regular energy drink brands"), it also cut into Monster's hegemonic position in the market, *see* Ex. P-0147 at 4 (noting that Monster was "under pressure" and its sales were "decelerat[ing]" due to "stepped-up competition from Bang (and others)"). Catapulting past Rockstar, Bang now sits atop the energy-drink market's "big three"—just behind Monster and Red Bull. *See* Tr. at 1120:24–1121:3.

### C. Monster's Reign Energy Drink

18. In early 2018, Monster—trying to get in on the emerging performance energy-drink subcategory— decided to develop a sugar-free energy drink with higher amounts of caffeine than its traditional energy drinks. *Id.* at 365:8–367:16 (describing the Reign design process). By then, it was clear that the performance subcategory was here to stay. In fact, Rockstar had increased the caffeine in some of its energy drinks to 240 mg; Hyde had released a 350 mg option; and Bang had assumed its position as a leader in the subcategory with 300 mg. *Id.* at 351:5–17.

19. After a year of designing the drinks and their packaging, Monster introduced Reign in February 2019, culminating in a nationwide launch on March 25, 2019. *Id.* at 365:8–367:16. During that process, Monster "carefully reviewed and debated hundreds and hundreds" of labels, names, and designs. *Id.* at 368:16–23. The end product looks like this:



*See* Exs. D-393A (Lemon HDZ), D-398A (Razzle Berry), D-397A (Peach Fizz), D-395A (Melon Mania), D-399A (Sour Apple), D-392A (Carnival Candy).

20. Through this action, VPX seeks to halt Monster's sale of Reign, alleging that VPX has protectable rights in the Bang trade dress and that Reign is confusingly similar to Bang's design. *See generally* Compl.

### D.  Bang's Trade Dress Merely Refines Designs that Are Common in the Industry

21. This Court has examined hundreds—if not thousands—of energy-drink cans. We've viewed them in all kinds of lightings; we've examined the drinks in person and in videos and in pictures; we've felt the cans and consumed their contents. In the end, we find that the Bang trade dress, as a whole, is neither unique nor unusual, that it does not stand out, and that it is a mere refinement of the other energy-drink labels that are—and for years have been—on the market.

22. Bang, in fact, is merely a refinement of the original Monster Energy can, the top-selling energy drink in the United States, which holds approximately 40% of the market share. *See* Tr. at 1534:13–19. The resemblance between Monster Energy and Bang is striking:



*See* Ex. D-421.

23. Each of the Monster Energy cans pictured above *pre-dates* the Bang cans that bear the alleged trade dress. *See* Ex. DDX2.2.

24. Bang's overall image closely resembles Monster Energy's, and a brief review of their individual elements simply confirms this point. They both use "a 16-oz. black aluminum can." Joint Pretrial Stipulation at 8. Against that black background, they both incorporate "a contrasting, flavor-dependent, bold, brightly-colored design for the rest of the can." *Id.* The M-Claw logo and the "b" logo both flash "bold, bright color(s)" appearing "horizontally, covering the top portion of the primary panel of the can." *Id.* They feature "ingredients . . . spanning the rim adjacent to the top of the can." *Id.* The drinks also include the "product name . . . appearing horizontally, covering the bottom portion of the primary panel of the can." *Id.* Like Bang, many of the Monster Energy flavors also include "the inventive flavor designation in all capital . . . appearing horizontally, . . . in the bottom portion of the can." *Id.* Both cans' overarching designs, in short, are very much the same.

14

25. Even if we were to look beyond the trade dress VPX defined in the joint pretrial stipulation, we would (nonetheless) conclude that Bang is a mere refinement of Monster Energy. For example, Bang's "U-shape" resembles similar silver carveouts that appear on certain Monster Energy cans, including Monster's Ultra Black flavor. *See* Motion to Conform at 3. Bang's "colored rim" also resembles Monster Energy's colored can openers, which similarly provide a pop of color at the top of the can. *Id.* at 4. And, while it's true that the nutritional bugs on the Bang can don't appear on Monster Energy, those "bugs" do nothing to distinguish *the source* of the products since they're widely used in the food-and-beverage industry. In fact, the American Beverage Association's guidelines recommend that drink manufacturers include these (or similar) nutritional bugs on their labels. *Id.*; *see also* Ex. D-445 (the guidelines). The point is this: however we define the Bang trade dress, it's not at all unique or unusual in the energy-drink market because, on the whole, it closely resembles the iconic Monster Energy design.

26. VPX tries desperately to resist this conclusion. At trial, for instance, Mr. Owoc described Monster Energy's can and logo as dark, evil, and satanic:

> So, [the M-claw logo] is 666 in Hebrew when you drink the can and turn it upside down. Right now they have an advertisement on the back, but it usually says "unleash the beast." We all know what the "beast" is in Torah and the Bible. It's the devil. That is the 666.

Tr. at 1251:3–13; *see also id.* at 1065:7–1066:14 (Mr. Owoc testifying that Bang is "radically different" from Monster and that Monster's logo gives him "a feeling of negativity, immaturity, and monsters hiding under your bed").

27. In contrast to Monster, which VPX paints as "dark and ominous," *id.* at 945:24–25, VPX says that Bang is "happy and positive and fun," *id.* at 596:12–17. It thus views the two drinks as "night and day." *Id.* at 945:23–24.

28. And, in one sense, VPX is right: its branding *is* totally different than Monster's. *Id.* at 946:4–9. VPX's advertising—perhaps unlike any other brand in the market—focuses on "positiv[ity]" and aims to "make[] people feel good." *Id.* VPX, for example, hosts experiential marketing events through what it calls its "Bang Revolution Tour." *Id.* at 962:2–5. At these events, VPX creates "a concert feel," "like a huge mosh pit," complete with models, dancers, and influencers, and gives away upwards of $250,000 in "swag." *Id.* at 962:2–967:25.

29. Beyond these events, VPX playfully calls its customers "Bangsters," *id.* at 946:10–14; offers fun flavors like Champagne, Frosé Rosé, and Rainbow Unicorn, *id.* at 946:4–24; advertises its product through influencers on social media, *id.* at 948:10–14; and emphasizes bright colors (and vibrant themes) in Bang ads, *id.* at 946:4–9. Here are just a few examples of ads that capture Bang's marketing strategy:



*See* Ex. P-0689 at 6.

30. Monster has taken a different approach. *See* Ex. D-626 at 5 (noting that Monster is not "looking to copy what the competition is doing: i.e. sign people with hot bodies, put them in trashy bathing suits & place a can in their hand"). Below, for instance, is a Reign advertisement. It's much darker, of course, and focuses on brute strength—rather than general fitness.



*See* Ex. D-899; *see also* Exs. D-907, D-915 (other Reign advertisements).

31. Although its colorful marketing may separate Bang from Monster Energy, that marketing says nothing (or very little) about Bang's *labeling*. And (again), as to the labeling, we see no meaningful differences between Bang and Monster Energy. Indeed, while VPX *claims* that Bang is happy and positive, the trade dress itself is gun-themed: its brand name is "Bang"; its logo incorporates a sniper's crosshairs; and the U-shaped carveout at the bottom is meant to resemble a bullet.[5] Looking to the labels' overall impressions, then, we conclude that Bang is a mere refinement of Monster Energy. In fact, VPX's own counsel, during his opening statement, described the cans this way: "[T]here are differences in the cans. This is not a counterfeit case. *But these products [Bang and Reign] are brothers from another—from the same mother, quite frankly.*" Tr. at 31:6–8 (emphasis added). We agree—and that mother is Monster Energy.

---

[5] VPX also tries to distinguish *its* can from the competition's by pointing to "dark" themes on *other* cans: monsters, spiders, scorpions, snakes, and the like. *See, e.g.*, VPX's Proposed Findings of Fact and Conclusions of Law [ECF No. 405] at 13–15. But, as we've said, the Bang trade dress likewise highlights a "dark" theme.

32. Other companies have followed Monster's lead. As a result, the market is full of energy drinks that share the same Monster-inspired architecture. Some of those drinks are pictured below:



*See* Ex. D-428.

33. This lineup includes Bang and six other energy drinks: Monster Energy, Rockstar, Venom, Scorpion, Spider, and Hyde. *Id.*

34. Monster Energy, Rockstar, and Venom have a substantial presence in the market. Monster Energy, of course, is ubiquitous. *See* Tr. at 318:16–20, 1534:13–19. Rockstar is the fourth-highest selling energy drink, *id.* at 311:12–21—with about 5% of the market, *id.* at 318:16–319:1. Mr. Owoc himself acknowledged that Rockstar is usually found in stores alongside Bang. *Id.* at 1121:4–10. Venom is a national brand sold by Dr. Pepper, *id.* at 317:10–14, and data indicates that Venom's sales for just a portion of 2020 were around $30 million, *id.* at 741:22–25.

35. The remaining three brands—Scorpion, Spider, and Hyde—are admittedly much smaller, and VPX, relying mainly on data collected by IRI, a company that tracks certain energy-drink sales, maintains that their sales numbers "are so low as to be insignificant." VPX's Findings and

Conclusions at 17. But the data VPX relies on is incomplete. As Mr. Sacks testified, smaller brands tend to sell through independent grocery and convenience stores—in other words, channels IRI doesn't capture. *See* Tr. at 316:5–317:3. We find Mr. Sacks's testimony on this point credible, especially since it was corroborated by Eugene Bukovi, VPX's own Executive Vice President of Sales. Mr. Bukovi confirmed that IRI doesn't measure the sales of independent convenience stores, of which there are more than one-hundred-thousand in the United States. *Id.* at 734:15–23. Mr. Bukovi also testified that IRI doesn't track sales in many chain stores where energy drinks are sold—such as Walmart, Costco, Home Depot, Lowe's, Subway, and some 99-cent stores. *Id.* at 733:18–734:3. IRI likewise doesn't consider sales in gyms or health-food stores, such as GNC and the Vitamin Shoppe. *Id.* at 734:24–735:2. And so, while these brands *are* smaller—Monster, Red Bull, Bang, and Rockstar, after all, capture 92% of the energy-drink market, *id.* at 318:16–319:10—we're not convinced that, especially when considered together, their impact on the market can be so easily disregarded.

36. Beyond the drinks featured in the above lineup, Monster introduced evidence of other energy drinks that carry similar labels—like Quake. Quake is an energy drink created by 7-Eleven, the country's largest convenience-store operator. *Id.* at 353:23–25, 356:9–13. Here's its can:



*See* Ex. D-67A.

37. These third-party products all share a similar overall appearance with Bang. They also incorporate the same basic design elements. For instance, they're each sold in "a 16-oz. black aluminum can." Joint Pretrial Stipulation at 8 (defining Bang's trade dress). The cans, just like Bang's, feature "a contrasting, flavor-dependent, bold, brightly-colored design for the rest of the can on a black background." *Id.* While none of the competing cans use Bang's "b" logo, they do feature their own logo in "in the same bold, bright color(s) as the rest of the color(s) on the can," often "appearing horizontally" on the top portion of the front of the can. *Id.* Several of the cans—like Monster Energy, Hyde, Quake, Rockstar, and Scorpion—also include "performance ingredients . . . spanning the rim adjacent to the top of the can." *Id.* VPX's competitors—again, like Bang— feature their own product names "in a stylized font in the same bold, bright color(s) as the rest of the color(s) on the can," usually "appearing horizontally, covering the bottom portion of the primary panel of the can." *Id.* Most of the cans also place a "flavor designation" horizontally along the bottom of the can. *Id.*

38. Looking beyond VPX's definition of its trade dress, the Court finds that Bang's labeling is neither unique nor unusual. Again, the Court's view, Bang's labeling is simply a refinement of a common form of labeling that has long existed in the market. *Cf.* Motion to Conform at 3–4 (adding Bang's colored rim and U-shaped carveout to the trade dress while admitting that those features are "non-material"). The "colored rim" on Bang's can, for instance, appears on other drinks, such as Venom. And Bang's U-shaped carveout—one of the strongest elements of the Bang trade dress—is nothing new in the industry. Other energy drinks, in fact—including Monster Energy and Rockstar—likewise feature silver cutouts. *See* Exs. D-421, D-428. In any event, as Mr. Owoc conceded at trial, and as VPX has time and again insisted, the U-shaped carveout is really "insignificant." *See, e.g.*, Tr. at 1141:23–1142:7 ("Q [by Monster's counsel]. But did the U shape at the bottom of the can also add to its distinctiveness along with the yellow rim? A [by Mr. Owoc]. The center of the label is iconic and speaks for itself. And the silver part is insignificant. Q. Then why did you add the silver part if it's so insignificant? A. I don't mean to insult you, but one day I felt like adding it, so I just added it."). In fact, Mr. Bukovi, VPX's Executive Vice President of Sales, admitted that VPX has since moved to its colorful, non-black cans in order to "stand out and be different from [its] competitors"—an admission that would make little sense if the Bang cans at issue in our case were *already* unique in the industry. *Id.* at 719:14–720:1.

39. Against all this, VPX relies on an email from a former Monster employee, Scot De Lorme. In that email, Mr. De Lorme wrote that Bang uses "powerful color combinations to really pop off [the] shelf." *See* Ex. P-251. VPX, though, never called Mr. De Lorme to the stand, so the Court never got to hear what *he* meant by this comment. In any event, the Court simply disagrees with the

sentiment VPX attributes to Mr. De Lorme. In an industry packed with bright, bold splashes of

color—often against black backgrounds—Bang's label is, if anything, the perfect camouflage.

### E. There Is No Evidence that Consumers Have Come to Identify the Bang Trade Dress with VPX

40. There's no evidence that consumers associate the Bang trade dress with VPX. Indeed, VPX

presented *no survey* that demonstrated what consumers understand about the Bang trade dress.

41. Instead, VPX relies on *indirect* evidence of secondary meaning: (1) "the length and exclusive and

continuous use of the [Bang] can design"; (2) "the prolific advertising and promotion of the [Bang]

trade dress"; (3) Bang's "extraordinary sales growth"; (4) "unsolicited media coverage"; and (5) its

contention that Monster "deliberate[ly] adopt[ed]" the Bang "[t]rade [d]ress [t]o [c]onfuse

[c]onsumers." VPX's Response to Monster's Proposed Findings of Fact and Conclusions of Law

[ECF No. 409] at 6–7; VPX's Findings and Conclusions at 23, 25, 29.[6] None of these helps VPX

here. We address each in turn.

### 1. Exclusive and Continuous Use

42. VPX contends that it has used the Bang trade dress exclusively and continuously since 2015. *See*

VPX's Findings and Conclusions at 18–19. But VPX's use of the Bang trade dress was neither

exclusive nor continuous.

43. As to exclusivity, the evidence showed that VPX's competitors have adopted substantially similar

dresses. *See, e.g.*, Exs. D-424, D-428. And VPX presented no evidence that, before this case, it ever

took enforcement action to prevent that use.

---

[6] VPX also claims to have some "direct evidence" of secondary meaning based on a few isolated instances of consumer confusion. But, as we'll explain below, these "direct" confusion witnesses weren't *actually* confused.

44. As to continuity, the evidence demonstrated that VPX used at least *three* variations of Bang's trade dress. *See* Ex. D-46. Some of VPX's changes—such as adding a colored rim and a U-shaped carveout—were quite significant. This inconsistency in the look-and-feel of the trade dress belies VPX's contention that it managed to create some deep-seated connection, in the minds of consumers, between the trade dress and its maker.

### 2. Advertising

45. There's no evidence that VPX's "marketing tactics have . . . created a consumer connection between the [Bang] brand and trade dress." VPX's Findings and Conclusions at 23. Marketing is a significant component of the Bang brand, to be sure. Every year, VPX puts out thousands of social-media posts to its 3.2 million Instagram followers and its 1.29 million Tik Tok followers. *See* Tr. at 953:20–954:15. VPX has hired over one-thousand influencers—each with his or her own reach—who produce and post content featuring Bang on their personal accounts. *Id.* at 948:15–21, 954:16–20, 956:13–23. Beyond social-media advertising, VPX promotes its brand, as noted above, through experiential marketing at live events. It also deploys, to a limited extent, traditional forms of advertising—such as point-of-sale displays. *Id.* at 961:7–16. To do all this, VPX has spent a fair bit of money—starting from approximately $500,000 in 2015, Ex. P-607 at Col. Q, Row 44, to about $2.5 million in 2016, *id.* at Col. AD, Row 44, $7.5 million in 2017, *id.* at Col. AQ, Row 44, $11.6 million in 2018, Ex. P-605 at Col. B, Row 65, and $35.9 million in 2019, *id.* at Col. C, Row 65.

46. VPX, however, failed to show how much of this marketing features the trade dress that's at issue in this case. Although the parties did file a sampling of various marketing materials (primarily images from social media), *see, e.g.*, Exs. D-1163, D-1169, P-689, P-691, P-692, P-695, P-700, P-

701, P-703, there's no indication that the mix of colored and black cans they submitted represents the actual mix of cans in VPX's total marketing campaign. Even if it were representative, most of those images feature the colored (rather than the black) Bang cans. *See, e.g.*, Exs. D-117–21, D-1162–63, D-1603–08, D-1627, P-689, P-691, P-692, P-695, P-700, P-701. Specifically, of the Bang cans that appear in the VPX Instagram posts the parties have given us, 1,575 show colored cans only, 1,007 show black cans only, and 250 show both colored and black cans. *See* Exs. D-1163, P-689, P-691, P-692, P-695, P-700, P-701, P-703. In other words, the record evidence indicates that Bang features the black-background cans only in a *minority* of its advertising posts.

47. Here's a sampling of VPX's colored-can marketing:

 



  

*See* Exs. D-119, D-121, D-1163, P-692 at 32.

48. Nor should we be surprised that *these* cans (the ones that *don't* feature the alleged trade dress) dominate Bang's total advertising. Since 2017, every new flavor VPX has released has had a colorful background. *See* Tr. at 1255:5–1256:2. As VPX releases each of these flavors, VPX asks its influencers to feature the newest drinks. *Id.* at 955:9–16. And VPX's advertising budget did not skyrocket until *after* it started to promote its brightly colored cans. *See* Exs. P-605, P-607.

49. Even VPX's advertising of its black cans sometimes fails to highlight the alleged trade dress. The trial evidence showed, in fact, that VPX often wraps its black-can variety packs in white and

colorful plastic—an odd choice, indeed, for a company that's trying to link its brand to the look-and-feel of a black background. See here, for instance:



Ex. D-1162.

50. VPX, in short, left us with no viable way to determine *how much* of its advertising is dedicated to the cans it here seeks to protect. Indeed, Mr. Owoc conceded as much at trial, agreeing that "there's no way to determine how much of VPX's marketing, promotion, and advertising feature cans with black backgrounds versus cans with a colored background." Tr. at 1259:18–1260:2.

51. And that evidentiary lacuna is only part of the problem, because VPX has also failed to show that any of its advertising was *effective* in creating the sort of mental association—between the trade dress and its source—it sought to foster in the minds of consumers.

### 3. Sales

52. VPX contends that Bang's "extraordinary sales growth, alone, strongly supports a finding" that consumers associate its trade dress with VPX. *See* VPX's Findings and Conclusions at 23. Mr. Owoc testified, for instance, that VPX's sales changed "dramatically" once it transitioned to its modern trade dress in 2015. *See* Tr. at 1080:21–25.

53. The evidence, however, suggests that VPX's growth had little (if anything) to do with its labeling. VPX's sales increased only slightly in 2015—when the label first took on its more modern feel—

while its most significant increases occurred roughly two years later, in 2017. Even Mr. Owoc testified that Bang's retail sales increased most dramatically after 2017. *Id.* at 1082:7–12. And that testimony was corroborated by the below graphs, which are based on (1) VPX's actual sales data and (2) IRI figures.



*See* Monster's Proposed Findings of Fact and Conclusions of Law [ECF No. 404] ("Monster's Findings and Conclusions") at 19 (citing Exs. P-684, P-719).



*Id.* (citing Ex. P-2772).

54. The data confirms that Bang owes its success, not to its trade dress—which blends in with so many of the cans that were already prevalent in the market—but to the invention of a rather unique *product*, marketed in a rather unique way, and hitting consumers at a rather opportune time.

Even Mr. Owoc recognized that science and marketing are his company's most "unique" assets. *See* Tr. at 1081:6–13 ("One of the unique things that we possess is the chief scientific officer's in charge of marketing and everything. And what that enables us to do, where in most companies science and marketing are fighting, I know when we're developing a product what it's gonna be on the final end, and know the marketing before the science and the science before the marketing.").

### 4.  Media Coverage

55. VPX submitted evidence of unsolicited media coverage to "demonstrate that the financial and trade press write about [VPX] in a way evidencing that VPX had developed a strong following and that its product was recognizable to relevant consumers by its distinctive trade dress." *See* VPX's Findings and Conclusions at 25–26. But the media coverage VPX submitted came almost entirely from the reports of financial analysts. *See* Exs. P-147, P-293, P-308, P-322, P-803, P-876, P-910, P-1427. And VPX's take on these reports largely misses the mark.

56. *First*, these reports, for the most part, do not picture the Bang can. *See, e.g.*, Ex. P-147, P-1427. As a result, they're unlikely to help consumers draw the sought-after association between the Bang trade dress and VPX.

57. *Second*, even if the media *had* covered the Bang trade dress, VPX offered no evidence that ordinary consumers regularly read analyst reports from companies like Wells Fargo or Evercore. There's little reason to think, then, that these reports would be effective in leading ordinary consumers to associate Bang's trade dress with anyone (much less VPX).

58. *Third*, there's evidence that at least some of the analyst reports may not be unsolicited at all. At trial, Mr. Owoc conceded that he was in direct contact with Bonnie Herzog, an analyst at Wells

Fargo, *see* Tr. at 1269:20–1271:1, who reported on VPX and Monster, *see, e.g.*, Ex. P-147. In one of those communications, Mr. Owoc suggested that Ms. Herzog cover VPX and Monster in certain ways—in his words: "May want to question Monster's poor decision to launch Bang knock-off brand, Reign." Ex. D-1628. Given this self-serving prompt, her subsequent report, *see* Ex. P-147—in which she did precisely what Mr. Owoc had asked—is thus less than probative here.

59. *Fourth*, VPX points to only a *single* instance where the reports commented on Bang's *labeling*. *See* VPX's Findings and Conclusions at 25–26 (citing only one report suggesting that Reign's packaging "closely mirror[ed] Bang's"). Otherwise, these reports mostly accused Reign of being a "me-too" product. *Id.* Again, though, given everything this Court has seen, the distinctiveness these reports highlight derives mainly from Bang's product and its marketing strategies—not its trade dress.

### 5. Intentional Copying

60. VPX premised its entire case on the theory that Monster copied Bang in the hopes of deceiving consumers into believing that Reign was produced, not by Monster, but by VPX. VPX, in fact, opened its case with this line: "Let me start by saying that the whole point of trade dress is to avoid customer confusion. And the easiest way to prove it is intent to cause confusion. And the evidence is going to show just that." Tr. at 26:3–6.

61. The problem with this theory is that the evidence at trial overwhelmingly showed that, while Monster was looking to *compete* with Bang, its ultimate goal was to develop a powerful and iconic design that would *differentiate* Reign from its competition.

62. In designing the Reign label, Monster hired two design firms: Yellow and McLean. *Id.* at 141:11–24. Monster paid these companies "around six figures" to propose hundreds of designs. *Id.* In the "design briefs" it sent to these two companies, Monster explained that its goal was to create something new and iconic that would crush the competition. So, for example, in the design brief it sent to Yellow, Monster unequivocally said that its objective was to "compete with Bang and growing demand for healthier energy drinks" by developing a "powerful icon and brand identity that will be recognized on the shelf." Ex. D-270 at 710226 (cleaned up). Its mission, Monster insisted, was to create a brand that was "iconic." *Id.* Similarly, in its instructions to McLean, Monster said that it wanted to create a "ROCKSTAR killer as much [as] a BANG killer" by developing a "powerful" and "iconic" design that would be "recognized on the shelf." Ex. D-933 at 1044397.

63. With these directives in mind, the design firms went on to create—and Monster went on to consider—hundreds of can designs. *See* Tr. at 368:16–23 ("Q. And how -- approximately how many variations of designs did you consider? A. We went through hundreds of designs. . . . And we really worked very hard on it internally with outside -- two outside design companies. And we carefully reviewed and debated hundreds and hundreds of designs."). Many of these designs were introduced into evidence. *See, e.g.*, Exs. P-253, P-2611, P-2737, D-273, D-933–39, D-941–42, D-945–47, D-950–51, D-954–62, D-966, D-969–70, D-1345–47, DDX2.4. Here are just a few:



Ex. P-253 at 7; Ex. P-2737 at 6, 10, 17, 21; Ex. D-1345 at 4; Ex. P-2617-008; Ex. P-2737-005; Ex. D-935 at 29615; Ex. D-942 at 1495543; Ex. D-942 at 335. In assessing these designs, Monster often placed the cans next to images of other energy drinks—including Bang—*both* to see how the new Reign cans would look on a commercial shelf next to its competitors *and* to ensure that the Reign cans would stand out. *See* Tr. at 400:14–23.

64. Eventually, unhappy with the design firms' work, Monster took the design process in-house. *Id.* at 479:19–480:1. In doing so, the evidence demonstrated that, while Monster was open to adopting a new can architecture, it ultimately determined that the alternative designs weren't strong enough. Monster thus decided to stick with what it knew: the architecture of Monster Energy. As Mr. Sacks testified:

> We were open to literally looking at hundreds and hundreds of designs of logos, names, structure of how we did it. We were open to doing it. My objective was to get an iconic, strong brand. It didn't matter how we did it or what we did. And we looked at it all the time. But ultimately, we had had experience and success for -- unbelievable success with Monster. And ultimately, I just felt . . . that these other designs, while they were good and nice, they just weren't as strong as the Monster design. They weren't

> as strong as the architecture. And ultimately . . . [w]e just got to follow what we'd done with Monster. That's what we know. That's our turf, and we know it, and we want to follow it again. It's worked for us.

*Id.* at 493:6–19.

65. With that decision, the ultimate Reign design came together fairly quickly. *Id.* at 471:4–10. Monster combined that original Monster Energy architecture with the concept of a Spartan crown and mask logo (initially developed by McLean) to create the basic Reign design. *Id.* at 489:10–490:1, 493:12–19. Monster refined the Spartan crown and mask logo in-house before settling on the final logo. *Id.* at 479:18–480:1, 481:25–485:14; *see also* Exs. D-951, D-953–62.

66. None of this is consistent with some purported intent to create a Bang knockoff. Monster spent approximately $100,000 working with two design firms, directed those companies to create hundreds of labels, and then spent months debating and refining their proposals. *See* Tr. at 141:22–24, 366:1–11, 368:16–23. Had Monster wanted to rip off Bang, it could have easily done so—without incurring the time or expense of searching for something new. *See id.* at 1067:3–9 (Mr. Owoc conceding that using designers to create hundreds of designs is inconsistent with an intent to copy).

67. Beyond this intricate process—and all the documentary evidence showing that, by combining the Monster Energy architecture with a powerful logo, Monster's goal was to create something different and "iconic"—this Court heard days of testimony from Mr. Sacks. And Mr. Sacks repeatedly testified that, while Monster undoubtedly wanted to compete with Bang in the emerging performance energy-drink subcategory, it *never* intended to copy Bang's design or to deceive consumers. *See, e.g.*, *id.* at 74:1–6 ("Q. Now, did you copy any aspect of the Bang can when making Reign? A. No. Q. You didn't do that because copying isn't how you succeed, right? A. Not how

you succeed, no."); *id.* at 107:12–15 ("I thought it was important to create our own identity, to create our own iconic can, yes, and that was different to Bang, just -- not just because of Bang, I'm trying to say, is because that's what I think we try to do to all other energy drinks."); *id.* at 140:24–141:3 ("Q. [T]he colors used on the Reign cans were created independent of any intent to copy the colors on the Bang can, right? A. Yes."). And, having watched him closely over days of testimony, the Court believes him.

68. Despite all this, VPX clings to its claim that Monster intended to copy the Bang can. VPX opened the case by telling the Court that this case is about "math." *Id.* at 33:6–8. In a compelling display, it then proceeded to compare the "Pantone" colors that appear on both the Bang and the Reign cans. Looking, for instance, at Bang's Purple Guava Pear and Reign's Peach Fizz, VPX told the Court that "[t]here's 191 shades of purple, and yet they've used exactly the same color of purple." *Id.* at 35:20–22. About Bang's Peach Mango and Reign's Melon Mania, VPX told us that both "used [the] 802C shade of green." *Id.* at 33:24–34:7. As for Cotton Candy, VPX represented that "[y]ou're going to find out here, your Honor, when you look at it, there's 22 -- 221 shades of pink. They both use the exact same shade." *Id.* at 34:9–12. VPX moved drink by drink in this way, promising to prove that, in each case, the shades Reign had selected were identical (or nearly identical) to Bang's. *Id.* at 33:6–35:7. What we were left with, according to VPX, were "lightning strike odds"—surefire evidence that Monster *intended* to (and did) rip off Bang. *Id.* at 34:12–14.

69. Had it worked out as VPX hoped, this evidence might have been persuasive. Unfortunately for VPX, none of this was true. The colors Monster chose for its Reign cans did not even appear on the same Pantone *pages* as Bang's colors—and some did not even appear in the same Pantone *booklet* Mr. Sacks had used in creating the Reign designs. *See, e.g., id.* at 1571:14–25 (purple); *id.* at

1588:22–1589:12 (green); *id.* at 1591:16–25 (pink). There are also differences in the way the colors appear on the physical cans—to the naked eye. In each case, as we'll see, Monster's colors appear slightly more muted than VPX's. By way of example, here are the Pantone comparisons for the three colors we described in ¶ 68, *supra*:



Ex. DDX6.1 (comparing the purple shades on Reign's Peach Fizz and Bang's Purple Guava Pear); Ex. DDX6.7 (comparing the green shades on Reign's Melon Mania and Bang's Peach Mango); Ex. DDX6.9 (comparing the pink shades on Reign's Carnival Candy and Bang's Cotton Candy).[7]

70. VPX advances a similar theory with respect to the products' flavors and flavor names. Starting with flavors, VPX suggests that Monster sought to create flavors that were similar to Bang's. *See* Ex. P-2194 (Monster presentation stating that the innovation team "studied" and directed its flavor houses to "match similar profiles"); Ex. P-1491 at 1 (email from Monster employee saying that he tasted several potential flavors, including a "[c]andy type that mirrored what Bang has going on"); Ex. P-1215 at 1 (email from Monster employee suggesting that Monster had Bang's formula "deconstructed"). But Mr. Sacks credibly testified that Monster never attempted to

---

[7] VPX also asks the Court to draw a negative inference from the absence of written communications about the process Mr. Sacks used to select Reign's colors. *See* VPX's Findings and Conclusions at 38 n.12, 40 n.14. But these (rather serious) accusations that Monster withheld documents in discovery are baseless. Mr. Sacks testified that, because of limitations in the quality of printing and computer projection, Monster holds its color-selection decisions almost exclusively in person. *See* Tr. at 1617:16–1619:14. This is unsurprising. VPX, after all, similarly goes to great lengths to avoid documenting the process by which it develops its products. *See id.* at 1130:2–1132:9.

"reverse engineer[]" Bang's flavors. *See* Tr. at 76:8–79:24. And, in any case, the *only* evidence in the record on what the drinks taste like—testimony from VPX's own witnesses—established that Reign tastes *nothing* like Bang. *Id.* at 762:22–763:4 (VPX witness testifying that the difference between Reign and Bang is similar to the difference between Dr. Pepper and Coca-Cola); *id.* at 796:2–5 (VPX witness testifying that he could tell his drink was a Reign, not a Bang, immediately after tasting it).

71. As for flavor names, VPX says that "Reign's launch flavors also bear striking visual and phonetic similarities to top selling [Bang] flavors." VPX's Findings and Conclusions at 46. For this proposition, it provides the following comparison:

| BANG® Flavor | Reign Flavor |
| --- | --- |
| Cotton **Candy** | Carnival **Candy** |
| Blue **Razz** | **Razzle** Berry |
| **Lemon** Drop | **Lemon** HDZ |
| Sour **Heads** | Lemon **HDZ** |
| **Sour** Heads | **Sour** Apple |
| Peach **Mango** | Melon **Mania** |

*Id.*

72. As an initial matter, these flavor names are sufficiently distinct to make any claim of copying implausible. Peach Mango and Melon Mania, for example, have nothing (save the ubiquitous syllable "Man") in common. And most of the remaining similarities stem, not from any intentional copying, but from the use by both companies of flavors and flavor names that are understandably common in the industry. Take, for instance, Bang's "Blue Razz" and Reign's "Razzle Berry." Other third-party energy drink companies—like Rockstar and C4—likewise sell a "Blue Razz" energy drink, thus undermining VPX's claim of exclusive rights to that name. *See* Exs. D-1624–25, D-

1630. In fact, Monster itself was using the name "Razzle Berry" on another drink *for years* before VPX introduced its own "Blue Razz" flavor. Tr. at 168:3–25, 504:22–505:3. Monster's original "Razzle Berry" is pictured here:



*See* Ex. D-1600. Whether VPX copied the flavor from Monster, no one can say. What we can say definitively is that any claim that Monster copied it from VPX is almost laughably implausible. And the same is true of VPX's purported ownership over flavor names like "Lemon," "Sour," and "Candy"—names so prevalent in the industry that VPX could muster only a haphazard claim to their control. *See, e.g.*, D-881 at 35 (Bubly "Lemon," La Croix "Lemon," Rockstar "Lemonade"); D-881 at 24 (Rockstar "Super Sours Green Apple"); D-881 (C4 "Cotton Candy," Faygo "Cotton Candy," Old Tyme "Cotton Candy").

73. Recognizing the demise of these theories, VPX asks the Court to infer, from the similarities between the two cans, that Monster *must have* intended to copy Bang. *See* VPX's Findings and Conclusions at 41–44. We're not convinced. As an initial matter, there are salient differences between the cans that are entirely inconsistent with an intent to pass off. So, for instance, Reign's spartan logo—the most prominent feature on the can—looks nothing like Bang's "b" logo.

36

*Compare, e.g.*, Ex. D-393A (Reign) *with* Ex. P-2783A (Bang). The next most prominent features on the cans—the brand names—are also different. Bang, for instance, has nothing to do with Reign—not phonetically, symbolically, or in any other way.[8] The word "Bang," in fact, appears in all lowercase font, while "Reign" is written in All-Caps. Other prominent differences abound: Bang's cross-hairs and its U-shaped carveout—two features VPX now wants to incorporate into its trade dress—appear nowhere on Reign's label. Reign's cans also have a rough texture—unlike any other drink in evidence—that lends the cans a distinct look-and-feel. *See, e.g.*, Ex. D-393A. It's true, of course, that the cans bear some similarities to each other: They're black; they display a bold, colorful logo; and they advertise their ingredients along the top of the rim. But Bang didn't invent these features; it copied them—intentionally or not—from the original Monster Energy. *See* Ex. P-2837-050 (respondent from VPX's own survey opining that "Reign and Bang are made by Monster"). The obvious similarities between the *three* cans can be seen in the images below:



Ex. D-418.

---

[8] Both names, we suppose, are monosyllabic—a thin reed, indeed, on which to rest a trade-dress claim.



Ex. D-421.

74. Next, pointing to evidence that Monster sought to overtake Bang in the marketplace, VPX tries to portray this legitimate competitiveness as a nefarious intent to knock off. *See* VPX's Findings and Conclusions at 78–80. For example, VPX relies on documents suggesting that Monster wanted (1) to disassociate Reign from Monster Energy and (2) Bang users to "switch" to Reign. *See, e.g.*, Ex. P-926 ("Do not place Reign in Monster branded equipment" because "we want to disassociate this brand from Traditional Energy."); Ex. P-205 at 21 (merchandising standards stressing that Reign "MUST be touching Bang"); Ex. P-1369 (Coca-Cola email stating that Monster should "[p]ut REIGN wherever BANG is," institute "competitive pricing," and communicate to consumers that "REIGN has attributes BANG consumer[s] want and like"). But the first email only shows that Monster didn't want its new Reign product to cannibalize its existing Monster sales—an understandable impulse. Equally comprehensible is Monster's desire to make it easy for Bang users to switch to Reign by, for instance, placing the drinks near each other. Far from pushing the bounds of illegality, this is just a commonsense measure for a new entrant to take when attempting to "attack[] a share leader" like Bang. *Cf.* Ex. P-1369 (email from a Coca-Cola employee detailing strategies for growing the Reign brand).

75. Along similar lines, VPX points to documents in which Monster employees said they wanted to "kill," "eliminate," or "takedown" Bang. These include documents about a Monster program that encouraged people to submit videos of themselves destroying Bang cans. *See, e.g.*, Ex. P-1364 (email describing incentives for destroying Bang cans); Ex. P-823 (Monster presentation slide titled "BANG, BANG! GAME OVER!"); Ex. P-890 at 18 (presentation showing "Bang casualties"). But competing isn't the same thing as copying. As Mr. Sacks put it: "It's like the same as a coach says to a football team: Go out flatten the opposition or kill the opposition. But that's the concept, that we were gonna compete strongly against" Bang. Tr. at 389:1–4. Put differently, there's no doubt that these companies compete fiercely against each other; and it isn't a stretch to say that they loathe one another—a feeling that, we emphasize, is very much mutual, *see, e.g.*, *id.* at 1305:13–15 (Mr. Owoc testifying that "I even told my lawyers that I don't care if you have to spend a hundred million dollars to take him down, take him down. His reign is over."); *id.* at 1301:2–3 ("Q. And you refer to [Mr. Sacks] as 'Rotten Rodney,' don't you? A. Because he's rotten to the core, yes, sir."). Viewed in this context, VPX's reading of these documents as evincing some intent by Monster to copy Bang makes little sense. After all, Monster wanted to *beat* Bang by getting consumers to *switch* from Bang to Reign. It would seem impossible to get consumers to make that switch if they couldn't tell the two products apart.

76. The closest VPX gets to showing improper intent is through certain documents suggesting that Monster used Bang for inspiration. For example, Mr. De Lorme, a Monster employee, sent one of the outside designers Monster was working with an email, in which he wrote: "Attached is line up shot of Bang. They've used powerful color combinations to really pop off shelf. It's definitely working and managed to capture a new consumer base." Ex. P-251. One of the email's

attachments was labeled "[Reign] INSPO." *Id.* In another email to that same designer, Mr. De Lorme added: "I know I mention healthy as one of [the] key features. Please don't mistake this for [a] white slim can or very soft play. As you see with Bang it's bright and fun but still black . . . not too hard." Ex. P-764. There's a difference, though, between using a design as inspiration and copying that design with an intent to deceive. Given the overwhelming evidence that Monster's goal was to create something powerful, unique, and different, we think it clear that Monster did the former, not the latter.[9]

### F.   Several Features of the Bang Trade Dress Have a Functional Purpose

77. Several features of the Bang trade dress affect the quality and functionality of the label. To grant VPX a monopoly over those features would thus place competitors at a significant disadvantage.

78. *First*, using colors to distinguish between different flavors serves a useful, non-arbitrary purpose. During trial, Norman Broadhurst—Monster's expert on food-and-beverage marketing—testified about the various ways in which the human brain creates associations between colors and flavors. *See* Tr. at 1346:1–12. Mr. Broadhurst testified that consumers "associate" different colors with certain flavors. *Id.* at 1353:16–24. If a drink, for instance, had a "blue package, and it had lemon in it, there would be a disconnect when [consumers] tasted it" because consumers would be

---

[9] VPX points to two other documents, neither of which shows an intent to copy or deceive. The first was a Monster email asking whether Monster "should list 'natural flavor' below the flavor name just as Bang." Ex. P-768. But this was a regulatory question whose answer, ultimately, was no. *See* Tr. at 299:8–300:2. Monster thus never included this information on any of its cans. The second was an email from a Monster employee, asking: "instead of mimicking Bang & it's 16oz package, did we evaluate the possibility of a twist cap package?" Ex. P-1926. This question—apparently asked by a relatively low-level Monster employee—proves nothing. The parties have not made the Court aware of any energy drinks that use a "twist cap package." And there's nothing Bang-centric about Reign's use of a device that all other energy-drink companies (including, of course, Monster Energy) use. This email thus doesn't come close to showing that Monster copied Bang or that it had any intent to confuse consumers.

"surprised and probably very disappointed, because it wasn't what they expected." *Id.* at 1354:4–8.

79. Because consumers naturally draw a connection between the colors on a product's label and the product's flavor, manufacturers work hard to honor that expectation. *See* Ex. D-881. Here are some examples of various apple (left) and lemon (right) drinks:



*Id.* at 24, 35.

80. Mr. Sacks corroborated Mr. Broadhurst's testimony when he said that Monster and Reign selected many of their colors because of what those colors signaled about the flavor of the liquid in the can. *See* Tr. at 501:11–504:21. So, the pink on Reign's Cotton Candy can is consistent with consumers' expectations for the flavor of cotton candy; the green on Reign's Sour Apple can is consistent with consumers' expectations for the sensation of a sour apple (a Granny Smith, for example); the red and green on Reign's Melon Mania are consistent with consumers' expectations for the taste of a watermelon; the yellow on the Reign Lemon HDZ can is consistent with consumers' expectations for the lemon flavor; the blue on Reign's Razzle Berry is consistent with

41

consumers' expectations for the taste of a berry; and the orange on the Reign Peach Fizz is consistent with consumers' expectations for a peach flavor.

81. VPX contends that some of its flavors don't fit this mold. So, VPX says, there's no flavor expectation for Rainbow Unicorn (which is blue and pink). *Id.* at 1165:5–9. Fair enough. At the same time, VPX *has* tried to tap into the color-to-flavor associations that consumers subconsciously maintain. As Monster points out, it uses red for cherry, orange for Mango, yellow for lemon, and purple for a grape-like flavor it calls "Purple Haze."[10] Here are some examples of these:

  

*See* Ex. D-1606 (Black Cherry Vanilla); Ex. D-1608 (Purple Haze); Ex. D-1626 (Lemon Drop).

82. *Second*, placing a drink's logo on the top half of the primary panel of the can also serves an important function beyond mere ornamentation and source-identification. As Mr. Sacks testified, this placement allows the logo to be seen by consumers when the can is in a glide rack—as it often is at a convenience store. *See* Tr. at 489:10–490:1; *id.* at 490:2–11 (noting that, if the logo were

---

[10] To be completely fair, Mr. Broadhurst couldn't remember exactly what "Purple Haze" tasted like, though he suspected the drink was grape-flavored, Tr. at 1434:9–24—and VPX, armed with every incentive to undermine Broadhurst's credibility, notably never challenged this assertion. Nor is this surprising. In the exhibit Monster introduced at trial, VPX marketed its "Purple Haze" can by playfully telling consumers: "We are eternally GRAPE-ful for you Bangsters!" Ex. D-1608.

lower, the glide rack would block it). That's why Monster placed the logo of its original Monster Energy can in that top-half location—a location the logo has kept since its inception in 2002. *Id.* at 489:10–22. Mr. Owoc, for his part, agreed that the placement of the "b" logo on the top of the primary panel of the can was designed specifically for social media. As he explained, "if you grab the can, no matter where you grab it, even if you're a man and you have a fairly big hand, the logo's still gonna stick out where you can see it on all angles." *Id.* at 1039:6–18. This aspect of the can's architecture thus plays a functional role.

83. *Third*, listing performance ingredients around the rim at the top of the can enhances the effectiveness of the label. VPX, for instance, lists "Super Creatine," "Ultra COQ10," and "BCAA Aminos" (or "EAA Aminos") on the rim of its cans. *Id.* at 1040:10–15. This common practice tells consumers about the product's most important ingredients, *id.* at 332:10–25, 1228:12–1229:1; allows those ingredients to be easily seen (even in a glide rack), *id.* at 332:10–25; and prevents the ingredients from interfering with the logo, *id.*

84. *Fourth*, while VPX emphasizes that both Bang and Reign cans display a nutritional "bug" on the front of the can—and several similar bugs on the back—these bugs also serve an informational purpose. Mr. Owoc explained that he put the zero-calorie bug on the Bang label to differentiate it from more-sugary energy drinks. *Id.* at 1035:7–14. In fact, he specifically testified that "the zero bug is important to let consumers know it's an informational bug." *Id.* at 1235:24–1236:18. The bugs on the back of the can serve a similarly functional purpose. *Id.* at 1035:15–1036:18.

### G.  There Is No Evidence that Consumers Are Likely to Confuse Reign with Bang

85. VPX has not shown any likelihood of confusion between Bang and Reign because, among other things, (1) the drinks look different and give distinct overall impressions, (2) VPX has failed to put

forth direct evidence of actual confusion, and (3) VPX's indirect evidence of confusion, in the form of a survey, is almost comically flawed.[11]

### 1. The Bang and Reign Trade Dresses Are Meaningfully Dissimilar

86. Having examined the Bang and Reign trade dresses—across settings, at different angles, and in different lights—we find that the trade dresses, when encountered in a crowded field of black energy drinks, are sufficiently dissimilar to render confusion unlikely.

87. The cans' two most prominent features—their logos and their names[12]—allow consumers to differentiate between the two brands. *First*, for both Bang and Reign, the logo is the largest design element and is prominently featured in the top-center of the front panel. Reign's spartan logo looks nothing like Bang's "b" logo. Indeed, unlike Bang's "b" logo, the Reign logo has a three-dimensional appearance, which conveys a strong and distinct impression. *Second*, the products' trade names—Bang and Reign—are the cans' second-largest (and second most prominent) design elements. That those product names are different—and given how clearly both are displayed in large text on the front panel of the cans—only further underscores the unlikeliness of any confusion.[13] Here's a helpful illustration:

---

[11] We address each of the seven likelihood-of-confusion factors in the Conclusions of Law section, *infra*.

[12] *See* Tr. at 623:21–624:6 (Jayme Lee Rivera, the VPX designer who helped create the Bang label, testifying that the logo and name are the two most prominent features).

[13] It's worth noting, again, that Reign appears in All-Caps, whereas Bang is written in lowercase.



*See* Monster's Findings and Conclusions at 27.

88. While those are the two most prominent differences, there are others that make consumer confusion even less likely. *First*, although both drinks share a black background, those black backgrounds are very different. Bang's is smooth and glossy, while Reign's has a heavily textured look-and-feel. *See, e.g.*, Ex. D-393A (Lemon HDZ). *Second*, the parties list their ingredients rather differently. Most notably, the only ingredient depicted on the front of the Bang can is "Super Creatine," which appears nowhere on the Reign can. *Third*, the colors on the cans are different. *See supra* ¶ 69. *Fourth*, there's Bang's U-shaped carveout, cross-hairs, and colored rim, neither of which appear anywhere on the Reign can.[14] Even Mr. Owoc conceded that the U shape created a "distinct difference," Tr. at 1046:19–22, and that the colored rim increased the "visual impact" of the Bang can, making it "more vibrant," *id.* at 1047:19–1048:10.

89. Our conclusion—that the Bang and Reign trade dresses look different—is reinforced by the fact that other energy drinks, like both of the drinks here, likewise display a colorful logo, a black background, and a similar layout. *See, e.g.*, Ex. D-428. Cans that incorporate this design—like

---

[14] Neither the U-shaped carveout nor the colored rim are part of the trade dress Bang defined in the joint pretrial stipulation. *See* Joint Pretrial Stipulation at 8. Much more on this below.

Monster Energy, Rockstar, and Quake—are routinely sold alongside Bang and Reign. *See, e.g.*, Exs. D-507, D509–20, D-535–50, D-575–83 (Monster Energy); Exs. D-512–13, D-536, D-541, D-544, D-547, D-549, D-583 (Rockstar); Exs. D-509–10, D-535, D-545 (Quake). In a crowded field of energy drinks with many of those features, the notable differences between Bang and Reign are sufficient to render consumer confusion unlikely.

### 2. VPX Presented No Direct Evidence of Actual Confusion

90. From Reign's inception through April 2020, Monster had sold more than 187 million cans of Reign, equating to over $432 million in revenue. *See* Ex. P-2499 (Energy Trends Tab) at rows 15, 25. In roughly that same time span, VPX sold over 547 million cans of Bang, which translated to retail sales of over $1.3 billion. *See* Tr. at 733:9–11; Ex. P-2499 (Energy Trends Tab) at rows 9, 19.

91. Despite all these sales, VPX could muster only *two* witnesses who (according to VPX) were confused by Reign's trade dress: Russell Buchanan and Anderson Amador. Even if we agreed that these two witnesses had relayed legitimate accounts of consumer confusion, we'd have to conclude that two people (out of a veritable army of tens of millions) was paltry proof indeed. As it turns out, though, the testimony of these two witnesses established that *neither* was confused by Reign's trade dress.

92. Mr. Buchanan testified that a member of his hockey team told him to try Reign, which the teammate described "as a Bang without the creatine." Tr. at 758:8–10. Taking this ambiguous statement literally, Mr. Buchanan assumed that Reign "was just essentially a Bang, made by the same company, but targeting people that maybe didn't want to have creatine." *Id.* at 758:11–13. Although Mr. Buchanan said that he didn't question that assumption because of certain similarities between the way both drinks looked, it was ultimately the teammate's statement—and Mr.

Buchanan's own assumptions about the teammate's meaning—that led Mr. Buchanan to presume some affiliation between Reign and Bang. *Id.* at 757:23–762:1.

93. Over the following months, Mr. Buchanan kept buying Bang and, aside from one instance, had no difficulty distinguishing between Bang and Reign. *Id.* at 773:23–25 (agreeing that he had "no trouble" buying one over the other). In that one instance, Mr. Buchanan went to a store he "normally stop[ped] in" to get a Bang. *Id.* at 762:6–764:23. In keeping with his usual routine, he went straight to the cooler he "normally [went] to," grabbed a drink, paid for it, and returned to his car. *Id.* As it turned out, though, someone had "put a Carnival Candy Reign in the slot where the Cotton Candy Bang normally sits." *Id.* And so, when he took a sip, he realized that he'd actually grabbed a Reign, not a Bang. *Id.* Mr. Buchanan's mistake, in other words, resulted, not from some confusing similarity between the two trade dresses, but from a misplacement of the Reign can.[15]

94. A similar thing happened to Mr. Amador, VPX's second confusion witness. Mr. Amador testified that he grabbed a Reign because it was sitting on a shelf that Bang typically occupied. *Id.* at 794:8–796:5. As Mr. Amador explained, he had gone to that same store for several months—often four times a week—to buy a Bang energy drink. *Id.* One day, out of habit, he grabbed a can from the usual spot without even looking at its label. *Id.* at 790:11–791:1. Mr. Amador, in fact, testified that he "actually looked at the can" only *after* he purchased the drink, took a sip, and noticed a different

---

[15] Even if Mr. Buchanan *had* testified that the trade dress confused him (he didn't), the Court would *still* have discounted his testimony. Mr. Buchanan is a Florida lawyer who, having learned of VPX's lawsuit, reached out to VPX's Florida-based in-house counsel. *See* Tr. at 765:10–768:17. In that initial email, Mr. Buchanan did two things: *first*, he laid out his can-confusion story; *then*, he (apparently) offered himself up as potential local counsel for the litigation. *Id.* at 769:3–18 (agreeing that he emailed VPX's in-house counsel from his firm email address, saying that he was a lawyer with Baker Donelson, that he had practiced law in Florida since 2008, and that he was AV-rated *in litigation*). When he sent the email that became the focal point of his testimony, then, Mr. Buchanan had more than just consumer confusion on his mind.

flavor. *Id.* As he glanced at the label, Mr. Amador immediately realized that he'd picked up a Reign, not a Bang. *Id.* In other words, as with Mr. Buchanan, Mr. Amador was confused, not by the cans' packaging, but by their placement in the store. In fact, at least in Mr. Amador's case, it was the very different look of the Reign can that *dispelled* his initial confusion.[16]

### 3.   The Consumer Survey Evidence Failed to Show a Likelihood of Confusion

95.   Monster and VPX each called an expert to testify about the likelihood of confusion. Both experts conducted consumer surveys. As we explain below, Monster's survey wasn't all that persuasive—but VPX's was entirely useless. We're thus left with *no* survey evidence of actual confusion.

96.   We'll start with Monster's expert, Dr. Bruce Isaacson. In assessing the likelihood that consumers would confuse Reign for a VPX product, Dr. Isaacson conducted an "*Eveready*" study. In an *Eveready* survey, the surveyor shows the participants the allegedly infringing product and, based on their responses, determines whether those participants associate the infringing product with the senior product. *See* Tr. at 1467:10–19.

97.   So, in this case, Dr. Isaacson showed participants an image of a Reign can, which the participants could rotate and observe from all angles. *Id.* at 1474:10–20, 1475:1–13, 1476:15–20. Each participant was randomly assigned a different Reign flavor. *Id.* at 1475:17–1476:1. The participants were then asked a series of questions. For our purposes, there were three key questions, all of which got at the issue of whether consumers associated Reign with VPX or Bang.

---

[16] VPX also points to a social-media comment—made before Mr. Amador accidentally bought a Reign—in which Mr. Amador responded to a Reign advertisement by saying: "Wait. Aren't you just infringing on BANG?" *See* Ex. P-748. But this post fails to show confusion. Just the opposite: it shows that Mr. Amador understood—even *before* he inadvertently bought a Reign—that the two products were different and came from different sources.

98.  The first question was: "What company do you believe makes or puts out the beverage you just viewed?" Ex. D-669 at 7. The second was: "Are you aware of any other products or brands made or put out by the company that makes or puts out the beverage you just viewed?" *Id.* If the participant answered yes, the participant was asked to identify those other products or brands. *Id.* at 8. The third was: "Do you think that whoever makes or puts out the beverage you just viewed is sponsored or approved by another company or brand, is not sponsored or approved by another company or brand, or, you don't know?" *Id.* (cleaned up). Those who *did* believe that Reign was sponsored or approved by another company or brand were asked to identify that other company or brand. *Id.* at 9.

99.  Dr. Isaacson then added together all the respondents who identified VPX or Bang (or who recalled a flavor or product made by VPX or Bang) in response to any of these questions. *Id.* at 1487:17–1493:8. Through this process, Dr. Isaacson arrived at a raw likelihood-of-confusion figure of 1.4% (*id.* at 1493:7–8)—this, out of a total of some 2,000 respondents, *id.* at 1524:15–17. Notably, the majority of survey respondents correctly identified Reign as being associated with Monster or Reign. *See* Exs. DDX4.8–DDX4.11.

100.  Dr. Isaacson also included a control in his survey. *Id.* at 1477:17–1478:6. The purpose of the control was to account for respondents who reported some confusion for reasons *unrelated to* the trade dress—a group that included, for instance, respondents who merely guessed, who were inattentive, or who incorrectly believed that all energy drinks are made by a single company. *Id.* at 1478:7–17. For his control cans, Dr. Isaacson made various changes to the Reign can. For example, he might change the background color from black to purple, *id.* at 1480:15–20; or he might change the vibrant portions to more muted pastels, *id.* at 1480:21–25; or he might alter the

flavor names, *id.* at 1481:9–12. Dr. Isaacson's survey showed a rate of confusion of 0.5%. *Id.* at 1493:15–16. Subtracting this number from the raw confusion figure of 1.4% yielded a net confusion rate of 0.9%—a confusion rate Dr. Isaacson characterized as negligible. *Id.* at 1493:17–25.

101.   The problem with Monster's survey, though, is that there's very little evidence that Bang's label enjoys "top-of-mind" awareness. As Dr. Isaacson testified, "when a mark is not sufficiently well known, an Eveready survey will produce very low results for likelihood of confusion." *Id.* at 1528:25–1529:6. This makes sense. If the survey participants aren't aware of the Bang label, then even looking at a near-identical can (say, for example, only swapping "Bang" for "Rang") won't bring the Bang product to mind or result in any confusion.

102.   This question—whether Bang enjoys "top-of-mind" awareness—put the parties in something of an awkward spot. Recall that, in the debate over secondary meaning, the parties assumed the positions we would have expected them to take—with Monster claiming that Bang's label is relatively unknown and VPX insisting that its label is (well) pretty much the most famous thing on the planet. Here, by contrast (on the issue of "top-of-mind" awareness) the parties swapped positions—with Monster claiming that Bang *has* achieved top-of-mind status and VPX saying (somewhat ironically) that its brand just isn't quite that famous yet. *See* Monster's Findings and Conclusions at 50–51; VPX's Findings and Conclusions at 82.

103.   Anyway, back to Monster's survey. Monster asks us to assume that Bang *is* top of mind for two reasons—both unavailing. *First*, based on VPX's substantial advertising expenditures and sales, Monster suggests that energy-drink purchasers *are* familiar with Bang's label. *See* Monster's Findings and Conclusions at 50. We're not persuaded. Bang is a relatively new product; it has

captured *less than* 10% of the market; it resembles other brands; and there's *no* evidence linking its advertising and sales to the general public's awareness of its trade dress.

104.   *Second*, Monster points to VPX's own statements that its trade dress is (very very) famous. For example, Mr. Owoc testified that Bang has "one of the most famous trade dresses on Planet Earth," *see* Tr. at 1318:18–21, and that it has the "most impactful logo, not only in beverage, but in the entire world," *id.* at 1067:11–12. But there's simply no evidence to support these outlandish claims. And we shouldn't make too much of them in any case: Mr. Owoc is justifiably proud of the business he's built; and, as the proprietor of a brand that has propagated itself mainly on the force of his advertising campaigns, he's understandably eager to puff up, as it were, his company's successes. But we can't agree that Bang is one of the most famous brands on the planet—and so, we find little value in Monster's *Eveready* survey.

105.   We turn, then, to VPX's confusion expert, James Berger, whose survey makes Monster's look flawless by comparison. Mr. Berger conducted what's known as a "*Squirt*" survey, which involves showing participants a lineup of products—as those products normally appear in the marketplace—and asking them whether, in their view, any of the products come from the same source. *Id.* at 847:20–848:1. Mr. Berger showed his survey participants a computer-generated cooler like this one:[17]

---

[17] Mr. Berger used five different coolers. The only difference between them was that, in each of the five coolers, the various can types appeared in different rows. Everything else, including the types of cans and the order of the cans on each individual row, remained the same. *See* Ex. P-2387-026.



*See* Ex. P-2387-026.

106.     As one look at this cooler should make plain, Mr. Berger's coolers were leading and infected

the entire study with an unacceptable degree of bias. Let's start with color. Although Mr. Berger's

study compared five different cans, only two of them—Bang and Reign—are black.[18] Mr. Berger

notably excluded from his survey other black cans from well-known manufacturers, like Monster

Energy and Rockstar. He did this even though—as he admitted—Bang and Reign are, "[o]f

course," more likely to be seen in stores alongside Monster Energy and Rockstar than the third-

party brands he included in his survey. *See* Tr. at 896:14–897:2. In addition, Mr. Berger's survey

stacked the Bang and Reign cans so that their colors aligned—an undisguised attempt to

---

[18] Mr. Berger testified (unpersuasively) that Celsius was also black. *See* Tr. at 889:2–3. But—as the above exhibit shows—it doesn't look black in the prompt the participants received.

exaggerate the cans' similarities. Faced with only two black cans—aligned by their flavor-dependent color—and three that looked nothing like the others, it's no surprise that so many of the participants incorrectly believed that the two black cans were in some way related.

107.     Indeed, Mr. Berger (implicitly) conceded as much at trial when he compared a police lineup to a *Squirt*-style survey. As he explained:

> [W]hat I was conscious of, if you had a victim who said he was -- he or she were attacked by an African-American, and you had a lineup of four Caucasians and one African-American, that would not be a fair array of products -- or array of people. If you had five African-Americans, I would think that that would be okay. Or if he was attacked by a Caucasian, and you had five Caucasians, that would be good. But if you had four African-Americans and one Caucasian, it would be the same problem as I [have] stated before.

Tr. at 885:6–886:20.

108.     The irony, of course, is that the problem Mr. Berger was describing—including, in the lineup for a case with a black suspect, only one black man and four whites—is not so different from what Mr. Berger did in his survey. With only two black cans alongside various colored cans, survey participants—like a man picking a black suspect out of an otherwise-white lineup—were far more likely to see some connection between those two black cans. We identified this problem for VPX well before our expert deadlines had passed. *See* Preliminary Injunction Transcript [ECF No. 96] at 28. VPX thus could have rectified the issue—but didn't.

109.     It would be one thing if Mr. Berger's artificial cooler matched, to one degree or another, what consumers might regularly see in the marketplace. But VPX has provided no evidence that the market in any way resembles Mr. Berger's artificial coolers. Mr. Berger, for his part, had no idea whether his survey approximated market conditions. *See* Tr. at 881:8–12 (Q. "Okay. You don't know whether the third-party brands included in your stimulus are likely to be found in a cooler

in a store together with Bang and Reign, do you? A. I do not, no. I don't know. I am assuming they might, but I'm not -- I don't know."). In fact, Mr. Berger testified that he'd never even seen a can of Bang or Reign on a store shelf. *Id.* at 871:10–16. He also admitted (somewhat oddly) that his prompt very likely *didn't* resemble real-world conditions. *Id.* at 896:14–23 (agreeing with the statement: "Rockstar, Monster Energy, and Red Bull, all three of those products are more likely than the third-party products in your stimulus to be included with Bang and Reign in a cooler in a store in the marketplace").

110.    Nor could Mr. Berger have said otherwise. None of the trial evidence suggested that these energy drinks are *ever* sold together as they appeared in Mr. Berger's survey: with only two black cans, organized by flavor-designating color, against a backdrop of multi-colored cans. At trial, of course, VPX repeated the mantra that Bang competes *directly* with Monster Energy and Rockstar. *Id.* at 634:21–23, 727:15–21, 1036:7–15, 1249:24–1250:1. If this is true—and we have no reason to doubt it—then the absence of these two drinks from Mr. Berger's survey was simply inexcusable.

111.    VPX tries to ensure that Bang is sold *next to* Monster Energy (and other traditional energy drinks). *Id.* at 730:20–732:5. Here's an example of how the drinks *actually* appear in the market:

54



*See* Ex. 540 (showing Bang and Reign in a cooler with Monster Energy, Rockstar, and Quake); *see also* Exs. D-507–20, D-535–50, D-575–83 (pictures of Bang and Reign in real coolers, none of which look like Mr. Berger's artificial coolers).

112.    Desperate to salvage Mr. Berger's survey, VPX pushes two arguments—both meritless. *First*, VPX points to certain documents, in which Monster proposed coolers that (in VPX's view) are similar to the ones Mr. Berger employed. *See* VPX's Findings and Conclusions at 84. But VPX doesn't show that these "proposed coolers" actually made their way into the marketplace. In any event, even these "proposed coolers" contained *other* black cans, like Rockstar and Hyde. *See* Ex. P-271 at 6–7. They're thus not nearly as misleading as Mr. Berger's were. *Second,* at trial, Mr. Berger

55

insisted that he only selected energy drinks that fit the following criteria: "a ready-to-drink product, in a 16-ounce can, that was a sugar-free product, and that is a product that came in a variety of flavors." Tr. at 846:1–5. But Mr. Berger never explained why his made-up criteria were appropriate or necessary. Nor could he tell us why he excluded Rockstar Xdurance—which *both* meets his criteria *and* has a black background—from the survey. *Id.* at 899:6–14.

113.    Although these problems would be, standing alone, sufficient to disregard Mr. Berger's survey, the survey's deficiencies don't end there. That's because Mr. Berger also failed to deploy a control and to calculate "noise." As both Mr. Berger and Dr. Isaacson testified, survey experts commonly use a separate group called a control. *Id.* at 915:3–24, 1478:7–1480:3. These control groups are given a prompt that replaces the accused product with a different (if similar) product. *Id.* To make the control work, the product the control group sees should be as similar as possible to the allegedly infringing product—removing only the disputed elements. *Id.* at 1503:8–1504:2. When using a separate control group in this way, experts typically subtract the control group's confusion rate, referred to as "the noise," from the confusion rate in the test group. *Id.* at 913:1–13. The result is called the net confusion rate. *Id.*

114.    But Mr. Berger didn't use a control. When asked why not, he testified that he "felt it was not necessary to use a control" because "he was assessing the presence of a state of mind, not the cause of a state of mind." *Id.* at 849:6–12; *see also id.* at 850:23–853:1, 856:16–22, 924:13–15. This explanation makes little sense. The question in our case, after all, is whether the trade dress has *caused* confusion. If the confusion the participants identified stemmed from some extraneous factor[19]—such as guessing, inattention, or the use of a suggestive stimulus—that confusion is

---

[19] That is, a factor unrelated to the trade dress.

necessarily irrelevant to our case. *Id.* at 1499:22–1500:23. Indeed, an article published in Mr. Berger's own book explains that "[c]onsumer surveys in Lanham Act cases are testing for 'causality,' that is, they are trying to test for whether a given trademark or advertisement causes consumers to be confused or misled." JAMES BERGER, TRADEMARK SURVEYS IN THE AGE OF *DAUBERT* 147 (2016).

115.    Faced with this issue at trial, Mr. Berger backtracked and claimed that the third-party cans he used in his survey *could* serve as valid, "internal" controls. *See* Tr. at 916:5–9. VPX hasn't seriously explained how this could be, given the obvious differences between the third-party cans and the two cans we care about here: Bang and Reign. But, even accepting Mr. Berger's "explanation," his survey would remain useless because he never even tried to determine how much of his confusion rate came from these "internal" controls. Whatever we think of the concept of "internal" controls, in other words, Mr. Berger made no effort to calculate the "noise" they generated.

116.    In the end, none of these problems is surprising. It came out at trial that, unlike Monster's expert—who designed his survey independently, *id.* at 1467:3–5—Mr. Berger conducted his survey with substantial assistance and direction from VPX's attorneys, *see, e.g.*, *id.* at 845:23–25 (testifying that VPX's attorneys helped to "determine[] what the criteria were for the drinks that you were going to use" in the survey); *id.* at 873:2–4 (testifying that the "design of [his] stimulus was a joint effort" between him and VPX's attorneys); *id.* at 873:18–20 (testifying that the call-outs in the cooler images were "engineered" by VPX and its attorneys); *id.* at 876:6–13 (testifying that "the flavors repeat" in his prompt because that was simply the "array presented to [him] by [VPX's attorneys]"). Thus unhinged from the independence we generally expect in a reliable survey, Mr. Berger's process was unreliable from the start.

117.    VPX's survey, in sum, is unpersuasive and provides *no* viable evidence of consumer confusion.

## CONCLUSIONS OF LAW

In this Section, we'll start by addressing VPX's (belated) motion to amend its trade-dress definition. We'll then turn to the substance of VPX's trade-dress claim.

### A.  The Motion to Conform

Federal Rule of Civil Procedure 15(b) allows parties, in limited circumstances, to amend their pleadings during and after trial. Although Rule 15(a), which governs pretrial amendments, "provides for liberal amendment of pleadings, Rule 15(b) operates more narrowly." *Amodeo v. United States*, 743 F. App'x 381, 385 (11th Cir. 2018). That's because motions to conform are filed at a later stage in the litigation, and "each party is entitled to know what is being tried, or at least to the means to find out." *Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, 420 (5th Cir. 1981). "Notice remains a first-reader element of procedural due process, and trial by ambush is no more favored here than elsewhere." *Id.* Rule 15(b) identifies two situations in which parties may seek leave to amend. As set out below, neither situation was present in our case—and so, we deny VPX's Motion to Conform.

### 1.  Rule 15(b)(1)

VPX is not entitled to amend its trade dress under Rule 15(b)(1). The first prong of Rule 15(b) allows for amendments to a party's pleadings "[b]ased on an [o]bjection at [t]rial." FED. R. CIV. P. 15(b)(1). The Rule provides that, "[i]f, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended." *Id.* "The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." *Id.*

This first prong is inapplicable here for at least two reasons. *First*, VPX has not sought to amend its complaint "[b]ased on an [o]bjection at [t]rial." FED. R. CIV. P. 15(b)(1). We start with the plain meaning of that textual requirement. *See Sargeant v. Hall*, 951 F.3d 1280, 1283 (11th Cir. 2020) ("We give the Federal Rules of Civil Procedure their plain meaning." (quoting *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 540 (1991))); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). An objection is "[a] formal statement opposing something that has occurred, or is about to occur, in court and seeking the judge's immediate ruling on the point." *Objection*, BLACK'S LAW DICTIONARY (11th ed. 2019). Rule 15(b)(1) thus applies only when the proposed amendment is based on some formal statement a party made at trial, seeking an immediate ruling. Or, to put it another way, "Rule 15(b)(1) prescribes the procedure to be followed if there is an objection to the introduction of evidence on the ground that the material offered is not within the issues framed by the pleadings." 6A C. WRIGHT & A. MILLER, FED. PRAC. & PROC. CIV. § 1495 (3d ed. 2021).

In our case, VPX's motion was sparked—not by any *objection* by Monster—but by a position Monster advanced in its opening statement. In that opening, Monster argued that VPX had "disclaimed" any rights to the zero-calorie bug by not including it in the trade dress the parties agreed to as part of their joint pretrial stipulation. *See* Tr. at 44:16–22. The following day, VPX's counsel raised the issue with the Court, contending that VPX had not "relinquished" its rights to the bug and suggesting that it had *mistakenly* left the zero-calorie bug out of both its summary-judgment briefing *and* its joint pretrial statement. *Id.* at 422:12–425:25. The Court held that "[i]t's not in the joint pretrial stipulation, so it's not in the trade dress," but invited VPX, before the end of trial, to provide any cases

it might find for the proposition that a district court could consider facts a party inadvertently excluded from the joint pretrial stipulation. *Id.* VPX then waited until *both* parties had rested their cases before it filed its Motion to Conform. In that motion, however, VPX doesn't simply ask the Court to add the zero-calorie bug to the trade-dress definition; it now proposes a whole host of new add-ons that would significantly alter the definition the parties included in their pre-trial stipulation. Either way, VPX didn't file its motion in response to any *objection* by Monster.[20] Monster, after all, had nothing to object to, since it was Monster's opening statement that prompted VPX to file its motion. Nor has VPX identified any *other* objection that might render Rule 15(b)(1) applicable in our case. Rule 15(b)(1), in short, cannot help VPX here.

Other courts have reached the same conclusion in similar circumstances. For example, in *Dank v. Shinseki*, 374 F. App'x 396 (4th Cir. 2010), the Fourth Circuit found that Rule 15(b)(1) was inapplicable where "it [did] not appear from the record that either party 'object[ed] that evidence [was] not within the issues raised in the pleadings,' thereby triggering application of the rule." *Id.* at 400 (quoting FED. R. CIV. P. 15(b)(1)). Rather, the party only requested an amendment *after* it became clear that the trial court planned to use a particular standard in its jury instructions. *Id.* A very similar thing happened in our case: VPX didn't move to conform its complaint to overcome any evidentiary objection. Instead, VPX requested an amendment only after it realized that Monster meant to strike at certain inconsistencies in the trade dress VPX had stipulated to.

---

[20] VPX concedes as much. In arguing that Monster consented to trying the proposed trade dress—a claim we deal with (and reject) below—VPX says that Monster "fail[ed] to object during trial" to the evidence it introduced on the proposed trade dress. *See* Motion to Conform at 2. Thus, by VPX's own admission, its amendment is not based on any evidentiary objection.

Similarly, in *Swiatek v. Bemis Co.*, the Third Circuit rejected a Rule 15(b)(1) motion where "[t]here was no *objection* at trial which caused [the party] to move for leave to amend." 542 F. App'x 183, 188 (3d Cir. 2013) (emphasis added). In our case (again), there was no "objection" that "caused" VPX to file its motion.[21]

*Second*, VPX's proposed amendment "would prejudice [Monster's] defense on the merits" by fundamentally altering Bang's defined trade dress. FED. R. CIV. P. 15(b)(1). "Several courts have adopted a requirement that a plaintiff seeking to protect its unregistered trade dress do more than just point to the 'overall look' of its trade dress; it must 'articulat[e] the specific elements which comprise its distinct dress.'" *Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1252 (10th Cir. 2016) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)).[22] While there are several compelling reasons to require plaintiffs to precisely define their trade dress,[23] only one bears

---

[21] In any event, VPX only first advanced an argument under Rule 15(b)(1) in its reply brief—by which point (of course) it had waived that argument. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

[22] *See also Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) ("It is the plaintiff's duty to articulate the specific elements which comprise its distinct dress." (cleaned up)); *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 415 (6th Cir. 2006) ("The discrete elements which make up [the trade dress] should be separated out and identified in a list." (cleaned up)); *Celler L. Org., Inc. v. Sony Pictures Television Inc.*, 2014 WL 12580516, at *2 (S.D. Fla. Apr. 12, 2014) (Cohn, J.) ("To bring a trade-dress claim, a plaintiff must precisely articulate the specific elements that comprise its distinct trade dress, so that courts can evaluate claims of infringement and fashion relief."); 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:3 (5th ed. 2021) ("All courts agree that the elements of the alleged trade dress must be clearly listed and described."

[23] 1 GILSON ON TRADEMARKS § 2A.01 (2021) ("There are several compelling reasons for courts to require the plaintiff to specify the elements it is relying on in its claim. A vague allusion to 'trade dress' fails to give a defendant sufficient notice of the claims against it, including which products and which features of those products it is said to have infringed. Different jurors may understand the trade dress to be made up of different elements, and any resulting verdict could be 'based on inconsistent findings.' In addition, a court or jury must assess the distinctiveness and functionality of the claimed

mentioning here—that it is only with a clearly defined trade dress that the "court and the parties [can] coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement." 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:3 (5th ed. 2021) (hereinafter MCCARTHY ON TRADEMARKS). In other words, at trial, the fact-finder must assess all three elements of a trade-dress claim—distinctiveness, functionality, and confusion—*in light of* the defined trade dress. *Id.* (noting that "the ultimate decision on infringement of trade dress . . . is determined by comparing the totality of the elements defined by plaintiff with the corresponding elements in the accused product and deciding if there would be a likelihood of confusion").

In our case, VPX seeks to alter its trade-dress definition *substantially*. VPX's proposed definition seeks to add, not only the zero-calorie bug—which appeared in VPX's preliminary-injunction briefing, though not in its complaint, its summary-judgment briefing, or its joint pretrial stipulation—but also several other elements that would broaden the scope of VPX's definition significantly. These new revisions include: (1) re-characterizing the definition as including only a list of "non-exhaustive features"; (2) adding the U shape at the bottom of the can; (3) adding the colored rim; (4) adding a thin contrasting strip at the bottom of the rim; (5) adding the use of EAA Aminos; (6) adding a contrasting line to the "b" logo and the "BANG" name; (7) broadening the specific performance ingredients comprising its alleged trade dress; and (8) adding certain features that appear on the back of the can, such as a "stylized logo . . . followed immediately by a tagline in contrasting

---

trade dress in order to determine whether the mark is a valid one; to do so, it must know just what the plaintiff is claiming. A court must also know what trade dress is at issue if it gets to the point of shaping appropriate injunctive relief. Competitors must know details of the claimed design in order to know what designs the plaintiff could challenge . . . .").

white/silver in all capital letters" and "a unique mix of text and callouts, including without limitation, 'Not Intended for Individuals under the AGE OF 18' and four horizontal zero bugs relating to nutritional facts and/or ingredients." Motion to Conform at 3–4.

This won't do. Throughout the protracted discovery period—and over the course of nine long trial days—Monster justifiably defended itself *only* against the definition VPX had outlined at the beginning of the case. Monster thus repeatedly referenced VPX's pretrial definition in its opening statement. *See, e.g.*, Tr. at 41:24–42:5, 48:18–23, 51:12–20. Indeed, a central theme of Monster's case was that "every issue in this case must be in accordance with the trade dress as the plaintiff chose to define it." *Id.* at 41:10–12. Consistent with that sensible position, Monster homed in on certain elements that were missing from VPX's definition (such as the U-shaped carveout, the zero-calorie bug, and the color band at the top of the can) to show, among other things, that VPX had departed from its claimed trade dress, that its defined trade dress was weak, and that (as such) the trade dress lacked secondary meaning. *Id.* at 44:16–45:11; 46:10–47:8. VPX's pretrial trade-dress definition also guided Monster's trial strategy—including the evidence Monster adduced and the specific questions it posed to witnesses. So, for instance, had VPX moved to amend its trade dress *before* trial, Monster could have introduced evidence to rebut or undermine the viability of the new features VPX had added to the trade dress. To that end, it might have introduced other energy drinks that feature silver carveouts or a colored rim or similar callouts on the back of the can—all of which would have gone to the question of *protectability*. Monster also might have shaped its questioning to, by way of example, determine whether those same features mitigated any likelihood of confusion. But Monster didn't get to do these things, not because it was unprepared, but because VPX has elected to sandbag Monster

with an entirely new trade-dress definition *after all the evidence was in*. VPX's gamesmanship, in short, has severely prejudiced Monster's ability to defend itself against VPX's trade-dress claim.

And it's not as if this was a one-move blunder. VPX had several opportunities to revise its definition before (or during the evidentiary portions of) the trial. This Court, in fact, has long noted—on multiple occasions—that certain prominent features of the Bang can were curiously absent from the defined trade dress. *See, e.g.*, Preliminary Injunction Order [ECF No. 134] at 16; Summary Judgment Order [ECF No. 344] at 5 n.2. Rather than refine its definition in response to the Court's concerns, however, VPX elected to wait until *weeks after* the trial evidence had closed (and just days before the parties' proposed findings of fact and conclusions of law were due) to request the amendment it hopes will save its claim. By that point, of course, we would have had to redo the whole trial—bringing back witnesses and lawyers from all across the country, at significant expense—to allow Monster to address VPX's never-before-seen trade dress. And then what? What happens when, at Trial #2, Monster identifies still another missing piece of the trade dress? Do we allow VPX to craft a third definition and hold a third trial? And then a fourth? Of course not. The solution is to hold VPX to the rules and enforce the stipulation VPX signed—a stipulation VPX agreed to, not by mistake, but because it incorporated the same trade dress VPX had preferred since the very earliest stages of the case. VPX, in sum, wants a second crack at Monster. But, barring some inapplicable exceptions, the law generally doesn't allow do-overs—and we won't allow one here.

Unsurprisingly, courts routinely reject last-ditch efforts to alter or amend liability theories at the close of trial. *See, e.g.*, *Smith v. Glob. Staffing*, 621 F. App'x 899, 904 (10th Cir. 2015) (affirming the district court's finding of prejudice "resulting from permitting [the plaintiff] to add an additional claim after the evidence was closed"); *Thews v. Wal-Mart Stores, Inc.*, 560 F. App'x 828, 831 (11th Cir. 2014)

(affirming the district court's finding of prejudice where the plaintiff attempted to amend its complaint "[a]fter the close of evidence and after the district court granted JMOL"); *Dank*, 374 F. App'x at 401 ("The prejudice here is especially evident given that [the plaintiff] moved for the amendment on the last day on which the parties presented evidence, thereby denying the [the defendant] any opportunity to amend the presentation of the case."); *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004) (finding that the defendant "would be prejudiced by having to defend against a new theory of liability first introduced at the close of trial"); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("Generally, introducing new claims for liability on the last day of trial will prejudice the defendant.").

Against all this, VPX offers two arguments—both unpersuasive.

*First*, VPX says that its proposed amendment wouldn't change the elements of its trade dress; it "simply . . . reduce[s] the overall image of the can, as shown in the photograph of the BANG Trade Dress first presented in the Complaint . . . , to more detailed verbiage." Reply in Support of Motion for Leave to File Conformed Complaint [ECF No. 414] at 7. But that's just not true. In its complaint, VPX defined its trade dress, not with a picture of a Bang can, but with a list of specific elements. *See* Compl. ¶ 20 ("VPX's trade dress consists of an overall look and feel resulting from the distinctive combination of the following non-functional features . . . ."). And, while it's true that trade dress "involves the total image of a product," *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986), a plaintiff must still define the dress it seeks to protect *with specificity*, *see, e.g.*, *Hammerton, Inc. v. Heisterman*, 2008 WL 2004327, at *3–*7 (D. Utah May 9, 2008) ("[F]ocus on the overall look of a product [or products] does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress."). This is so because a plaintiff may seek to protect a set

of elements that encompasses *less* than the whole label—something VPX *initially* tried to do here.[24] Put simply, VPX is indisputably altering the definition of its trade dress.

The decisions VPX cites only highlight the inappropriateness of its request. It's true, for instance, that, in *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 21056809 (S.D.N.Y. May 8, 2003), the court allowed the plaintiff to amend its trade-dress definition. But *Cartier* is completely different from our case. The amendment there occurred *at the preliminary-injunction phase*, and the plaintiff filed its motion under the (more) liberal standards of Rule 15(a). *Id.* at *3–*4. Since the plaintiff moved to amend so early in that case, the only prejudice the defendants claimed stemmed from the possibility that they'd have to "redo" some discovery—a possibility the court discounted given that the defendants' discovery was not "based upon the written description of the trade dress." *Id.* In our case, by contrast, VPX filed its motion (1) under the more stringent standards of Rule 15(b), (2) long after discovery had closed, and (3) weeks after the evidentiary portions of the trial had been completed. And, unlike *Cartier*—where the trial judge specifically found that the defendants would suffer *no* prejudice—the prejudice to Monster is both obvious and extreme. Again, the new trade dress would force Monster to choose between the litigation equivalents of Scylla and Charybdis: to choose, on the one hand, between spending hundreds of thousands of dollars retrying a case it had (rather easily) won and, on the other, proceeding to judgment without having defended itself against a trade dress it had never seen before. *Cartier* thus cannot guide us here.

---

[24] 1 MCCARTHY ON TRADEMARKS § 8:3 ("While trade dress is most often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of elements consisting of less than the totality of features. Whatever plaintiff may claim as the combination of elements making up its alleged trade dress in the product or its packaging and presentation, it is not adequate for the plaintiff to solely identify such a combination as 'the trade dress.' Rather, the discrete elements which make up that combination must be separated out and clearly identified in a list.").

VPX's reliance on *Eliya, Inc. v. Steven Madden, Ltd.*, 2017 WL 1190943 (E.D.N.Y. Mar. 30, 2017), fares no better. In that case, the court allowed the plaintiff, well before trial, to revise its trade-dress description after the court, in a related proceeding, dismissed the plaintiff's complaint for failure to define its trade dress with sufficient clarity. *Id.* at *4–*5. In the separate action, the court had found the plaintiff's trade dress deficient because it (the dress) was supported "only by photographs without clear specification as to the distinct features that substantiated the protected trade dress." *Id.* at *2. Notably—and like the amendment in *Cartier*—the *Eliya* amendment occurred *before* the close of discovery (and long before trial), was adjudicated under Rule 15(a), and came only after the court rejected the defense's view that expending "additional resources to conduct further discovery" constituted undue prejudice. *See generally id.* Our case (again) is totally different. VPX filed its motion long after discovery (and the evidentiary portions of the trial) had closed, its motion is governed by the strictures of Rule 15(b), and the prejudice Monster would suffer—having to choose between retrying its case or proceeding blindly to judgment—is difficult to quantify.[25]

*Second*, VPX claims that Monster wouldn't be prejudiced because "the proposed trade dress definition reflects what was tried before the Court." Motion to Conform at 8. Not so. Monster did not litigate the case under the proposed trade dress; it simply referenced certain features of the now-proposed trade dress to highlight that those features were *not* part of VPX's claimed trade dress. For example, Monster introduced an exhibit that illustrated the changes in the Bang label over time, *not* to examine whether that trade dress met the elements of a trade-dress claim, but simply to suggest that

---

[25] To the extent VPX characterizes its trade-dress amendment as "small and insignificant," *Keebler Co. v. Nabisco Brands, Inc.*, 1992 U.S. Dist. LEXIS 6826, at *48 (N.D. Ill. May 18, 1992), we disagree. Two of the label's most dominant features—the U shape and the colored rim—are included in VPX's proposed definition, even though they were omitted from all prior definitions.

the changes in the label undermined VPX's claim to secondary meaning. *See, e.g.*, Tr. at 1132:18–1152:21; Ex. D-46. Similarly, Monster asked Mr. Owoc about the U shape and the colored rim to emphasize that certain more-distinctive features of the Bang can were *not* part of the trade dress. *See, e.g.*, Tr. at 1141:22–1143:3 ("But did the U shape at the bottom of the can also add to its distinctiveness . . . ?").

VPX comes closest to showing a lack of prejudice when it discusses the zero-calorie bug. That was the *only* new feature of the proposed trade dress that, *at trial*, VPX asked the Court to incorporate into its dress. And it's true that, during the trial, Monster (in large part to protect itself against this new feature) introduced one exhibit and elicited some testimony about that bug—evidence that directly addressed the elements of a trade-dress claim. *See id.* at 506:4–509:21. Even with respect to the zero-calorie bug, however, Monster's strategy—and the attention it would have paid to the issue—very likely would have changed had the bug been part of VPX's trade dress from the beginning. VPX, after all, didn't reveal its intentions with respect to the bug until *after* Monster had opened. By then, of course, Monster had lost the chance to conduct any further discovery on the bug—discovery that likely would have included a survey of the bug's prevalence in the industry and some background on Mr. Owoc's claim to have invented it, *id.* at 1074:16–17 (claiming that "Reign specifically targeted Bang and copied all our zero bugs"). And this is all to say nothing of the prejudice Monster would suffer from having prepared for trial (and then opened) under a theory—and pursuant to a strategy—that the added bug would (at least partially) undermine. Monster, in short, would be prejudiced by VPX's belated attempt to refine its trade dress.

### 2. Rule 15(b)(2)

For many of the same reasons, VPX's bid to conform its complaint under Rule 15(b)(2) likewise falters. That provision reads as follows: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." FED. R. CIV. P. 15(b)(2). Monster certainly didn't *expressly* consent to VPX's proposed trade dress, so the viability of VPX's request turns on its argument that Monster *impliedly* consented. *See* Motion to Conform at 5 (contending that Monster "impliedly consented to trying the BANG® trade dress as proffered").

"Implied consent under Rule 15(b) will not be found if the defendant will be prejudiced; that is, if the defendant had no notice of the new issue, if the defendant could have offered additional evidence in defense, or if the defendant in some other way was denied a fair opportunity to defend." *Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1339 (11th Cir. 2020) (quoting *Cioffe v. Morris*, 676 F.2d 539, 541–42 (11th Cir. 1982)). "Failure to object to evidence raising issues outside of the pleadings constitutes implied consent as long as the evidence is not relevant to issues already within the pleadings." *U.S. for Use & Benefit of Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 677 (11th Cir. 1987). The flip side is that "[t]he introduction of evidence arguably relevant to pleaded issues cannot serve to give a party fair notice that new issues are entering the case." *Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212, 1215 (11th Cir. 2010) (quoting *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487 (11th Cir. 1987)). The doctrine of "implied consent" only applies when the consent is "evident." *Kearney v. Auto-Owners Ins. Co.*, 422 F. App'x 812, 816–17 (11th Cir. 2011) (quoting *Cioffe*, 676 F.2d at 541).

For three reasons, Monster's "implied consent" is *not* evident here. To the contrary, the evidence strongly suggests that Monster never consented—impliedly or otherwise.

*First*, as we've emphasized, one of the themes Monster pressed at trial was this notion that a trade-dress plaintiff must be bound by the scope of the trade dress *it defined*. *See, e.g.*, Tr. at 41:10–12 ("[E]very issue in this case must be in accordance with the trade dress as the plaintiff chose to define it."); *id.* at 52:2 ("They can't redefine their trade dress . . . ."); *id.* at 421:3–4 (arguing that VPX "disclaimed not just bugs on the back [but also] the bugs on the front" because those elements did not appear in VPX's defined trade dress). It's thus implausible to believe that Monster impliedly consented to an amendment that stands in such stark contrast to the positions it *expressly* pushed at trial. *See Myers v. Moore*, 326 F.R.D. 50, 62 (S.D.N.Y. 2018) ("Defendants' repeated, vigorous, and explicit opposition . . . demonstrates that Defendants have not impliedly consented to litigate that claim.").

*Second*, Monster had no notice that VPX was bringing other elements of its can—outside of its defined trade dress—into the case. While VPX rightly notes that *some* evidence of its newly-proposed trade dress came in at trial, all of that evidence was "arguably relevant to pleaded issues" and thus could not "serve to give [Monster] fair notice that new issues [were] entering the case." *Diaz*, 627 F.3d at 1215 (quoting *Wesco*, 833 F.2d at 1487). To understand why this is so, let's take a look at the four primary pieces of evidence VPX relies on: (1) a few questions Monster posed to several witnesses about the extent to which the Bang can had changed over time; (2) certain questions Monster put to Mr. Owoc about the U-shaped carveout; (3) an exhibit Monster introduced about the zero-calorie bugs; and (4) a set of physical Bang cans Monster moved into evidence. But none of these suggests that Monster understood VPX to have *altered* its defined trade dress, because *all of this evidence*

70

was relevant to *other* live issues in the case. So, for instance, changes in the can were relevant to secondary meaning; the U-shaped carveout was relevant to Monster's contention that other, more-distinctive aspects of the can were *not* part of the defined trade dress; evidence that the zero-calorie bugs were widespread in the industry rebutted VPX's claim that the bugs established intentional copying; and the physical Bang cans were relevant to the scope of the defined trade dress (which VPX had curiously delimited to a mere subset of the whole can).[26]

*Third*, for all the same reasons we've discussed already, Monster would be prejudiced by VPX's proposed alteration of its trade dress. Over the course of the trial, Monster repeatedly referenced VPX's trade-dress definition, continuously emphasized that VPX was bound by that trade dress, and limited its questioning—especially on the issue of distinctiveness—to the trade dress as VPX had defined it. Had Monster known about this new definition, it could have admitted other energy drinks that feature carveouts or colored rims or similar callouts on the back of the can—all of which might have undermined VPX's claimed protection over those features. But it didn't do those things because VPX never asserted ownership over those features of its trade dress. In short, all of the evidence Monster harnessed—and all of the testimony it elicited—was directed at the rights *VPX had said* it was trying to protect. To change that framework after all the evidence came in—when all that remained were the closing arguments—would (we think it clear) significantly prejudice Monster.

### 3.   VPX Is Bound by the Joint Pretrial Stipulation

VPX's motion fails for an entirely different (if simpler) reason: Rule 15(b) only allows a party to amend its *pleadings*, not its *joint pretrial stipulation*. Rule 15(b)(1) says that, "[i]f, at trial, a party objects

---

[26] Monster also used the physical Bang cans to distinguish the Bang surface from Reign's rougher, textured *feel*.

that evidence is not within the issues raised in the pleadings, the court may permit the *pleadings* to be amended." FED. R. CIV. P. 15(b)(1) (emphasis added). Rule 15(b)(2) provides that, "[w]hen an issue not raised by the *pleadings* is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the *pleadings*." FED. R. CIV. P. 15(b)(2) (emphases added).

And we needn't speculate about the meaning of the word "pleadings" in this context, because Rule 7(a) specifically delineates the seven kinds of documents that qualify as "pleadings" under the Federal Rules: (1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer. FED. R. CIV. P. 7(a); *see also Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1336 (11th Cir. 2014) (noting that "Rule 7(a) . . . sets forth a limited list of permissible pleadings"). "Rule 7 explicitly excludes everything else from its definition of pleadings." *Burns v. Lawther*, 53 F.3d 1237, 1241 (11th Cir. 1995); *see also New York Marine & Gen. Ins. Co. v. Boss Interior Contractors, Inc.*, 2021 WL 327421, at *1 (S.D. Fla. Feb. 1, 2021) (Bloom, J.) (recognizing that documents falling outside Rule 7(a) do not qualify as pleadings); *Silver Creek Farms, LLC v. Fullington*, 2018 WL 1967133, at *1 (S.D. Fla. Feb. 15, 2018) (Marra, J.) (same); *Sec. & Exch. Comm'n v. City of Miami*, 2016 WL 7188133, at *1 (S.D. Fla. May 20, 2016) (Altonaga, C.J.) (same).

In our case, VPX defined the Bang trade dress in the parties' joint pretrial stipulation. Because joint pretrial stipulations are not *pleadings* under Rule 7, Rule 15(b)—which permits a party, in certain circumstances, to amend its *pleadings*—simply doesn't apply. Indeed, the Eleventh Circuit has recognized this point in applying the pretrial amendment provision of Rule 15(a). In *Ojeda v. Louisville Ladder Inc.*, 410 F. App'x 213 (11th Cir. 2010), the Eleventh Circuit rejected a party's attempt to file an amended affidavit under Rule 15(a), which "provides that leave to amend pleadings should be

'freely give[n] . . . when justice so requires." *Id.* at 216 (quoting FED. R. CIV. P. 15(a)). The court reasoned that the Rule was inapplicable because "an affidavit is not a pleading." *Id.* (citing FED. R. CIV. P. 7(a)). Since a joint pretrial stipulation is likewise *not* a pleading, Rule 15(b) doesn't apply to our case.

As if all that weren't enough, this District's Local Rules are pellucid on the applicable (and separate) standard for amending a joint pretrial stipulation. Those rules provide that, after the pretrial conference, "the pretrial stipulation as so modified will control the course of the trial, and may be thereafter amended by the Court only to prevent manifest injustice." S.D. FLA. L.R. 16.1(g). The Eleventh Circuit "has affirmed the binding nature of pretrial stipulations which have been entered voluntarily and submitted to the court." *F.D.I.C. v. Stahl*, 89 F.3d 1510, 1521 (11th Cir. 1996); *see also Kallberg Indus., LLC v. Auto. Experts, Inc.*, ___ Fed. App'x ___, 2021 WL 2588379, at *2 (11th Cir. June 24, 2021) ("[P]arties are bound by their stipulations and a pretrial stipulation frames the issues for trial." (quoting *G.I.C. Corp. v. United States*, 121 F.3d 1447, 1450 (11th Cir. 1997)).

VPX is bound by the trade-dress definition it agreed to in the joint pretrial stipulation. As an initial matter, VPX never even cited Local Rule 16.1(g)—much less explained how it met the Rule's standard. It has thus waived any attempt to stray from its stipulated trade-dress definition. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."). Nor could VPX have satisfied the "manifestly unjust" standard (even had it tried). There's nothing unjust about requiring VPX to stick to the trade-dress definition it proffered throughout the pendency of this litigation. To the contrary,

if anything, we think it would be "manifestly unjust" to allow (at this very late stage of the case) VPX to fundamentally alter its defined trade dress.

*     *     *

On the battlefield, we praise clever gambits and successful feints. We lionize Washington's midnight crossing of the frosty Delaware and eulogize his successful attack on the slumbering Hessians. But, in litigation, things are different. We expect our litigants to play fair and by the rules—which, in a case like ours, generally means giving the other side fair warning of the scope of the defined trade dress. Because we won't reward VPX for trying to do otherwise, its Motion to Conform [ECF No. 401] is **DENIED**.[27] Nevertheless, to avoid all doubt, we'll now explain why—even under the broader trade-dress definition VPX has proposed—VPX's trade-dress claim would still fail.

### B. The Trade-Dress Claim

Turning to the heart of this case—and having carefully weighed all the evidence, the credibility of the witnesses, and the arguments of counsel—we now conclude that VPX has failed to establish its claim for trade-dress infringement.[28] Section 43(a) of the Lanham Act creates a federal cause of

---

[27] We note, too—though it's admittedly not very probative of anything—that these tactics are nothing new for VPX. *See, e.g.*, *Vital Pharms., Inc. v. Am. Body Bldg. Prod., LLC*, 510 F. Supp. 2d 1043, 1051 (S.D. Fla. 2007) ("The Plaintiff's motivation in bringing suit seemed to be an effort to utilize the Lanham Act as a tool to stifle legitimate competition, rather than to protect a valid trade dress. This is evidenced by the fact that VPX had an evolving definition of its trade dress throughout the case.").

[28] VPX had brought six counts against Monster: (I) trade-dress infringement under the Lanham Act; (II) trademark infringement under the Lanham Act; (III) federal unfair competition under the Lanham Act; (IV) Florida common law trade-dress infringement and unfair competition; (V) Florida common law trademark infringement; and (VI) deceptive conduct under the Florida Deceptive and Unfair Trade Practices Act. At summary judgment, this Court disposed of VPX's trademark claims (Counts II, III, and V), and the parties agree that this Court should use the same trade-dress framework under the Lanham Act to analyze the remaining counts. *See* VPX Findings and Conclusions at 85–86 ("The legal standards for Lanham Act violations, on one hand, and claims for common law trade dress infringement, unfair competition, and violation of Florida's Deceptive and Unfair Trade Practices Act,

action for trade-dress infringement. *See* 15 U.S.C. § 1125. "'Trade dress' involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983). As here, the "classic trade dress infringement action involve[s] the packaging or labeling of goods." *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996).

The plaintiff carries the burden of proving the three elements of a trade-dress claim. *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1288 (11th Cir. 2018) (recognizing that "[t]he plaintiff must prove three elements to prevail on a trade dress claim"). Those three elements are that "(1) the defendant's product is confusingly similar to its product; (2) the similar features of the two products are primarily non-functional; and (3) the plaintiff's product is distinctive." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012). "[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold." *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1202 (11th Cir. 2004) (quoting

---

on the other, are 'essentially the same.'" (quoting *Drew Estate Holding Co., LLC v. Fantasia Dist., Inc.*, 2012 U.S. Dist. LEXIS 7910, at *7 (S.D. Fla. Jan. 24, 2012))). We thus dispose of this case under the familiar Lanham Act trade-dress framework, which (as we'll see in a moment) is dispositive as to the rest of VPX's claims. *See Investacorp., Inc. v. Arabian Inv. Banking Corp. E.C.*, 931 F.2d 1519, 1521 (11th Cir. 1991) (using federal infringement analysis as the measuring stick for Florida common law infringement claims).

*Epic Metals*, 99 F.3d at 1039).[29] VPX has failed to meet its burden as to two of these elements: distinctiveness and likelihood of confusion.[30]

### 1.   The Bang Trade Dress Is Not Distinctive

There are two ways in which a product's trade dress may be distinctive. *First*, "[s]ome trade dress, 'because its intrinsic nature serves to identify a particular source of a product, is deemed inherently distinctive.'" *Miller's Ale House*, 702 F.3d at 1322 (cleaned up) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). *Second*, "[o]ther trade dress, though not inherently distinctive, can become distinctive if it acquires 'secondary meaning, which occurs when, in the minds of the public, the primary significance of [the] trade dress is to identify the source of the product rather than the product itself.'" *Id.* (cleaned up) (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000)).

We've previously explored the foundations of the distinctiveness requirement, explaining that "[d]istinctiveness . . . is just another way of assessing the informational value a particular trade dress conveys." *Vital Pharms., Inc. v. Monster Energy Co.*, 472 F. Supp. 3d 1237, 1250 (S.D. Fla. 2020) (Altman,

---

[29] "Since each element is fact sensitive, [an appeals court] cannot reverse the . . . verdict 'absent clear error.'" *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1170 (11th Cir. 1991) (quoting *AmBrit*, 812 F.2d at 1535); *see also Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir. 1994) ("We have held that the question of whether each of the criteria is satisfied is a question of fact. The trial court's findings, therefore, cannot be disturbed unless they are clearly erroneous." (cleaned up)).

[30] We need not—and do not—here resolve the (much) closer question of functionality. Certain prominent features of the Bang trade dress are plainly functional—its flavor-designating colors, for instance. *Dippin' Dots*, 369 F.3d at 1203–04 ("The color is functional because it indicates the flavor of the ice cream, for example, pink signifies strawberry, white signifies vanilla, brown signifies chocolate, etc."). At the same time, we think it not entirely clear, given the (potentially) infinite ways in which a label can be designed, that the "design *as a whole* is nonetheless functional." *Id.* at 1206 n.9; *cf. Spark Indus., LLC v. Kretek Int'l, Inc.*, 2014 WL 4365736, at *4 (C.D. Cal. Aug. 28, 2014) ("Given the functionality doctrine's underlying purpose, the Ninth Circuit has suggested that it may apply with somewhat less force in most product packaging cases, as opposed to cases involving product configurations.").

J.). The "distinctiveness" requirement means that a product's trade dress is protectable *only if* the dress is used to identify the producer. *Dippin' Dots*, 369 F.3d at 1202. Requiring this association between trade dress and producer makes sense. As the Supreme Court has explained, the "[p]rotection of trade dress . . . serves the [Lanham] Act's purpose to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Two Pesos*, 505 U.S. at 774 (cleaned up). But protecting a trade dress furthers neither of these aims—securing goodwill or protecting consumers—when consumers do not associate the trade dress with a specific producer. This is because, "[e]ven if a competitor appropriated the identical trade dress, the plaintiff would not be injured [if] the plaintiff's trade dress does not serve to distinguish its goods from those of its competitor's." *AmBrit*, 812 F.2d at 1536.

VPX has fallen short of establishing that the Bang trade dress is inherently distinctive or that it has developed secondary meaning in the minds of consumers.

### a.    The Bang Trade Dress Is Not Inherently Distinctive

In assessing inherent distinctiveness, courts must examine the trade dress and consider "whether [it] is a common basic shape or design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." *Miller's Ale House*, 702 F.3d at 1323 (quoting *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983)); *see also Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977). The ultimate question in determining whether a product's trade dress is distinctive is not whether "each element or part" of the dress is distinctive, but rather whether the combination of elements, taken "as a whole," conveys a unique impression. *See Remcraft Lighting Prod., Inc. v. Maxim Lighting, Inc.*, 706 F.

Supp. 855, 858 (S.D. Fla. 1989); *see also AmBrit*, 812 F.2d at 1537 n.25 (noting that "§ 43(a) protects not the individual elements of a producer's trade dress, but rather their combination and the unique impression conveyed by that combination").

That said, the concept of inherent distinctiveness is an "intuitive" one that's "heavily fact-dependent." *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 377 (4th Cir. 1999). Perhaps for this reason, "[t]he courts have struggled to articulate a standard for when a trade dress is sufficiently distinctive to be entitled to the prima facie protection of the Lanham Act." *Publ'ns Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338–39 (7th Cir. 1998) (Posner, J.). Indeed, "beyond stating the principles to be applied there is little to be said except to compare the impression made by" the trade dresses. *Id.* (quoting *Joseph Schlitz Brewing Co. v. Houston Ice & Brewing Co.*, 250 U.S. 28, 30 (1919) (Holmes, J.)).

Armed with these principles, we think it plain that Bang's trade dress is *not* inherently distinctive. Comparing Bang with Monster Energy settles the issue. Both cans have a strikingly similar look-and-feel, and the individual elements of the two cans only confirm this basic point. Both beverages, for instance, are sold in a "16-oz. black aluminum can." Joint Pretrial Stipulation at 8.[31] They both feature "a contrasting, flavor-dependent, bold, brightly-colored design for the rest of the can on a black background." *Id.* Both beverages include "performance ingredients . . . spanning the rim adjacent to the top of the can." *Id.* They both display their logos in "bold, bright" colors, "appearing horizontally, covering the top portion of the primary panel of the can." *Id.* Beneath their

---

[31] To clarify, we don't here mean to suggest that VPX *stipulated* to these descriptions of the Monster Energy can. We simply quote the joint pretrial stipulation for the proposition that most of Bang's defined features—the ones VPX thought important—likewise appear on the original Monster Energy label.

logos, both drinks add their "product name[s]," with those names likewise "appearing horizontally, covering the bottom portion of the primary panel of the can." *Id.* Bang and several flavors of Monster Energy also lay out their "inventive flavor designation . . . [on] the bottom portion of the can." *Id.* In short, they're both 16-oz. energy drinks in black cans accentuated by pops of vibrant color and highlighted by similarly-placed logos. The overall impressions are thus substantially the same.

Straying beyond VPX's defined trade dress, of course, makes the question *slightly* more complicated. The most distinctive part of the *proposed* trade dress is the silver U shape towards the bottom of the Bang can, which VPX omitted from its trade-dress definition. At the same time, even certain Monster Energy flavors—like Ultra Black—employed comparable silver carveouts. *See* Ex. D-448. And, although Monster Energy did not feature a "colored rim," some of the Monster Energy flavors created a similar effect by flashing colored can openers and by displaying their performance ingredients in colored text along the top of the can.

Now, it's true that Bang's zero-calorie (and other nutritional) bugs are absent from Monster Energy's can. But these bugs are unambiguously functional and, therefore, can serve no source-identifying purpose. That is, they tell us only about the drink's nutritional content, Tr. at 1235:24–1236:1—and do nothing to identify the drink's producer, *cf. Miller's Ale House*, 702 F.3d at 1315 (noting that "trademark law allows merchants to label their products with source-identifying marks and to protect those marks from infringement"). However it's defined, in other words, Bang's trade dress includes a "common . . . design"; is not at all "unique or unusual" in the energy-drink market; and features, at most, a "mere refinement of a commonly-adopted and well-known form of ornamentation." That's sufficient to defeat Bang's claim.

Even putting Monster Energy aside, though, there's a whole long litany of *other* energy drinks that likewise carry—and have long carried—strikingly similar trade dresses. So, for example, Rockstar, Venom, Scorpion, Spider, Hyde, and Quake are also sold in black cans and feature bold, bright colors—the same dominant traits that define the Bang trade dress. Many of those third-party cans likewise include performance ingredients along the top rim of the can; display a horizontal logo underscored by a horizontally oriented brand name; and sport a flavor-designation at the near-bottom of the primary label. Nor is VPX's newly proposed trade dress immune from these comparisons. Brands like Rockstar, for instance, display silver carveouts that closely resemble Bang's U-shape, and energy drinks like Spider and Venom feature a colored rim along the top of the can. As a whole, then, Bang conveys a similar commercial impression to these other drinks on the market.

In the end, Monster revolutionized the industry when it created the Monster Energy drink. More than a decade later, VPX created Bang, a competing product that closely resembles the original Monster Energy's design. Now, in an ironic twist, VPX claims superior rights in the Bang design (whose basic look-and-feel it took from Monster) and asks the Court to prohibit Monster from replicating the design Monster invented. Fortunately, the law doesn't allow judges to inject themselves into the marketplace in this absurd, script-flipping way. Given Bang's resemblance to Monster Energy—and its uncannily similar appearance to various third-party brands—we cannot agree that Bang's "combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin." 1 MCCARTHY ON TRADEMARKS § 8:13. The Bang trade dress, in sum, is *not* inherently distinctive.

The Eleventh Circuit's trade-dress decisions provide strong support for this result. Take *Miller's Ale House*, for example. 702 F.3d at 1324. In that case, one restaurant sued another for trade-dress infringement. *Id.* at 1321. Affirming the trial court's order rejecting the trade-dress claim and entering summary judgment for the defense, the appellate court found the plaintiff's overall appearance—which included (among other things) the restaurant's name in red letters on the building, menu items branded with that name, and particular outfits for its servers—*not* distinctive. As the panel explained:

> We find nothing particularly unique in a restaurant fixing its name in red letters on the outside of its building and on its menu, branding items it sells with that name, dressing its staff in khakis and a polo shirt, featuring a center bar with a soffit, offering seating at "high-top" tables, and paneling its walls with wood. These are the prototypical features—what we might call the common design—of a standard sports bar or brew pub. The particular name affixed on the wall and to menu items, the specific color of the polo shirts, the type of wood on the walls, the placement of the "high-top" tables, and the openness of the kitchen, even if they in combination could be deemed unique, are all mere refinements of this commonly-adopted and well-known form of ornamentation.

*Id.* at 1324 (cleaned up). This analysis—which, by the way, came at summary judgment, where all facts must be viewed in the light most favorable to the non-moving party—all but compels the result in our case. Here, free to weigh the facts as they are, we find that, like the restaurant in *Miller's Ale House*, the Bang trade dress flashes nothing "particularly unique." The black can, the bold colors, the standard architecture—though perhaps not identical to other drinks in the industry—constitute a "mere refinement" of other prevalent designs.

The Eleventh Circuit's decision in *Brooks Shoe* further bolsters this conclusion. 716 F.2d at 858. The trade-dress claim there involved a line of shoes with a "V" design on the sides. *Id.* at 856. After a six-day bench trial, the trial court ruled for the defendant, *id.* at 856–57, and the Eleventh Circuit affirmed, agreeing that the "V" design was not inherently distinctive. *Id.* at 857–58. In doing so, the

court noted that "there are numerous athletic shoes in the marketplace which contain decorative stripes, bars and designs"—and so, the plaintiff's "trade dress is not unique or unusual in the field of athletic shoes." *Id.* The same is true here. There are "numerous" energy drinks that "contain" black 16-oz. cans, vibrant colors, centered logos, horizontal brand names, and ingredient displays. The Bang trade dress is simply not unique or unusual in this market.

Courts within this Circuit (and around the country) routinely find that similar trade dresses are *not* inherently distinctive. *See, e.g.*, *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1356–57 (Fed. Cir. 2010) (affirming the trial court's finding that an adult-entertainment business's trade dress—which consisted of a male in no shirt with cuffs and a collar—was not inherently distinctive because "[t]he Cuffs & Collar mark is very similar to the Playboy bunny costume, although the Cuffs & Collar mark includes no bunny ears and includes a bare-chested man instead of a woman in a corset"); *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1033 (N.D. Cal. 2017) (finding, after a bench trial, that a bourbon producer's trade dress, which included a buffalo, was not inherently distinctive because there was "extensive evidence of other alcoholic beverages with trade dresses that include a buffalo image"), *aff'd*, 786 F. App'x 662 (9th Cir. 2019); *Spark Indus., LLC v. Kretek Int'l, Inc.*, 2014 WL 4365736, at *8– *9 (C.D. Cal. Aug. 28, 2014) (concluding that an e-cigarette's packaging was not inherently distinctive because the labeling used "a fairly routine color scheme, graphic layout, and choice of font" and because, although no other product was identical, "uniqueness does not automatically equate to inherent distinctiveness"); *Vital Pharms., Inc. v. Am. Body Bldg. Prod., LLC*, 511 F. Supp. 2d 1303, 1311 (S.D. Fla. 2007) ("Plaintiff is asking me to find that a smooth, cylindrical container with a neck and vertical lettering is inherently distinctive. I am unpersuaded, and for purposes of this first prong of the test, find that VPX's trade dress is not inherently distinctive."); *Turtle Wax, Inc. v. First Brands Corp.*,

781 F. Supp. 1314, 1320 (N.D. Ill. 1991) (ruling that a can of car polish—which featured the brand name, a black background, gold lettering, red details, and an image of a gold Porsche—was not inherently distinctive, because, although "no existing product utilized precisely the same combination of elements," the can simply "refined the basic elements of a trade dress which has been utilized extensively by other manufacturers in the industry").

Unphased, VPX offers three additional arguments. We reject them all.

*First*, VPX points to three cases that, it says, support its claim to inherent distinctiveness. *See* VPX's Findings and Conclusions at 8–9. They don't. The first case is *AmBrit*, 812 F.2d at 1537, which asked whether the trade dress of Kraft's Polar B'ar infringed on the Klondike Bar's trade dress. In affirming (on clear-error review) the district court's finding that the Kraft Polar B'ar's trade dress was distinctive, the Eleventh Circuit noted that "the record reveal[ed] *no* prior use of any combination of the Klondike trade dress elements that is at all similar to the unique impression conveyed by [Klondike's] trade dress." *Id.* (emphasis added). Our case, of course, is very different. Monster Energy itself—a drink that has been around for almost two decades and which has captured over 40% of the market—leaves consumers with a substantially similar impression. So do several third-party beverages, including Rockstar, Venom, Scorpion, Spider, Hyde, and Quake. We do not have, in other words, "[i]solated or piecemeal third party uses of various elements" of the Bang dress. *Id.* We have, instead, use that "is so extensive and so similar to the plaintiff's that it impairs the ability of consumers to use the trade dress of the products to identify their source." *Id.*

The second case is *Moroccanoil, Inc. v. Marc Anthony Cosms., Inc.*, 57 F. Supp. 3d 1203, 1222 (C.D. Cal. 2014). There, the Central District of California found Moroccanoil's trade dress inherently distinctive. In so doing, however, the court simply looked at the elements of the product's trade dress

and—*voila!*—concluded that "[n]one of these elements have any inherent meaning and do not describe the product." *Id.* at 1222. The case is of no use to us. The *Moroccanoil* Court never even cited the *Seabrook* test—which asks whether the trade dress is unique or unusual; much less did it apply anything close to the scrutiny that test requires. The court, for instance, never analyzed how the plaintiff's trade dress compared to other trade dresses in the relevant market. Since its analysis thus departs from the standard mode of reasoning this Circuit requires for cases like ours, the decision is unpersuasive.

The third case is *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980 (D. Ariz. 1992). In that case, the District of Arizona found, at least for purposes of a preliminary injunction, that the plaintiff was likely to show that its stationery products displayed an inherently distinctive trade dress. *Id.* at 987–89. In saying so, however, the court (as in *AmBrit*) concluded that, "[w]hile there are isolated similarities among the various products, they do not present an overall image consistent with the [plaintiff's] look." *Id.* Although the court didn't explain how those other products compared to the plaintiff's, what's clear from its opinion is that its conclusion doesn't help VPX. The energy-drink market is *saturated* with trade dresses whose overall impressions *are* consistent with Bang's. *Lisa Frank* thus cannot instruct us here.

*Second*, VPX asks the Court to measure Bang's look-and-feel, not against other brands in the energy-drink category, but against a narrower range of beverages in the subcategory of "performance" energy drinks. *See* VPX's Findings and Conclusions at 15–16. And, VPX says, in the "performance" subcategory, its trade dress *is* unique. *Id.* In some sense, VPX has a point. Imagine, for instance, that VPX sold Bang in a glass bottle. It probably wouldn't be enough to say that these glass Bang bottles aren't distinctive in the *beverage* industry simply because (say) whiskey is also sold in glass bottles. That kind of "all beverages" category is likely too broad. Why? Well, because energy drinks generally *don't*

84

compete with whiskey and *aren't* placed alongside whiskey bottles on store shelves. As a result, your average energy-drink consumer wouldn't likely believe that the glass energy drink he was handling was manufactured by a whiskey distiller. And so, an energy-drink architecture that appropriates a design that's really only present in (the very distinct) whiskey subcategory may serve an important source-identifying function. This, of course, is what at least one water company has tried to do by packaging its beverage in a box that generally resembles a milk carton.[32]

In our case, however, there's little sense in comparing Bang with "performance" energy drinks *only*—to the exclusion of more "traditional" energy drinks. Bang competes directly with *all* energy drinks, including Monster Energy, and is placed in coolers next to "traditional" energy drinks. Tr. at 634:21–23, 727:15–21, 1036:7–15, 1249:24–1250:1. Indeed, consumers regularly see Bang together with "traditional" energy drinks and are forced to choose between them. *See, e.g.*, Exs. D-507, D509–20, D-535–50, D-575–83 (Monster Energy); Exs. D-512–13, D-536, D-541, D-544, D-547, D-549, D-583 (Rockstar). Taking the design of a "traditional" energy drink (like Monster Energy) and mimicking it in a "performance" energy drink (like Bang) would, therefore, fail to alert consumers that the product comes from a different source. In either event, there's little evidence to support the proposition that consumers even recognize any such traditional-vs.-performance distinction among energy drinks, and it's not our role to conjure up separate subcategories that may mean nothing to consumers. VPX, in short, must prove that its Bang trade dress stands out when compared with *all* energy drinks—not just the performance variety.

---

[32] *See* BOXED WATER, https://boxedwaterisbetter.com/products/500ml-boxed-water?variant=34256049097&currency=USD&utm_medium=product_sync&utm_source=google&utm_content=sag_organic&utm_campaign=sag_organic&gclid=CjwKCAjwuvmHBhAxEiwAWAYj-PRsitlkAAA61wjpqXAZdLY8mvqppS3qFCh5yOA7rlgmJCwRsxnYThoClngQAvD_BwE.

The only authority VPX cites for its position is *Carillon Imp. Ltd. v. Frank Pesce Grp., Inc.*, 913 F. Supp. 1559 (S.D. Fla. 1996), *aff'd*, 112 F.3d 1125 (11th Cir. 1997). But that case actually supports Monster's view. In that trade-dress dispute, the plaintiff and the defendant sold competing bottles of "ultra premium vodka"—a "luxury product" in a "niche" market. *Id.* at 1561. In assessing whether the plaintiff's vodka bottles were inherently distinctive, the court compared the product—not just to other "ultra premium vodkas"—but to "Absolut, Finlandia, and the other vodkas in evidence." *Id.* at 1563–64. Having conducted this comparison, the court concluded that the plaintiff's bottles *were* inherently distinctive because "their use here is a fanciful addition to the *vodka market*." *Id.* at 1564 (emphasis added). In other words, rather than confine itself to the narrower subcategory of ultra premium vodkas—as VPX would have us do—the court compared the plaintiff's bottle with the broader category of vodkas *against whom* the plaintiff was competing.[33] Likewise, the proper category here is not the narrow subcategory of "performance" energy drinks—but rather the broader host of energy drinks that compete with (and regularly appear next to) Bang.[34]

---

[33] VPX's misreading of *Carillon* is, in some sense, understandable. The *Carillon* Court did say: "Despite the commonplace use of some of these individual components in the marketing of alcoholic beverages other than ultra premium vodkas, their use here is a fanciful addition to the vodka market." *Carillon*, 913 F. Supp. at 1564. VPX focuses on the first part of this sentence and reads it to mean that the vodka bottle was inherently distinctive because its features had only been used on drinks "other than ultra premium vodkas." But what the court meant to say was that the plaintiff's product was inherently distinctive, not because its features had only been used *outside* the ultra-premium vodka market, but because those features had not reached "commonplace use" in the vodka market *as a whole*. That's the only way to square this (admittedly confusing) sentence with the court's ultimate holding—which is that the features' use was a "fanciful addition to the vodka market." *Id.*

[34] Other decisions support our view that the relevant "comparator" category shouldn't be defined so narrowly. *See, e.g.*, *Sazerac*, 265 F. Supp. 3d at 1029 (relying on evidence that "beers, wines, and spirits, as well as breweries and a distillery, currently us[e] the terms 'buffalo' or 'bison' or images of those animals" in finding that the trade dress for a bourbon bottle was not inherently distinctive).

*Third*, VPX asks us to disregard many of the energy drinks that come in black cans because some of these (Rockstar XDurance, Scorpion, and Hyde) were launched after Bang and because others (Spider, Venom, Hyde, Scorpion, and a few Monster products) have enjoyed only limited success. We disagree.

*As to the first point*, in the context of trademarks, "[t]he law imposes on trademark owners the duty to be pro-active and to police the relevant market for infringers." 2 MCCARTHY ON TRADEMARKS § 11:91. Otherwise, the trademark owner runs the risk that its trademark will become generic and, ultimately, lose protection. 15 U.S.C. § 1064 (providing that a trademark loses protection if, "[a]t any time . . . the registered mark becomes the generic name for the goods or services"); *see also Miller's Ale House*, 702 F.3d at 1320 (noting that a trademark may "los[e] trademark protection by becoming the generic name of goods and services" (cleaned up)). And courts generally agree that a similar thing can happen with trade dresses—*i.e.*, a once-unique look-and-feel can become so ubiquitous that it loses its source-identifying function.[35] As a matter of law, then, VPX's argument—that we should disregard some energy drinks' trade dresses *merely* because those drinks entered the market *after* Bang—appears unjustified. More fundamentally, though, the argument misses its mark—because, even if we *were* to

---

[35] *See, e.g.*, *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 744 (2d Cir. 1998) ("Competitors are free to use an owner's trade dress if it has become generic over time even if it was originally distinctive."); *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 365 (S.D.N.Y. 2003) (indicating that a trade dress lost protection because the plaintiff was "aware[] for decades of competitive third-party gummy fish-shaped candies in the market, [yet] they failed to take action against those alleged infringers"). Notably, VPX complains that "Rockstar XDurance, Scorpion, and Hyde should be excluded from the Court's inherent distinctiveness analysis, as they were not launched *until 2018*." VPX's Proposed Findings and Conclusions at 16 (emphasis added). But, since Monster's Reign energy drink didn't hit the market until the Spring of 2019, the Bang design had certainly become generic by that point. *See* 2 MCCARTHY ON TRADEMARKS § 12:17.75 (noting that courts "have held that the crucial date for the determination of genericness is the date on which the alleged infringer entered the market with the disputed designation").

exclude the energy drinks VPX complains about, that exclusion would make no difference in the end. Long before Bang came into being, after all, Monster had inundated the energy-drink market with billions of Monster Energy cans—each of which resembled, to a not-insubstantial degree, Bang's *later* trade dress. This deluge of similar Monster Energy cans alone thus eviscerates any arguments to distinctiveness Bang might have had.

*As to the second*, VPX's claim that brands with limited distribution should be "excluded" from the Court's analysis finds no support in the law. The two cases VPX cites on this issue held only (and uncontroversially) that third-party use must be "extensive" and "similar" before that use can undermine inherent distinctiveness. *Ice Cold Auto Air of Clearwater, Inc. v. Cold Air & Accessories, Inc.*, 828 F. Supp. 925, 939 (M.D. Fla. 1993); *Robarb, Inc. v. Pool Builders Supply of the Carolinas, Inc.*, 696 F. Supp. 621, 625 (N.D. Ga. 1988). These cases say nothing—and purport to say nothing—about *excluding* certain smaller trade dresses from the analysis. Nor would any such exclusion be sensible. To understand why, imagine a world with 1,000 energy-drink brands—all featuring a similar trade dress to Bang's. Suppose, too, that these 1,000 brands—taken together—boast an extensive distribution network, even though each individual brand's distribution is rather limited. In such a case, the entry of Bang's trade dress wouldn't help to distinguish Bang from the 1,000 other energy drinks on the market. That's because consumers get accustomed to seeing a certain kind of energy drink on the shelf—whether that style of drink comes from one large distributor or many smaller ones. And that's precisely what we have here: a rather common look-and-feel propagated in a saturated market by a few very large players—like Monster Energy, Bang, and Rockstar—and many smaller ones (like the ones VPX asks us not to consider). And so, when we compare Bang (as we must) with the market as

it *really* appears (the market as a whole, with big brands and small ones), we're forced to conclude that its overall impression just isn't all that distinctive.[36]

*       *       *

To recap: Monster created its iconic Monster Energy architecture in 2002. VPX started its slow transition to the modern Bang design in 2015. But that design merely refined the trade dress Monster had already made famous. When Monster attempted to remaster its original design through a new product, VPX sought refuge, not in the marketplace—but in the courts. That's not how free markets work. Because the Bang trade dress isn't unique or unusual, it isn't inherently distinctive.

### b.     The Bang Trade Dress Has Not Achieved Secondary Meaning

Secondary meaning "occurs when, in the minds of the public, the primary significance of [the] trade dress is to identify the source of the product rather than the product itself." *Miller's Ale House*, 702 F.3d at 1322 (cleaned up) (quoting *Wal-Mart*, 529 U.S. at 211). Because secondary meaning asks an empirical question, "survey evidence 'is the most direct and persuasive evidence' to establish secondary meaning." *Vital Pharms.*, 511 F. Supp. 2d at 1311 (quoting *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999)); *see also Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, 2011 WL 4005454, at *6 (S.D. Fla. Sept. 8, 2011) ("Establishing secondary meaning is best accomplished by surveys or other quantitative evidence.").

In the absence of a consumer survey, courts in this Circuit consider the following four factors to determine whether a trade dress has acquired secondary meaning:

> (1) The length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in

---

[36] Either way, as we've said—*q.v.* our discussion of third-party products—we disagree with VPX that (as a factual matter) the brands it hopes to exclude enjoy only "limited" distribution. *See supra* ¶ 35. Even if VPX were right about the law, then, the outcome wouldn't change.

89

the public's mind between the trade dress and the plaintiff's business; and (4) the extent to which the public actually identifies the trade dress with the plaintiff's products.

*Olem Shoe Corp. v. Washington Shoe Co.*, 2011 WL 6202282, at *20 (S.D. Fla. Dec. 1, 2011), *aff'd*, 591 F. App'x 873 (11th Cir. 2015) (cleaned up) (citing *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1525 (11th Cir. 1991)); *see also Habersham Plantation Corp.*, 2011 WL 4005454, at *7 (applying the four factors). Some courts have also recognized that "proof of intentional copying [may be] probative evidence on the secondary meaning issue." *Brooks Shoe*, 716 F.2d at 860. "Proof of secondary meaning entails vigorous evidentiary requirements." *Bos. Beer Co. P'ship v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir. 1993) (quoting *Perini Corp. v. Perini Construction*, 915 F.2d 121, 125 (4th Cir. 1990)); *see also Lanard Toys Ltd. v. Toys "R" Us-Delaware, Inc.*, 2019 WL 1304290, at *25 (M.D. Fla. Mar. 21, 2019) (same), *aff'd sub nom. Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337 (Fed. Cir. 2020). Whether a product has acquired secondary meaning is a "question[] of fact." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1084 (11th Cir. 2016).

At summary judgment, this Court noted that, "[w]hile VPX ha[d] not adduced much evidence of secondary meaning, it ha[d] provided, in the Court's view, enough to survive summary judgment." *Vital Pharms.*, 472 F. Supp. 3d at 1255. Nothing has changed. VPX *still* hasn't adduced much evidence of secondary meaning. At this stage, however, that failure is fatal.

### i.  Survey Evidence

*First*, VPX failed to present *any* survey evidence of secondary meaning. "[T]he authorities are in agreement that survey evidence is the most direct and persuasive way of establishing secondary meaning." *Sec. Ctr., Ltd. v. First Nat. Sec. Ctrs.*, 750 F.2d 1295, 1301 (5th Cir. 1985). That's because this question—whether "the primary significance" of the trade dress "is to identify the source of the

product rather than the product itself"—is a deeply empirical one. Without a survey, we're left only with *indirect* evidence of how consumers *might* perceive the Bang trade dress. VPX's failure to present survey evidence thus weighs against its claim to secondary meaning. *See, e.g., Vital Pharms.*, 511 F. Supp. 2d at 1311 (finding no secondary meaning, in part, because "VPX presented no survey evidence at trial indicating that its Redline product had acquired secondary meaning in the minds of consumers"); *Yankee Candle Co. v. Bridgewater Candle Co.*, LLC, 259 F.3d 25, 39 (1st Cir. 2001) (affirming the district court's finding of no secondary meaning, in part, because the plaintiff "failed to introduce any survey evidence").

### ii.   Length and Manner

*Second*, as to the length and manner of use, most courts agree that "exclusive" and "continuous" use is "circumstantial evidence that secondary meaning has attached to the Plaintiff's trade dress." *Remcraft*, 706 F. Supp. at 858; *see also Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789–90 (8th Cir. 1995) ("[L]ength and exclusivity of continuous use is a factor bearing on secondary meaning . . . ."); *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 n.4 (10th Cir. 2002) (recognizing "'proof of substantially exclusive and continuous use' of mark as prima facie evidence of secondary meaning" (emphasis omitted) (quoting 15 U.S.C. § 1052(f)). Although VPX's transition to its modern trade dress began in 2015, the evidence at trial demonstrated that VPX's use of the Bang trade dress was neither exclusive nor continuous.

Starting with exclusivity, Bang's overall look-and-feel was never exclusive, because Monster Energy—which dominated the market—pre-dated Bang and created that overall design. Nor, as we've said, was Monster Energy alone. We've seen half-a-dozen third-party designs (from companies like Rockstar, Venom, Scorpion, Spider, Hyde, and Quake) that closely resemble the Bang trade dress—

undercutting any claim VPX might have had to exclusivity. Because Bang's overall look-and-feel was not at all distinctive in comparison to other energy drinks on the market, there's little reason to believe that its use over the short period of time before Reign was introduced was sufficient to incept some secondary meaning into the minds of consumers. *See, e.g.*, *Sally Beauty Co.*, 304 F.3d at 978 (finding no secondary meaning, in part, because the plaintiff "offered no evidence below or on appeal that its use of trade dress was substantially exclusive"); *MZ Wallace Inc. v. Fuller*, 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018) ("The evidence of the ubiquity of this third-party use in the market significantly undercuts the plaintiff's efforts to show that its Trade Dress has achieved secondary meaning.").

Nor has VPX used the Bang trade dress continuously. At summary judgment, the Court suggested that "the parties agree[d] that the Bang trade dress has remained virtually identical since it was redesigned in October 2015." *Vital Pharms.*, 472 F. Supp. 3d at 1255. At trial, it turned out that the Bang trade dress has *not* remained virtually identical since October 2015. Instead, VPX has changed the can's look-and-feel at least two times, including by adding a silver U shape—which has become one of the label's most distinctive features. VPX's (sometimes significant) changes militate against a finding of continuous use. *See, e.g.*, *Forney Indus.*, 835 F.3d at 1255 (noting that the plaintiff's "packaging has changed significantly" over time and asking "[h]ow then is a consumer supposed to have come to associate the packaging with [the plaintiff]?"); *Spark Indus.*, 2014 WL 4365736, at *12 (finding that even a "minor change in the orientation" of the plaintiff's product weighed against a finding of secondary meaning by continuous use).

### iii.     Advertising and Sales

*Third*, the next two factors—VPX's advertising and its efforts to create a conscious connection in the public's mind between the Bang trade dress and its source—also weigh against VPX's claim to secondary meaning. In assessing these factors, the Eleventh Circuit has recognized that "sales and advertising may be considered by the finder of fact in making the secondary meaning inquiry." *AmBrit*, 812 F.2d at 1540. But sales and advertising do not, in all cases, *establish* secondary meaning. Instead, there must be some link between the trade dress and its sales or its advertising:

> For advertising to serve as evidence to prove secondary meaning in a trade dress case, the advertising must draw attention to the alleged trade dress. Similarly, to use the volume of sales to serve as evidence to prove secondary meaning in a trade dress, there must be some proof that the sales were generated by the alleged trade dress rather than by factors other than source identification.

*See* 1 MCCARTHY ON TRADEMARKS § 8:8.50; *see also Hard Rock Cafe*, 2018 WL 7825183, at *18 (explaining that evidence of advertising "emphasizing" or "highlighting" the trade dress can support secondary meaning); *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 722 F. Supp. 719, 724 (S.D. Fla. 1989) (noting that "[m]ore is needed to establish the necessary consumer association than the mere proof of sales and growth"), *aff'd*, 931 F.2d 1519 (11th Cir. 1991).

Starting with sales, VPX failed to link its sales to its trade dress. Although VPX pointed to more than $1 billion in sales since 2016, it never showed that its sales were *generated by* its trade dress—rather than by other factors. The evidence, in fact, indicated that the sales were very likely generated by factors other than source identification—things like the taste of the beverage itself, widespread demand for a healthier energy drink, and a uniquely upbeat marketing scheme. Why do we think so? Consider the relevant chronology: Although Bang introduced its modern trade dress in 2015, its sales remained almost entirely stagnant. *See, e.g.*, Ex. P-2772. Bang started to grow rapidly only in 2017, two years *after* it had introduced its trade dress, *id.*—suggesting that the can's look-and-feel had very little

93

to do with its success. Even Mr. Owoc conceded that Bang owed its unique role in the energy-drink market to its science and marketing. *See* Tr. at 1081:6–13. Consumers, then, may have purchased Bang for many different reasons,[37] without knowing—and without caring—that Bang was manufactured by VPX.[38]

Courts around the country have consistently required plaintiffs to link their sales to the trade dress. *See, e.g.*, *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1148 (10th Cir. 2016) (noting that "sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification" (cleaned up)); *Cicena Ltd. v. Columbia Telecomms. Grp.*, 900 F.2d 1546, 1551 (Fed. Cir. 1990) (recognizing that "sales success is not necessarily indicative of secondary meaning, but can be attributed to many other factors," including the product's "aesthetically pleasing" appearance); *Sazerac*, 265 F. Supp. 3d at 1034 (concluding that the plaintiff's sales were not indicative of secondary meaning because the plaintiff had "provided no evidence that its . . . sales [were] due to [its] trade dress").

Moving to advertising, at trial, VPX never showed that its marketing efforts created *any* association (in consumers' minds) between Bang's trade dress and its source. For starters, although

---

[37] As we explain below—*q.v.* our discussion of *Brooks Shoe*—one of these was very likely an industry-wide increase in consumer demand for healthier energy drinks.

[38] Another problem is that, to support its claim to secondary meaning, VPX relies on *all* of its sales—even those that *post*-date Reign's inception in early 2019. *See* VPX's Findings and Conclusions at 23 (noting that Bang's sales were $70 million in 2016, $320 million in 2017, more than $1 billion in 2019, and a projected $2 billion in 2020). But, it goes without saying, any sales that *post*-date Reign tell us nothing about whether Bang had achieved secondary meaning by the time Reign entered the market. *See, e.g.*, *Brooks Shoe*, 716 F.2d at 857 (suggesting that the question is whether the plaintiff's "shoes had acquired secondary meaning as of January 1979, when [the defendant] began selling shoes with a similar trade dress"); *cf.* 2 MCCARTHY ON TRADEMARKS § 16:34 ("The rule is that the senior user must prove the existence of a secondary meaning in its designation at the time and place that the junior user first began use of the accused mark.").

VPX introduced lots of inapposite advertising evidence—*e.g.*, about its total advertising budget, its experiential marketing campaigns, and its social-media posts—it couldn't tell us how much of that advertising featured the black cans at issue here. Indeed, Mr. Owoc had no idea what percentage of Bang's advertisements featured the black cans—as opposed to the brightly colored cans that aren't part of this case. *See* Tr. at 1259:18–1260:2. Since the trial ended, we've spent many hours reviewing, culling, and counting the vast trove of social-media posts the parties submitted—and it turns out that only a *minority* of those featured the black cans. *See* Exs. D-1163, P-689, P-691–92, P-695, P-700–01, P-703. Nor is there any way to tell whether that sample is at all representative. It could very well turn out that only an insignificant portion of Bang's ads featured the black cans, especially because VPX has shifted its focus to the colored cans since 2017—which (perhaps not coincidentally) was when its marketing expenditures spiked dramatically. But here's the point: even if VPX had established that a significant proportion of its marketing featured the black cans, it would nevertheless have failed to show that its advertising was *effective* at creating an association between the Bang trade dress and its source.[39]

---

[39] This is unsurprising. In fact, the bulk of VPX's advertising appears to come from the several months *after* Reign entered the market in early 2019. *See, e.g.*, VPX's Findings and Conclusions at 24 ("VPX's marketing expenses grew from approximately $500,000 in 2015 (P-0607 at Col. Q, Row 44), to approximately $2.5 million in 2016, (id. at Col. AD, Row 44), to approximately $7.5 million in 2017 (id. at Col. AQ, Row 44), up to $11.6 million in 2018 and to $35.9 million in 2019. P-0605 at Col. C and D, Row 65."). But VPX can't point to *that* advertising (*i.e.*, the marketing that *post-dated* Reign's entry) to support its claim. *See, e.g.*, *EL Holdings Lake City, LLC v. Lake City RV Resort, LLC*, 2016 WL 10637091, at *2 (N.D. Fla. Aug. 3, 2016) ("But the plaintiff has produced little evidence about the extent of its advertising and promotion during the relevant time—that is, before the defendant began using its similar mark in about June 2015."); *Discus Dental LLC v. Biolase Tech., Inc.*, 2011 WL 13225110, at *3 (C.D. Cal. May 3, 2011) (recognizing that "advertising featuring trade dress that runs after defendant begins allegedly infringing activities cannot be used to support secondary meaning").

On facts like these, other courts have regularly required more before finding secondary meaning. *See, e.g., Aloe Creme Lab'ys, Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir. 1970) ("[T]he question is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning of [the trademark] to the consuming public."); *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 2021 WL 247922, at *5 (S.D.N.Y. Jan. 26, 2021) (finding no secondary meaning where the plaintiff pointed to "approximately $8,132,000 on marketing and advertising for [its] brand as a whole" but did not explain how much of that advertising included the particular trade dress at issue); *Pride Fam. Brands, Inc. v. Carls Patio, Inc.*, 2014 WL 347040, at *5 n.14 (S.D. Fla. Jan. 30, 2014) ("[T]he relevant inquiry is not how much Plaintiff spent on advertising , but how effective it was in fostering a consciousness of origin."); *Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 412 (E.D.N.Y. 2011) (concluding that the plaintiff's "advertising expenditures do not weigh in favor of finding secondary meaning" because the "plaintiff ha[d] used a number of different marks in commerce to sell its products" and it was "unclear whether plaintiff's advertising expenditures were made solely to promote" the mark at issue).[40]

---

[40] Monster asks the Court to disregard VPX's advertising for a separate reason—because, in its ads, VPX did not expressly urge consumers to "look for" the alleged trade dress as an indicator of source. *See* Monster's Findings and Conclusions at 60. Of course, if Monster is right that advertising must *explicitly* tell consumers to look for the product's trade dress, then (for this additional reason) VPX's reliance on its advertising would be meaningless—since it's undisputed that VPX never expressly guided consumers' attention to the Bang trade dress. But we've already rejected Monster's "look-for" argument at summary judgment, reasoning:

> [T]he First Circuit's conclusion—that featuring the trade dress is insufficient to support a finding of secondary meaning *unless* the advertisement "directs" consumers to the dress—appears to be at odds with what we know about human cognitive behavior. If, for example, something as subtle as playing French music in a store makes customers more likely to buy French wine, it is difficult to believe that advertisers would need to spell out *so explicitly* what consumers need to "look for" in a product

Ultimately, the Eleventh Circuit's guidance on how we should treat sales and advertising data reinforces our findings here. So, for instance, in *Brooks Shoe*, the plaintiff "presented evidence of a substantial increase in sales during the late 1970's which [the plaintiff] attributed to its promotional efforts." *Brooks Shoe*, 716 F.2d at 860. Still, the Eleventh Circuit rejected the plaintiff's claim to secondary meaning, explaining that, "[a]s the district court pointed out, the growth in [the plaintiff's] sales . . . may have been attributable in large part to the increased interest in running and jogging during the same period." *Id.* Swap "running and jogging" with "healthier energy drink" and that decision is virtually on all-fours with what we've said here.

---

before those consumers draw the desired connection between the product's trade dress and its producer. *See* A. C. North, *et al.*, *The Influence of In-Store Music on Wine Selections*, 84(2) J. APPLIED PSYCHOL. 271 (1999); *see generally* DANIEL KAHNEMAN, THINKING, FAST AND SLOW 13 (2011) (explaining the "complexity and richness of the automatic and often unconscious processes that underlie" our thinking).

The First Circuit's decision is also at odds with the view adopted by other courts—perhaps most notably the Ninth Circuit. That circuit has repeatedly said that "image advertising"—advertising that "'feature[s] in' some way the trade dress itself"—supports an inference of secondary meaning, *even if* the advertisement does not explicitly "urge[ ] the customer to 'look for' the . . . claimed "elements" of [the] trade dress." *Sunburst Prod., Inc. v. Derrick Law Co.*, 922 F.2d 845, 845 (9th Cir. 1991) . . . .

Fortunately, the Eleventh Circuit has weighed in on this question. In considering whether a company's "V" design on its shoes had acquired secondary meaning, the court concluded that it [ha]d not because the seller "did not engage in substantial 'image advertising,' featuring the 'V' design and other aesthetic aspects of the shoes." *Brooks Shoe Mfg.*, 716 F.2d at 860. The ineluctable inference, of course, was that the advertising *would have* tilted in favor of secondary meaning if—as VPX has done here—the plaintiff had prominently featured the design in its ads. Ultimately, then, Monster asks for too much. While an advertisement that explicitly directs consumers to a product's trade dress may *help* to foster secondary meaning, it is not *necessary* to do so.

*Vital Pharms.*, 472 F. Supp. 3d at 1258. We see no reason to deviate from that conclusion here.

That's because, by 2017, consumer demand for a healthier energy drink began to skyrocket. Around that time, in fact, Monster noted that "BANG energy has recently caught fire positioning [its] brand as [a] healthier alternative to core BIG 3." Ex. P-259 at 1; *see also* Ex. P-194 at 3 (Monster design brief citing "growing demand for High Performance Energy Drinks"); Ex. P-271 at 2 (Monster presentation stating that "[t]he Performance Sub-Category continues to grow"). It's no surprise, then, that the largest energy-drink players—from Monster to Rockstar—entered the "performance" energy-drink market in the months that followed. *See, e.g.*, Ex. P-2848 (article noting that Rockstar Xdurance launched in August 2018). As Mr. Sacks put it: "there was clearly a subbrand of adult consumers, probably more fitness-oriented or workout-oriented, that seemed to want the higher caffeine level." *Id.* at 145:18–25. And it's this growing demand, like the increased interest in "running and jogging" from *Brooks Shoe*, that ultimately provides a more compelling explanation for Bang's growth.

The Eleventh Circuit's decision in *Investacorp* is also instructive. *See* 931 F.2d at 1525–26. In that case, the plaintiff "emphasize[d] that they had expansive growth and showed a high ratio of sales dollars to advertising dollars during the relevant period." *Id.* But the Eleventh Circuit shot down the plaintiff's effort to divine secondary meaning from the scale of its advertising budget or the spike in its sales, noting that "this fact does not indicate that [the plaintiff's] bantam advertising campaigns made major inroads to the consumer psyche." *Id.* Our case is just the same, because VPX has done precious little to link its sales and advertising data to any concomitant effect on "the consumer psyche."

### iv.    Media Coverage

*Fourth*, a few courts have held that "unsolicited media coverage of the product" can support a finding of secondary meaning. *See Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985). In

our case, VPX pointed to some media coverage—almost exclusively from market reports by investment firms like Stifel, Evercore, Goldman Sachs, and Wells Fargo.[41] But these aren't the kinds of reports that would impart secondary meaning.

As an initial matter—and for the most part—these (limited) reports say nothing about Bang's trade dress. Nor do they suggest any connection between that trade dress and VPX. *See* VPX's Findings and Conclusions at 25–26. These two facts are, probably standing alone, sufficient to reject VPX's contentions that these reports suffused the trade dress with secondary meaning. *See, e.g.*, *Easy Spirit*, 2021 WL 247922, at *7 (discounting media coverage that "barely discuss[ed] [the product's] appearance, let alone the claimed trade dress"); *IT'SUGAR LLC v. I Love Sugar, Inc.*, 2013 WL 6077353, at *6 (D.S.C. Nov. 19, 2013) (determining that the "evidence of media attention . . . [did] not support a finding of secondary meaning" because only one article "describe[ed] the physical look of the [trade dress]"); *W. Chem. Pumps, Inc. v. Superior Mfg., Inc.*, 989 F. Supp. 1112, 1122 (D. Kan. 1997) (concluding that media coverage failed to establish secondary meaning because there was no evidence that "the profile of either [product] was depicted").

There's also no indication that these market reports ever reached consumers, and courts have (largely) disregarded market analyst reports for this reason. *See, e.g.*, *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 872 (8th Cir. 1994) ("[I]n order to be the basis for an inference of secondary meaning, the articles must in some way indicate a connection in the minds of consumers between the trade dress

---

[41] At least for Wells Fargo, it's not at all obvious that those reports were "unsolicited." Mr. Owoc and Ms. Herzog, the Wells Fargo analyst, were in regular communication, and Monster introduced evidence indicating that, from time to time, Mr. Owoc gave Ms. Herzog suggestions about how Wells Fargo should cover Bang and Reign. *See* Tr. at 1269:20–1271:1. Moreover, as we've said, from the evidence that's been presented, it looks as though Ms. Herzog sometimes followed those suggestions. *See* Ex. P-147.

and [the plaintiff]. Some of the articles seem to have been published in trade journals or the business press. Such articles are not likely to be read by ordinary consumers and do not necessarily reflect the minds of consumers with respect to the necessary connection between [the plaintiff] and its claimed marks."); *Buca, Inc. v. Gambucci's, Inc.*, 18 F. Supp. 2d 1193, 1205 (D. Kan. 1998) (characterizing trade journals as "irrelevant" because the "trade journal articles are circulated only to the trade, and are not ordinarily read by the general public"); *compare with Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 227 (2d Cir. 2012) (finding media coverage meaningful where "unsolicited media attention to that red sole became rampant").

### v.   Actual Confusion

*Fifth*, several courts have held that "actual confusion is an indicium of secondary meaning." *Am. Sci. Chem. v. Am. Hosp. Supply*, 690 F.2d 791, 793 (9th Cir. 1982). This is because, "[i]f buyers are confused between two sources, then this also means that they must have recognized plaintiff's designation as a trademark and associated it only with plaintiff." 2 MCCARTHY ON TRADEMARKS § 15:11; *see also Popular Bank of Fla. v. Banco Popular de P.R.*, 9 F. Supp. 2d 1347, 1358 (S.D. Fla. 1998) (making the same point). At the same time, "[a]lthough instances of consumer confusion are probative of secondary meaning, [a] few isolated instances . . . are not adequate to present a genuine issue of material fact." *Investacorp*, 931 F.2d at 1526.

As we've said (and will no doubt say again), VPX introduced almost no evidence of actual confusion at trial. *First*, VPX's two confusion witnesses, Mr. Buchanan and Mr. Amador, were not confused by the similarities between the Bang and Reign trade dresses. Instead, even assuming that both witnesses were credible, they testified to being confused by *other factors*. Both, for instance, testified that they (without looking) grabbed a can from the same spot on the same shelf in the same

store from which they had, for weeks or more, habitually purchased Bang. *See* Tr. at 762:6–764:23, 790:11–791:1. Indeed, the two men only realized their mistake later—after they'd had a taste of the drink *inside* the can. *Id.* at 762:6–764:23, 796:2–5. And both men agreed that, having been surprised by the flavor, they then (for the first time) looked at the face of the can, which *immediately* alerted them to the confusion—immediately alerted them, in other words, to the fact that they had bought a Reign instead of a Bang. *Id.* at 763:5–7, 790:20–24. If anything, then, the distinct features of the Reign trade dress allowed them to *distinguish*—rather than conflate—the two products.

But, even were none of this true, we'd nevertheless give very little weight to a mere two instances of alleged confusion, especially when one sets these two instances against the growing army of Bang consumers, who've collectively paid, since March 2019 alone, some $432 million for 187 million cans, Ex. P-2499 (Energy Trends Tab) at rows 15, 25—all (we presume from the lack of additional confusion evidence) without much difficulty, *cf. Tana v. Dantanna's*, 611 F.3d 767, 779-80 (11th Cir. 2010) (two instances of confusion between two restaurants that served over a million customers was *de minimis*).

*Second*, VPX relies on the results of the Berger and Isaacson surveys. But the *Squirt*-style survey Mr. Berger conducted cannot inform our secondary-meaning analysis. As McCarthy explains, a *Squirt* survey simply shows subjects two products *without* presuming that the senior dress carries any general familiarity (read: secondary meaning) in the minds of consumers:

> A number of courts have said that survey evidence showing that confusion is likely can also be evidence of the existence of a secondary meaning. But this inference should be used with caution, because survey evidence is not direct evidence of customer confusion in the real marketplace. A classic *Eveready* confusion survey is evidence of confusion which in turn is relevant to show a secondary meaning. But a *Squirt*-type survey cannot, because a *Squirt*-type survey does not presume that those surveyed know of plaintiff's mark.

2 MCCARTHY ON TRADEMARKS § 15:11.[42] And, while Mr. Isaacson *did* conduct an *Eveready* confusion survey for Monster, that survey demonstrated only a 0.9% confusion rate—paltry evidence of secondary meaning. VPX has thus failed to show "actual confusion" here.

### vi. Intentional Copying

*Sixth*, the Eleventh Circuit has held that "proof of intentional copying is probative evidence on the secondary meaning issue." *Brooks Shoe*, 716 F.2d at 860. At the same time, the court has cautioned that "close copying does not necessarily indicate that the defendant has attempted to capitalize on the secondary meaning of plaintiff's trademark or trade dress." *Id.* There may be perfectly legitimate reasons to copy or imitate the primary features of another company's product. Competitors "may, for example, choose to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844–45 (9th Cir. 1987). Indeed, almost any invention is, in some sense, built on the foundations of everything that came before it. We *want* competitors to be inspired by— and to improve on—the findings of their predecessors. *See* 1 MCCARTHY ON TRADEMARKS § 8:1 ("Balanced against the marketplace exclusivity granted by trade dress protection must be the paramount principle of free competition and free copying."). As a result, the Eleventh Circuit asks whether the alleged copying indicates that a company adopted its trade dress "to take advantage of the popularity of [its competitor's dress] on the market." *FN Herstal SA*, 838 F.3d at 1086. It's *this* more nefarious variety of passing off—the kind that confuses consumers and exploits a competitor's established goodwill—that trademark law is prepared to prevent.

---

[42] Beyond that—and for all the reasons we've already outlined—we find Mr. Berger's survey wholly unpersuasive.

The heart of VPX's attack—that Monster intentionally copied Bang's trade dress—fell apart at trial. We've already addressed this issue exhaustively in our Findings of Fact. *See supra* ¶¶ 60–76. But, because so much of VPX's claim hinges on this theory of alleged copying, we'll highlight (again) just a few of the facts that put VPX's contentions to rest.

*One*, Bang and Reign look different. Two of their most prominent features—their logos (a spartan mask vs. a "b") and their brand names (Bang vs. Reign)—have almost nothing in common. If Monster were attempting to pass Reign off as Bang, it did an exceptionally poor job of it. The best inference we can draw from these incongruities, then, is that Monster simply never intended to copy Bang. *See, e.g., Aromatique*, 28 F.3d at 871 (holding that it was "clearly erroneous" to find intentional copying because the defendant's "conspicuous placement of its identifying marks must be seen as an attempt to distinguish its potpourri from [the plaintiff's]"); *R.H. Donnelley Inc. v. USA Northland Directories, Inc.*, 2004 WL 2713248, at *6 (D. Minn. Nov. 19, 2004) (concluding that the "prominent placement of its name . . . weigh[s] against a finding of intent to infringe").

*Two*, the process Monster undertook before designing Reign's architecture renders implausible any claim that it attempted to duplicate Bang's design. Monster spent roughly six figures hiring two companies to help design the Reign can. During that process, it reviewed, considered, and debated hundreds of can designs—most resembling Bang not at all. Indeed, Monster's instructions to those design companies—in which it demanded a look that would be "iconic" and a feel that would be "recognized on the shelf"—expresses Monster's authentic desire to create something unique. This process (and these requests) would make little sense if Monster's aim was simply to mimic the Bang can.

*Three*, during trial, the Court heard directly from the most significant players in each of the companies and was able to assess their credibility. Based on the testimony of these witnesses, the Court is convinced that Monster never set out to copy the Bang trade dress. There's little doubt that Monster was, in some respect, responding to Bang when it created Reign. Bang, after all, had successfully painted itself as a *healthier* energy drink. Monster wanted to compete with Bang in this emerging performance subcategory. And, to some extent—we think it's fair to say—Monster may even have been inspired by Bang's design. When we dig a bit deeper, though, we can see why Monster felt such an affinity for that design: it (very) closely resembled the iconic architecture Monster had invented when it came out with its own Monster Energy in 2002. But, for all that inspiration, Mr. Sacks—who was indisputably the primary decisionmaker when it came to Reign's design, Tr. at 73:10–25—persuasively testified that, while the company did want to return to its Monster Energy roots, it also wanted to create a product that was, on its own, compelling, iconic, and different. Mr. Sacks's testimony—on this and many other subjects—was credible, and we believe him.

*Four*, many of VPX's countervailing positions crumbled at trial. VPX, remember, opened with a never-before-seen theory that Monster had copied Bang's colors *down to the very Pantone shade. Id.* at 33:6–35:7. By the end of the trial, however, this theory had been utterly dismantled. *See supra* ¶ 69. Pivoting, VPX suggested that Monster had attempted to reverse-engineer Bang's taste. Tr. at 76:8–79:24. But VPX's own witnesses would go on to testify (truthfully, in our view) that Reign and Bang *actually* taste nothing alike—as different (one witness said) as Coke and Dr. Pepper. *Id.* at 762:22–763:4. Later, pointing to evidence that Monster wanted to "kill" Bang, VPX feigned abhorrence. *Id.* at 125:17–127:18. But we live in a free society, where market actors are granted some necessary leeway in growing their businesses and arrogating for themselves an ever-larger slice of the proverbial pie.

While we may not enjoy the euphemism, in other words, we cannot realistically say that it evinces some interest in copying (as opposed to destroying) Bang and its business. Next, VPX complained that the names of many Bang and Reign flavors resembled one another *Id.* at 35:9–16. As it turned out, though, Monster had been using at least one of those flavor names *long* before Bang even existed. *Id.* at 168:3–169:16. And, as we've said—*q.v.* our discussion of flavor names, *supra* ¶¶ 71–72—VPX's flavor-name complaint was (as the Old Bard once wrote) much ado about very little. Time and again, VPX's claims fell short.

*     *     *

In the best of circumstances, the secondary-meaning test stands as a steep hill for trade-dress plaintiffs to climb. But these aren't the best of circumstances. VPX, recall, has no survey evidence to show that consumers viewed its trade dress as source-identifying. And several courts have warned plaintiffs that "the lack of evidence in the form of an objective survey [is] a significant hindrance to meeting the standard of proof required." *Sec. Ctr., Ltd.*, 750 F.2d at 1301 (finding the hindrance "insurmountable" in that case). As one judge on our court has said: "That Plaintiff failed to produce survey or other quantitative evidence renders Plaintiff's uphill battle even steeper." *Habersham Plantation Corp. v. Molyneux*, 2011 WL 13216994, at *7 (S.D. Fla. Aug. 19, 2011) (Dimitrouleas, J.). The steeper the hill, the tougher the slog. *Cf.* SUN TZU, THE ART OF WAR 68 (Lionel Giles trans. 1910) ("It is a military axiom not to advance uphill against the enemy . . . ."). And VPX just never got close to the summit here. Having weighed all the evidence, we reject VPX's claim to secondary meaning.

### 2.  The Reign Trade Dress Is Not Likely to Cause Confusion

The Eleventh Circuit considers seven factors in assessing the likelihood of confusion in a trade-dress case:

> (1) the strength of plaintiff's trade dress, (2) the similarity of the products' designs, (3) the similarity of the products themselves, (4) the similarity of the parties' trade channels and customers, (5) the similarity of advertising media used by the parties, (6) the defendant's intent, and (7) the existence and extent of actual confusion in the consuming public.

*Yellowfin Yachts*, 898 F.3d at 1289. "Because the bottom line is the likelihood of consumer confusion, application of [these] factors entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 649 (11th Cir. 2007) (quoting *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1342 (11th Cir. 1999)). That said, the Eleventh Circuit has counseled that the strength of the dress and the evidence of actual confusion are the "most important" considerations. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016). Ultimately, "[w]hile there is no bright line test to determine the existence of a likelihood of consumer confusion, recovery under the Lanham Act requires, at a minimum, that confusion, mistake, or deception be likely, not merely possible." *Custom Mfg.*, 508 F.3d at 651 (cleaned up). VPX hasn't met its burden here.

### a. Strength of the Trade Dress

Starting with the first factor, the Bang trade dress is (at best) weak. "The strength of a particular trade dress is determined by a number of factors that establish its standing in the marketplace." *AmBrit*, 812 F.2d at 1539. "[T]he appropriate degree of protection is determined by examining a number of factors that establish the standing of the trade dress in the marketplace: most notably, the type of trade dress and the extent of the third party uses." *Id.*; *see also John H. Harland Co.*, 711 F.2d at 975 (noting that "[r]ecent authority in this circuit indicates that both of the factors cited by the parties [*i.e.*, the type of mark and the extensiveness of third-party use] should be considered when analyzing the strength of a particular trademark").

106

"In analyzing the scope of protection a particular trade dress warrants, a court must first consider the type of trade dress involved." *AmBrit*, 812 F.2d at 1539. A product's trade dress may be classified as "generic, descriptive, suggestive, or arbitrary," and the trade dress becomes stronger as it "moves toward the . . . arbitrary end of the spectrum." *Id.* at 1537. The Eleventh Circuit has distinguished the various typologies as follows:

> Generic marks refer to a particular genus or class of which an individual service [or product] is but a member; such marks may never receive . . . protection. Descriptive marks directly describe a characteristic or quality of the service [or product], and can only be protected if they have acquired "secondary meaning." "Vision Center," when used to describe a place to purchase eyeglasses, would be a descriptive name. Suggestive marks subtly connote something about the service [or product] so that a consumer could use his or her imagination and determine the nature of the service [or product]. The term "Penguin" would be suggestive of refrigerators. . . . An arbitrary or fanciful mark is a word in common usage applied to a service [or product] unrelated to its meaning; "Sun Bank" is such an arbitrary or fanciful mark when applied to banking services.

*Id.* at 1357 n.20 (quoting *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1182 n.5 (11th Cir. 1985)).[43]

This first consideration favors VPX's contention that its trade dress is strong. Certain elements of the Bang can are undoubtedly descriptive in that they set out the drink's characteristics. For instance, the ingredients along the rim of the can, the tagline ("POTENT BRAIN AND BODY FUEL"), the flavor-designating colors, and the zero-calorie bug all describe the drink and outline

---

[43] There's some reason to question this test's place in the doctrine. As the Eleventh Circuit noted in a case after *AmBrit*, "[t]he *Abercrombie* spectrum was developed specifically for word marks and does not translate into the world of shapes and designs." *Miller's Ale House*, 702 F.3d at 1323 (quoting 1 MCCARTHY ON TRADEMARKS § 8:13). By way of example, under the *Abercrombie* framework, "[a] generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). Generic marks receive no protection. *Id.* Think a computer company trying to trademark the word "computer." Under these standards, it's not altogether clear how a trade dress can be generic because, by definition, a trade dress will never refer to a product's genus. Even so, we'll faithfully apply the test until the Eleventh Circuit instructs us to do otherwise.

what's in it. At the same time, the overall mosaic—including, among other things, the "b" logo, the brand name, and the can layout—seems arbitrary. Those features, in other words, don't necessarily indicate that the product is an energy drink. If this one factor were all we had to consider, then, Bang's trade dress would appear quite strong.

But the second key consideration in evaluating the strength of a trade dress—"the extent of third-party use," *AmBrit*, 812 F.2d at 1539—weighs strongly against VPX and renders the Bang trade dress rather weak. As we've discussed, Bang's trade dress displays an overall image that's prevalent in the energy-drink market. The original Monster Energy drink, for instance—the top-selling energy drink in the United States—has captured approximately 40% of the market and has, for years, inundated consumers with a strikingly similar look-and-feel. The same can be said of several other brands, including Rockstar, Venom, Scorpion, Spider, Hyde, and Quake. On this record, therefore, we cannot agree that the Bang can, as a whole, leaves consumers with a peculiarly distinct impression.

Other considerations bolster our view that Bang's trade dress is weak. For starters, the modern Bang trade dress has been on the market for only five years and has changed several times during that period. Bang, moreover, has (for the most part) turned its attention away from cans with a black background and focused, instead, on brightly colored labels. And there's no survey (or other) evidence that consumers are generally aware of the Bang trade dress—as they would be, for example, with a Ferrari, *cf. Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1240 (6th Cir. 1991) (finding secondary meaning where over 70% of survey respondents could recognize a car as a Ferrari, even with the logo removed), or the red soles of a Christian Louboutin shoe, *cf. Christian Louboutin*, 696 F.3d at 227 (relying on consumer surveys to find "worldwide recognition").

Our conclusion that Bang's trade dress is weak—and thus entitled to only limited protection—finds support in many of this Circuit's trademark decisions. The Eleventh Circuit, for instance, has held that the mark FLORIDA INTERNATIONAL UNIVERSITY deserved little (or no) protection. *See Fla. Int'l Univ.*, 830 F.3d at 1258. In so holding, the court looked at third-party use and found that "FIU operates in a crowded field of similar names," including FAMU, FAU, FGCU, UF, and others. *Id.* As in our case, it made no difference that the other names weren't *identical* to the mark in question. *Id.* What mattered was that those other names were close enough that the FIU mark was "not particularly distinct to consumers." *Id.*

Authority abounds. *See, e.g.*, *Yellowfin Yachts*, 898 F.3d at 1291 (affirming the district court's finding that a trade dress was weak where "many other boats in the relevant market have a [similar trade dress]"); *Tardieu Grp., Inc. v. MEC Apparel Grp., Inc.*, 2009 WL 10667537, at *5 (S.D. Fla. May 5, 2009) (Altonaga, C.J.) (concluding that a trade dress, though arbitrary, was nevertheless "entitled to weak protection" because "[t]he amount of third party use of the majority of the design features utilized by [the plaintiff] [was] high"); *Fla. Breckenridge, Inc. v. Solvay Pharms., Inc.*, 1997 WL 695413, at *6 (S.D. Fla. July 18, 1997) (finding that an arbitrary trade dress "should be accorded low to moderate protection" because "third party use of the [plaintiff's] trade dress . . . [was] extensive"); *Vital Pharms.*, 511 F. Supp. 2d at 1316 (holding that VPX's Redline trade dress was "deserving of little or no protection" because it was sold in "a commonly manufactured and marketed 8 ounce, cylindrical bottle"). This first factor, in short, favors Monster.

### b.   Similarity of the Products' Designs

"The second likelihood of confusion factor focuses on the overall impression of the two products at issue." *Yellowfin Yachts*, 898 F.3d at 1291; *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502,

1507 (11th Cir. 1985) (same). Crucially, in applying this factor, courts have recognized that, while not dispositive, "[t]he conspicuous use of very different logos and of the names of the [producers] [may] significantly distinguish[] . . . two trade dresses." *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 71 (2d Cir. 1994).[44] Indeed, the Eleventh Circuit has explained—in the analogous trademark context—that, "[i]f a trademark operates in a crowded field of 'similar marks on similar goods or services,' slight differences in names may be meaningful because consumers 'will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.'" *Fla. Int'l Univ.*, 830 F.3d at 1260 (quoting 2 MCCARTHY ON TRADEMARKS § 11:85).

In our case, widespread confusion is unlikely. It's true, of course—as VPX points out—that energy drinks are low-cost, grab-and-go products. *See* Tr. at 109:1–4. But the differences between the two labels are stark—even on a momentary glance. Starting with the obvious, both drinks prominently display their names and logos, and Reign's name and spartan logo look and sound nothing like Bang's name and "b" logo. In a crowded field of energy drinks with black backgrounds and vibrant color combinations, we think it reasonable to presume that consumers rely primarily on brand names and

---

[44] Courts around the nation agree. *See, e.g.*, *Dippin' Dots*, 369 F.3d at 1209 (finding that "the two logos are so different that no reasonable jury could find that even a hurried 8–18 year old impulse shopper could confuse them"); *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 828 (Fed. Cir. 1992) (holding that the defendant's "prominent labelling of the carton with its brand name and trademark logo is probative evidence that the cartons are not confusingly similar"); *Fuddruckers*, 826 F.2d at 846 ("Use of differing names or distinctive logos in connection with similar marks can reduce the likelihood of confusion but doesn't always do so. . . . The issue is properly part of the factual determination left to the jury."); *Kwik-Site Corp. v. Clear View Mfg. Co.*, 758 F.2d 167, 178 (6th Cir. 1985) (noting that "the most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name and when that is done, there is no basis for a charge of unfair competition" (cleaned up)); *see generally* 4 MCCARTHY ON TRADEMARKS § 23:53 ("Other decisions have held that on the facts, the use of defendant's name on a product similar to a protected shape is sufficient in the overall context of the case to prevent a likelihood of confusion.").

logos to differentiate their options.[45] Indeed, VPX's own witnesses conceded that Bang's logo and name are the most prominent aspects of its trade dress. *Id.* at 623:21–624:6. And (as we've seen) its "confusion" witnesses were (in the end) not confused *by the trade dress* at all. *See supra* ¶¶ 91–94. There are, on top of all that, several other salient differences between the cans: The color sequences are different; the fonts are not at all the same; the flavor names bear only minimal resemblance; and, while Bang's background is smooth and glossy, Reign's is rough and textured. Indeed, when we move beyond the defined trade dress—when we consider, for instance, Bang's colored rim and U-shaped carveout, neither of which appear on the Reign can—we find even more support for our conclusion that consumers, faced with a market full of black drinks with vibrant logos, are able to easily distinguish between the Bang and Reign cans.

Two federal decisions—one involving VPX and a second involving Monster—help guide our analysis of this "similarity" factor. *In the first*, Judge Middlebrooks (of our Court) considered whether VPX's Redline product, a ready-to-drink beverage, was confusingly similar to the defendant's product. *Vital Pharms.*, 511 F. Supp. 2d at 1316. After a bench trial, Judge Middlebrooks noted that "[t]he prominent eagle marking and labeling on Defendant's bottle serves to drastically reduce the likelihood of any possible confusion." *Id.* Our prominent names and logos likewise "drastically reduce" the likelihood that consumers will confuse Reign with Bang.

---

[45] In other words, because the features Reign shares with Bang are common in the industry, consumers are unlikely to rely on *those* features to differentiate between sources. *See, e.g., Funrise Canada (HK) Ltd. v. Zauder Bros.*, 1999 WL 1021810, at *25 (E.D.N.Y. July 2, 1999) ("Where the common elements of conflicting trademarks or trade dresses are generic or widely used throughout an industry, the likelihood of confusion is reduced."). It would be one thing, for instance, if, after VPX put its energy drink in a triangular glass bottle—something that appears nowhere else in the industry—Monster copied *that* design. Because those features would be so unique, a consumer who saw the competing product might be justifiably confused about its origins. But the features Bang and Reign share—their colorful logos, black backgrounds, and can architectures—are ubiquitous in the energy-drink industry.

*In the second*, the Ninth Circuit addressed a similar lawsuit Monster had brought against another energy-drink company, Freek. *Hansen Beverage Co. v. Nat'l Beverage Corp.*, 493 F.3d 1074, 1079 (9th Cir.), *vacated as moot because of settlement*, 499 F.3d 923 (9th Cir. 2007). In reversing the district court's preliminary-injunction finding that the two products were likely to confuse consumers, the court reasoned, as we do here, that the differences between the two drinks rendered confusion unlikely— *one*, because their names and logos were different and, *two*, because their shared features were common in the industry. In fact, it's worth quoting this portion of the court's decision in full:

> The two trade dresses are similar in overall appearance only to the extent that they both feature "aggressive" graphics and bold accent colors against dark backgrounds. However, these elements are widely employed in the crowded energy drink market and are therefore unlikely to lead to confusion as to source. . . . The appearance of the competing trade dress speaks for itself. Monster products are distinguishable from the other energy drinks on the market largely because the word "Monster" and a large "M" are prominently displayed on the cans. Freek's trade dress does not feature either of these source-identifying marks; instead, it displays prominently its own trade name ("Freek") along with a distinctive depiction of a distorted and frightening face (the so-called "Freek Man"). These very significant differences weigh heavily against a finding that consumer confusion is likely to result from the overall look of the packaging.

*Id.* To sum up: although there are some similarities between the two designs, those similarities are not source-identifying, and the products' differences are both stark and prominent. This factor likewise goes to Monster.

For its part, VPX relies on four cases for its position that Reign looks like Bang.

*First*, VPX leans on *Ambrit*, 812 F.2d at 1540–41. But that case supports our decision. There, the Eleventh Circuit affirmed the district court's factual finding that the Polar B'ar and the Klondike Bar appeared confusingly similar. *Id.* In doing so, the court explained that the similarity factor was "really nothing more than a subjective eyeball test," "that the presence of dissimilar word marks lessens the possibility of a finding of similarity of design," and that "a court must consider how the

trade dress would function in the actual market place." *Id.* In *Ambrit*, the court—mindful that "the district court's finding that the designs are similar is still reversible only for clear error"—affirmed the trial court's determination that the products looked similar. *Id.* But the very considerations the court found persuasive in *Ambrit* cut the other way here. So, for example, having applied our own "subjective eyeball test" to the labels in *our* case, we find that consumers will have little difficulty distinguishing between them—a finding that's solidified by the "dissimilar word marks" and logos and the ways in which the trade dresses "function in the actual market" (*i.e.*, in a crowded field of similar black cans that share the same overall impression).

*Second*, VPX points to *American Beverage Corp. v. Diageo North America, Inc.*, 936 F. Supp. 2d 555, 604–05 (W.D. Pa. 2013). In that case, the trial court held that similarities between certain frozen cocktail products were likely to confuse consumers. *Id.* For two reasons, that case doesn't alter our conclusion here. *One*, the frozen drinks in *Diageo* (unlike Bang and Reign) didn't feature prominent logos that dominated the cans' overall appearances. *Id.* As a result, the court found that any differences between the drinks were "minor and subtle." *Id.* By contrast, the differences between *our* drinks are— as we've highlighted—significant and immediately obvious. *Two*, in considering the degree of similarity between the drinks in that case, the WDPA didn't consider the look-and-feel of *other* drinks that were likely to be found alongside the frozen cocktails at issue there. *Id.* In our case, we simply cannot ignore the reality that Bang and Reign appear on shelves and in stores alongside half-a-dozen (or more) other energy drinks—many of which, like Reign and Bang, sport flashy, vibrant logos against black backdrops. Since this look is commonplace in the industry, consumers are accustomed to using the drinks' names and logos to distinguish between them—an important factor the WDPA didn't need to confront.

*Third*, VPX cites *San Antonio Winery, Inc. v. Enovation Brands, Inc.*, 2020 WL 888320, at *1 (S.D. Fla. Feb. 24, 2020). There, Judge Scola agreed (for purposes of entering a temporary restraining order) that two wine bottles were confusingly similar. *Id.* at *4. But that ruling was entirely understandable in the circumstances of that case—with "Stella Rosa" as plaintiff and "Bella Rosa" for the defense. *See id.* (noting "the striking similarity between Bella Rosa and the Stella Rosa mark"). This near-identity in the marks was bad enough—but Judge Scola also found that both companies prominently displayed those confusingly similar names on their bottles. *Id.* Since our names—Bang and Reign—aren't confusingly similar, *San Antonio Winery* is inapposite here.

*Fourth*, VPX looks to *It's a 10, Inc. v. Beauty Elite Grp., Inc.*, 2013 WL 6834804, at *4 (S.D. Fla. Dec. 23, 2013), where the court found the labels of two hair-care products confusingly similar. In so holding, the court stressed the confounding similarity between the products' names—"It's a 10" and "10 PL+US." *Id.* The court also noted that the products shared "similar orientations on similarly colored, irregularly shaped bottles." *Id.* Our names, by contrast, are *not* similar, and our drinks are *not* sold in irregularly shaped cans. *It's a 10* thus doesn't help VPX here.

*A Brief Digression*

At first glance, there does appear to be some tension between this finding and our earlier conclusion that Bang's trade dress isn't inherently distinctive. In that earlier section, after all, we determined that Bang wasn't all that different from Monster Energy—or, for that matter, Reign—whereas now we're suggesting that Bang and Reign are *quite* different, at least in the ways that matter. But this seeming tension dissipates when we hold our problem up against the light of a familiar tonic: whiskey.

114

Whiskey, as we've said, generally comes in glass bottles. Of course, the bottles aren't always the same—some are wider and shorter, some leaner and taller; some are textured, others are smooth; some clear, others green or opaque—but the general *form* of a whiskey bottle is (we submit) immediately recognizable.[46] Within this universe of glass whiskey bottles, however, there are a few that have carved out for themselves a unique—call it distinctive—look. One such brand is B_____— whose architecture incorporates a cream-colored, parchment-esque sleeve that fits over the neck of the bottle and, functioning very much like a label, is draped over the bottle's front panel. In a sea of glass whiskey bottles with parchment-like labels, B_____'s (sleeved) label stands alone. The bottle's look is so unique, in fact, that B_____ can incorporate significant changes to the label's design—say, by deploying a line of products with a green, rather than a cream-colored, sleeve or by crafting a seasonal label that does away with B_____'s traditional logo—*without* confusing its customers about the source of the new design.

To understand how, suppose you walk into a store and, from the front door, look up at the wall of whiskeys at the back. You're too far to notice the contours and textures of the individual bottles—too far even to read the names or see the logos on the labels. But you don't need to get any closer to know that the one bottle with a paper sleeve draped over its front is a B_____. *That's* inherent distinctiveness.

And this is where new market players can get into trouble—because, as we've hinted, when a brand's look is *this* unique, consumers will continue to associate that look with the original brand, *even in* the face of significant alterations to the bottle's design. So, if a competing company were to design

---

[46] This isn't to say that all whiskey must come in glass bottles: Jim Beam and Jack Daniels, for instance, have come out with plastic alternatives. But these are just common examples of designs that *purposely* deviate from the industry's common look-and-feel.

a bottle with a similar parchment-like sleeve, it'd be very likely to confuse consumers *even if* its different name and logo were prominently displayed on that sleeve. Why? Because in the minds of consumers, sleeves on whiskey bottles *signal* B_____. By contrast, when we have a product that's *not* inherently distinctive—or is only moderately so—even *minor* differences between the infringed and infringing products will alert consumers to their separate pedigrees. In this more commonplace scenario, then— where we're comparing two regularly-sized and shaped glass whiskey bottles with similar-looking labels—it's *precisely* these minor differences (in their names and logos, for example, or in their colors, trims, and frills) that help consumers to distinguish one product from another.[47]

And now we can begin to resolve that tension we thought we'd identified between a product's inherent distinctiveness and the likelihood that it will confuse. We can now see, in other words, that the two factors operate, not as independent elements along orthogonal lines, but as a sliding scale: the more distinctive the product, the more likely it is that a new product *whose design arrogates the atypical qualities of the old product* will confuse consumers; on the other hand, the less distinctive the product, the less likely it becomes that a new product *whose design incorporates only the commonplace features of the old product* will cause confusion. And this is what the "strength of the trade dress factor" is *really* getting at—*i.e.*, what it's really doing here in the likelihood-of-confusion test: the stronger (read: more

---

[47] To go back to our example, a consumer who walks into the store and, from afar, looks up at the back wall may not be able to distinguish between the hundred-or-so similar-looking whiskey bottles he finds there. But that's not to say that he's *confused.* Our consumer—who observes the market in the real world—understands that, for the most part, whiskey bottles employ the common design he sees replicated against the back wall. He thus doesn't assume, standing at a distance, that *all* 100 of the similar bottles he finds were manufactured by the same producer. To the contrary, he knows that many of these bottles were put out by different manufacturers, and that, to properly distinguish between them, he needs to come up close, look at their names and logos, and examine their *other* distinguishing features. In the real world, in other words—where consumers are flooded with products that sport a common look-and-feel—these more-minor differences are sufficient to allow our consumer to walk away with the specific whiskey he was searching for.

distinctive) the trade dress, the more likely it becomes that consumers will be confused by a product that incorporates the most distinctive features of that design.

Turning back to energy drinks. If Bang had come up with a distinctive architecture (say, a boxed carton or a triangular shape) then a second energy drink that copied Bang's unique design would have a hard time avoiding confusion—even with a different name, a distinct label, and a separate coloring scheme. But Bang doesn't flash a unique design: it has the same-old look of many other energy drinks—the same-old look Monster Energy pioneered almost 20 years ago. So, Reign can safely enter Bang's market with that same commonplace design and feel secure that even relatively minor alterations in that design (different names and logos, separate color schemes, and a somewhat cleaner look, devoid of bullet shapes and cross hairs and colored rims) will be sufficient to put consumers on notice that its product comes, to use VPX's words, "from a different mother."

### c.   Similarity of the Products

The third factor—the similarity of the goods themselves—"requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338. While Bang and Reign are not at all identical, they *are* both energy drinks that target health-conscious consumers. And they're both the kinds of products a consumer might attribute to a single source. This factor tilts towards VPX.

### d.   Similarity of the Parties' Trade Channels and Customers

The fourth likelihood-of-confusion factor looks to "where, how, and to whom the parties' products are sold." *Frehling*, 192 F.3d at 1339. The record supports the proposition that Bang and Reign are, for the most part, sold in the same stores in the same way to the same class of consumers. This factor, then, likewise supports VPX.

117

### e.  Similarity of Advertising Media

The fifth factor considers the similarity of advertising media, acknowledging that "[t]he greater the similarity in advertising campaigns the greater the likelihood of confusion." *Ross Bicycles*, 765 F.2d at 1508. In applying this factor, the Eleventh Circuit asks whether the parties market their products in "the same advertising media," *AmBrit*, 812 F.2d at 1542—the idea being that a "significant enough overlap in the respective target audiences [may suggest] that a possibility of confusion could result," *Custom Mfg.*, 508 F.3d at 648 (cleaned up). On this metric, the factor leans in VPX's favor, since both Monster and VPX use point-of-sale displays, social-media marketing, and experiential advertising. The parties don't *really* dispute this point.

Monster, though, insists that the Court should *also* consider whether the ads' contents are themselves similar. *See* Monster's Findings and Conclusions at 42–43. And, it's true, the two companies' advertising content *does* differ. Even Ms. Owoc, VPX's marketing director, testified that VPX's advertising is quite different from that of its competitors—in her words: "basically like night and day." Tr. at 945:21–24.

Intuitively, Monster has a point: consumers are more likely to be confused when the parties' advertising themes and images are similar—and they're less likely to be confused when their advertising differs. And, while Monster never points to any, there *is* limited support for the notion that we should examine the contents of the advertisements themselves. *See AmBrit*, 812 F.2d at 1542 (noting, in discussing this factor, that "[t]he district court found that both parties use the same advertising media, primarily television and radio, *and that the advertisements were themselves similar*" (emphasis added)). Nonetheless, in the absence of more direct precedent, we'll weigh this factor in

118

favor of VPX since, while their advertising content may differ, the platforms the companies use *are* similar.

### f.    Monster's Intent

The sixth prong of the likelihood-of-confusion test asks whether the defendant copied the plaintiff's trade dress *with the intent* to confuse consumers. "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." *Fla. Int'l Univ.*, 830 F.3d at 1263. In considering this factor, courts must be mindful that "[t]here is a difference between intentional copying and intentional copying *with intent to cause confusion*." *Yellowfin Yachts*, 898 F.3d at 1293. "This distinction is an important one. If a defendant intentionally copies an aspect of the plaintiff's product, but not with intent to confuse consumers, then the defendant's intent has little bearing on the ultimate question: whether the allegedly infringing product is likely to confuse consumers." *Id.*

The trial evidence showed that Monster sought to create an iconic product that would dominate—and be easily distinguishable from—other energy drinks on the market. The evidence, in other words, was simply inconsistent with VPX's unfounded accusation of bad intentions. We've already articulated our reasons for coming to this conclusion, *see supra* ¶¶ 60–76, so we'll only briefly reiterate just a few of the key facts here. *First*, the cans look different—thus undercutting VPX's claim that Monster created Reign in an effort to pass its product off as Bang and to exploit VPX's goodwill (which, by the way, Monster's own brand had enough of to begin with). *Second*, Monster spent more than a year (along with a not-insubstantial amount of money) paying two outside designers to create a can that would stand out in the marketplace—an absurd expenditure of time and resources if (as

VPX insists) the company had simply wanted to replicate Bang. *Third*, Mr. Sacks testified over several days about his intentions: in creating Reign, he wanted to invent something iconic, powerful, and *different*. We believe him. *Fourth*, the countervailing evidence VPX clung to either didn't pan out (*e.g.*, the *supposedly* identical Pantones) or was simply indicative of a legitimate, capitalistic intent to compete with others in a free market (*e.g.*, the "kill" Bang credo). While Monster, in other words, may have been inspired by Bang, it had no desire to *copy* the drink or to *deceive* consumers. To put it somewhat differently, Monster wanted to crush its competitors, not copy them; it wanted to win consumers, not confuse them.

### g.    Actual Confusion

"The last factor, actual confusion in the consuming public, is the most persuasive evidence in assessing likelihood of confusion." *Tana*, 611 F.3d at 779; *see also Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362 (11th Cir. 2019) ("Our cases have often recognized actual confusion as one of the most important factors."). "There is no absolute scale as to how many instances of actual confusion establish the existence of that factor. Rather, the court must evaluate the evidence of actual confusion in the light of the totality of the circumstances involved." *AmBrit*, 812 F.2d at 1543. VPX has pointed to two kinds of evidence as support for its confusion contentions—two *unconfused* witnesses and a deeply flawed confusion survey. As we've said, neither can sustain VPX's claim here.[48]

---

[48] *Cf. Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997) ("Actual confusion can be shown by either direct evidence or by survey evidence."); *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1564 (Fed. Cir. 1994) ("Actual confusion is normally proven 'through the use of direct evidence, i.e., testimony from members of the buying public, as well as through circumstantial evidence, e.g., consumer surveys or consumer reaction tests.'" (quoting *PPX Enters. v. Audiofidelity Enters.*, 818 F.2d 266, 271 (2d Cir. 1987)).

### i.    Confusion Witnesses

"[T]he testimony of [confused] witnesses is probative of actual confusion." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 845 (11th Cir. 1983); *see also AmBrit*, 812 F.2d at 1544 (considering, in assessing actual confusion, "consumers who testified they had been confused while making purchases in the market place"). In our case, VPX's two "confusion" witnesses—Mr. Buchanan and Mr. Amador—weren't actually confused by Reign's trade dress. In fact, *both* customers were easily able to distinguish between the Bang and Reign trade dresses. *See supra* ¶¶ 91–94.

As we've said, even if these witnesses *had* testified that they'd been confused by Reign's trade dress (they didn't), these two instances would be—when set against the volume of Bang's total sales—mathematically *de minimis* and entitled to little or no weight. "Although it takes very little evidence to establish the existence of the actual confusion factor, the evidence adduced must be more than nominal." *Yellowfin Yachts*, 898 F.3d at 1295. There's no hard-and-fast rule for determining whether the proffered evidence of actual confusion is nominal. Instead, "a court should examine the totality of the circumstances to determine how likely instances of actual confusion would be reported," considering (for instance) "the time period in question and how extensively the product is advertised or made known to the public . . . as well as the type of confusion that exists and who suffers the confusion." *Jellibeans*, 716 F.2d at 844.

While we can understand why some consumers might be unwilling to testify to being deceived, especially for relatively inexpensive goods (like energy drinks), *see AmBrit*, 812 F.2d at 1544, we would've expected VPX to have an easier time than most finding ready witnesses. For one thing, we're talking *millions* upon *millions* of people. From the day of Reign's launch through April 2020, Reign had sold more than 187 million cans and brought in about $432 million. Ex. P-2499 (Energy Trends Tab)

at rows 15, 25. In roughly that same span, VPX sold over 547 million Bang cans, which translated to over $1.3 billion in revenues. *See* Tr. at 733:9–11; Ex. P-2499 (Energy Trends Tab) at rows 9, 19. On top of that, VPX has a substantial social-media following. And, according to VPX, its fans are extremely passionate about Bang. In these circumstances, we'd expect at least some of these very passionate millions to come forward and express their frustration over the tremendous confusion Reign had injected into the marketplace. But no such brigade of confounded supporters materialized—probably because Reign and Bang aren't that similar and because Bang's customers just weren't all that confused.

The Eleventh Circuit's decision in *Hard Candy* is directly on point. In that case, the court reasoned that "there was enough opportunity for confusion to make the absence of any evidence significant" because the plaintiff had sold 248,075 "Gleam Glow Kits," totaling over $5 million in revenue and because the product was posted on "corporate social media accounts, which have millions of followers." 921 F.3d at 1362–63. Given the size of the company's sales and the significance of its social-media presence, the court found that "the lack of evidence is at least probative of the conclusion that there was no likelihood of confusion—hundreds of thousands of . . . consumers purchased the allegedly infringing kit, several times more likely saw it on store shelves or online, and still there is no evidence that anyone, anywhere, was ever confused about [who] was responsible for the product." *Id.* Since our figures—hundreds of millions of cans, millions of social-media followers, and billions of dollars in sales—dwarf the figures the Eleventh Circuit found compelling in *Hard Candy*, we similarly conclude that VPX's "lack of evidence is at least probative" on the all-important question of confusion.

122

And there are plenty of other decisions to go around. *See, e.g., Dantanna's*, 611 F.3d at 779 ("Dantanna's has served over one million customers in the five years between its opening and the filing of this lawsuit; no reasonable jury would conclude that an inquiry by only two customers of a possible connection between the restaurants demonstrates actual confusion in the consuming public."); *George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 399 (4th Cir. 2009) (holding that, "in light of [the plaintiff's] huge sales volume, four instances of consumer confusion is at best *de minimis*"); *Sun Banks v. Sun Fed. Sav. & Loan*, 651 F.2d 311, 319 (5th Cir. 1981) (finding 19 instances of actual confusion insufficient); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 639 (7th Cir. 1999) (concluding that evidence of only two consumers who were confused was "minimal" and did not prevent dismissal on summary judgment); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092–93 (10th Cir. 1999) (holding that seven examples of actual confusion was *de minimis*).

### ii.   Survey Evidence

"Although [the Eleventh Circuit] has noted a trend away from according great weight to survey evidence in cases such as this, . . . survey evidence can be probative on the actual confusion issue." *AmBrit*, 812 F.2d at 1544 n.68. Obviously, "survey evidence is circumstantial, not direct, evidence of the likelihood of confusion. Surveys do not measure the degree of actual confusion by real consumers making mistaken purchases." 6 McCarthy on Trademarks § 32:184. When it comes to survey results, there is no magic number that establishes a likelihood of confusion. *Id.* § 32:185. "A finder of fact has great latitude in determining the appropriate weight to accord particular evidence." *Id.*

As we've explained, VPX's survey purported to show a confusion rate of 28%. But, for the following reasons, we afford that survey no weight.

*First*, VPX's *Squirt*-style survey, conducted by Mr. Berger, departed from real-market conditions in a way that was both biased and misleading. The survey showed participants a computer-generated cooler containing three non-black cans and only two black cans (Bang and Reign)—lined up by their accenting colors. *See* Ex. P-2387-026. Set up this way, it's no wonder that some survey participants noticed a connection between Bang and Reign. But the evidence at trial confirmed the obvious: that the artificial coolers Mr. Berger showed his survey participants looked nothing like the coolers consumers would encounter in real stores. So, for instance, Mr. Berger conceded that he excluded other black cans from his survey (like Monster Energy and Rockstar), even though *those* drinks were, "[o]f course," more likely to be seen in stores next to Bang and Reign than the third-party drinks he used. *See* Tr. at 896:14–23. And, indeed, none of the images of real coolers the parties introduced into evidence resembled the suggestive coolers Mr. Berger invented. *See* Exs. D-507–20, D-535–50, D-575–83.

While we'd never allow a police lineup like this in a criminal case, we denied Monster's *Daubert* motion and allowed this suggestive survey to come in at our bench trial. *See* Omnibus Order [ECF No. 321]. Now, however—having heard from Mr. Berger and weighed all the evidence—we're in a better position to conclude that the survey was biased, misleading, unrealistic, and undeserving of any real weight. *See, e.g.*, *Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, 320 F. App'x 341, 348 n.4 (6th Cir. 2009) (minimizing the weight of a confusion survey because it "failed to mimic the purchase conditions"); *Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1126 (10th Cir. 1991) (affirming the district court's finding that the "survey did not show actual confusion because it failed to simulate decisions in the marketplace"); *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 660 (2d Cir. 1979) (finding that "the critical defect in this survey was the failure to conduct it under actual marketing

conditions"—and so the "district court's rejection of this survey evidence was not clearly erroneous"); 4 MCCARTHY ON TRADEMARKS § 23:2.50 (stating that a survey is only evidence of confusion if "the survey mirrors the real world setting which can create an instance of actual confusion").

*Second*, VPX's survey didn't employ a control and never calculated noise. "Courts have held that a survey that fails to use a control may be given less weight or even excluded from evidence altogether." 6 MCCARTHY ON TRADEMARKS § 32:187. "Noise is variability in judgments that should be identical," DANIEL KAHNEMAN, OLIVER SIBONY & CASS SUNSTEIN, NOISE: A FLAW IN HUMAN JUDGMENT 488 (2021)—such as when doctors diagnose a patient, judges deny bail, or (in our case) consumers assess whether two labels are confusingly similar. So, if some of the survey participants guessed because they were bored, answered incorrectly because they were being careless, or responded "no" to every question because they were hangry, these would be examples of noise. "These must be filtered out though control questions." 6 MCCARTHY ON TRADEMARKS § 32:187; *see also Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2018 WL 2087239, at *4 (M.D. Fla. May 4, 2018) ("With no control group and no legitimate control question, the Court cannot determine whether it was the infringing mark that was the source of confusion among respondents.").

Mr. Berger's survey employed no control group.[49] At trial, Mr. Berger insisted that he didn't need a control because (he said) a likelihood-of-confusion survey doesn't test causation. *See, e.g.*, Tr. at 924:8–18. But even his own book says that "[c]onsumer surveys in Lanham Act cases are testing for 'causality,' that is, they are trying to test for whether a given trademark or advertisement causes consumers to be confused or misled." BERGER, TRADEMARK SURVEYS IN THE AGE OF *DAUBERT* 147.

---

[49] This was in stark contrast to Monster's study, which showed a control group pictures of Reign cans with a significantly altered trade dress—all in an effort to determine whether (and how many) consumers would be confused by factors *unrelated* to the trade dress. *See* Tr. at 1477:17–1478:6.

Indeed, one federal judge has already cited Mr. Berger's unwillingness to deploy proper controls in excluding one of his *Squirt* surveys from trial. *See Black & Decker Corp. v. Positec USA Inc.*, 2017 WL 4010922, at *4 (N.D. Ill. Sept. 11, 2017) (excluding Mr. Berger's survey because, as here, "Mr. Berger admitted at trial that his survey was 'observational' and not directed at whether Defendants' trade dress caused the consumer confusion, which is the 'relevant issue' in this case"). Pressed on this point, Mr. Berger suggested that the third-party cans in his survey served as "internal" controls. *See* Tr. at 916:5–9. But he never seriously explained how that was so. Even if he had, however, he never calculated (or used) the noise he detected from those "internal" controls. His survey, in sum, is useless.

*Third*, Mr. Berger's testimony simply wasn't credible. On cross, Monster consistently—and successfully—impeached him with his deposition testimony. *See, e.g.*, Tr. at 897:3–14 (impeaching his trial testimony that he could not have used Monster Energy in his survey); *id.* at 989:5–23 (impeaching his trial testimony that he didn't include Rockstar in his survey because of certain criteria he'd invented); *id.* at 916:5–917:22 (impeaching his trial testimony that he used an internal control in his survey); *id.* at 921:14–922:19 (impeaching his trial testimony that he knew how to test noise in a one-control-group survey). This is just a tiny sample of the many major inconsistencies Monster identified in Mr. Berger's trial testimony. But we wouldn't be doing our job if we didn't add just one more example to this list: In his report, Mr. Berger *completely* miscalculated the likelihood-of-confusion number. *See* Tr. at 904:1–24. Using the wrong denominator, he concluded that the confusion rate was 56% when, even under his *very* flawed study, that figure was 28%. *Id.* What's worse, at trial, rather than admit this simple arithmetical mistake, Mr. Berger continued to defend his indefensible figure. *Id.* Even had Mr. Berger presented a more useful study, in other words, we likely wouldn't have believed what he had to say about his results.

\*        \*        \*

We have virtually no evidence of confusion. VPX's actual confusion witnesses were never *actually* confused. And VPX's survey—which probably should've been excluded before trial—was probative of absolutely nothing. Evidence of actual confusion, to be sure, "is not necessary to a finding of likelihood of confusion." *John H. Harland Co.*, 711 F.2d at 978. Still, the lack of any persuasive confusion evidence redounds to VPX's detriment. *See Hard Candy*, 921 F.3d at 1362 ("If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999))).

### h.    Balancing

Four of the likelihood-of-confusion factors—strength of the mark, similarity of product designs, intent to deceive, and evidence of actual confusion—favor Monster. Three favor VPX. Of course, we shouldn't apply this test mechanically—as if our trial had ended in a score of 4 – 3. Nor have we. Instead, having heard all the testimony, seen all the witnesses, and weighed all the evidence, we conclude that—on the whole—Reign's entry into the market isn't likely to confuse consumers. VPX, in short, has failed to meet its burden.

CONCLUSION

After a careful review of all the evidence, the Court hereby

**ORDERS AND ADJUDGES** as follows:

1. Final judgment shall be entered in favor of Monster and against VPX. VPX shall take nothing from this action. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter final judgment separately.

2. All pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**. This case shall remain **CLOSED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 3rd day of August 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record